1  SAMUEL R. MAIZEL (Bar No. 189301)
   samuel.maizel@dentons.com
2  TANIA M. MOYRON (Bar No. 235736)
   tania.moyron@dentons.com
3  DENTONS US LLP
   601 South Figueroa Street, Suite 2500
4  Los Angeles, California 90017-5704
   Telephone:  213 623 9300
5  Facsimile:   213 623 9924

6  JOSEPH R. LAMAGNA (Bar No. 246850)
   jlamagna@health-law.com
7  DEVIN M. SENELICK (Bar No. 221478)
   dsenelick@health-law.com
8  JORDAN KEARNEY (Bar No. 305483)
   jkearney@health-law.com
9  HOOPER, LUNDY & BOOKMAN, P.C.
   101 West Broadway, Suite 1200
10 San Diego, California 92101
   Telephone:  619 744 7300
11 Facsimile:   619 230 0987

12 *Proposed Attorneys for the Chapter 11*
   *Debtor and Debtor In Possession*

13

14           **UNITED STATES BANKRUPTCY COURT**

15           **SOUTHERN DISTRICT OF CALIFORNIA**

16 In re                                    | Case No. 22-02384-11

17 BORREGO COMMUNITY HEALTH         | Chapter 11 Case
   FOUNDATION, a California nonprofit
18 public benefit corporation,

19        Debtor and Debtor in Possession.

20 BORREGO COMMUNITY HEALTH         | Adv. Pro. No. 22-90056
   FOUNDATION, a California nonprofit
21 public benefit corporation,              | **EMERGENCY MOTION: (I) TO**
                                            | **ENFORCE THE AUTOMATIC STAY**
22              Plaintiff,                  | **PURSUANT TO 11 U.S.C. § 362; OR,**
                                            | **ALTERNATIVELY (II) FOR**
23     v.                                   | **TEMPORARY RESTRAINING**
                                            | **ORDER; MEMORANDUM OF**
24 CALIFORNIA DEPARTMENT OF          | **POINTS AND AUTHORITIES IN**
   HEALTH CARE SERVICES, by and           | **SUPPORT THEREOF; AND**
25 through its Director, Michelle Baass,    | **DECLARATIONS IN SUPPORT**
                                            | **THEREOF**
26              Defendant.
                                            | Judge: Honorable Laura S. Taylor
27                                          | Date: TBD
                                            | Time: TBD
28                                          | Place: TBD

*(left margin vertical text)* DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122384540\V-4

i

# **TABLE OF CONTENTS**

**Page**

EMERGENCY MOTION ....................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................... 6

I.  INTRODUCTION ......................................................................... 6

II.  STATEMENT OF FACTS ............................................................. 8

    A.  GENERAL BACKGROUND ................................................... 8

    B.  THE DEBTOR'S STATUS AS AN FQHC .............................. 10

    C.  PAYMENTS FOR DEBTOR'S SERVICES UNDER THE MEDI-CAL PROGRAM .......................................................... 12

    D.  THE FIRST MEDI-CAL SUSPENSION ................................. 13

    E.  THE SETTLEMENT AGREEMENT AND MONITOR RESOLVING THE FIRST MEDI-CAL SUSPENSION .............. 14

    F.  THE SECOND MEDI-CAL PAYMENT SUSPENSION ............ 17

    G.  THE MEDI-CAL SUSPENSION WILL CAUSE IRREPARABLE HARM TO THE DEBTOR, ITS PATIENTS AND THE ESTATE ................................................................. 19

III.  DISCUSSION .............................................................................. 22

    A.  DHCS HAS AND WILL VIOLATE THE AUTOMATIC STAY BY THE CONTINUED ENFORCEMENT OF ACTIONS AGAINST THE DEBTOR, THE PROPOSED SUSPENSION, WITHHOLDING REIMBURSEMENT, AND EXERCISING CONTROL OVER CONTRACTS WITH HEALTH PLANS ............ 22

        1.  Overview of the Automatic Stay and Request for Relief without Further Proceedings ........................................... 22

        2.  Basis for Relief under Section 362 of the Bankruptcy Code ..... 23

            a.  DCHS's Continuation of Actions Against the Debtor Violates the Stay and the Implementation of the Proposed Suspension of Medi-Cal Payments Would Violate the Automatic Stay ................................. 24

            b.  DHCS' Refusal to Pay the Debtor for "In House" Dental Services Violates the Automatic Stay ................. 25

            c.  DHCS Is Impermissibly Attempting to Terminate the Debtor's Contracts with the Health Plans ................. 26

        3.  Section 362(b)(4) Does Not Apply ............................................ 27

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122384540\V-4

4.      Conclusion .................................................. 29

B.      ALTERNATIVELY, A TEMPORARY RESTRAINING ORDER SHOULD BE ISSUED BECAUSE THE DEBTOR WILL SUFFER IMMEDIATE AND IRREPARABLE INJURY IF THE SUSPENSION IS ENFORCED ................................ 30

1.      The Debtor Is Likely to Succeed on the Merits ...................... 32

a.      The Automatic Stay Claims .............................. 32

b.      The Due Process Claim .................................. 33

2.      The Debtor Will Suffer Irreparable Harm from the Proposed Suspension ................................... 41

3.      Balance of Equities and Public Interest ...................... 45

IV.    CONCLUSION .................................................. 48

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iii

122384540\V-4

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alford v. Cnty. of San Diego*,
151 Cal.App.4th 16 (2007) ................................................................. 43

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
750 F.2d 17 1470, 1474 (9th Cir. 1985) ............................................. 45

*Barenfeld v. City of Los Angeles*,
162 Cal.App.3d 1035 (1984) .............................................................. 41

*Bracco v. Lackner*,
462 F. Supp. 436 (N.D. Cal. 1978) ..................................................... 43

*Carabetta Enters., Inc. v. City of Ashbury Park (In re Carabetta Enters., Inc.)*, 162 B.R. 399 (Bankr. D. Conn. 1993) ......................... 30

*Catricala v. State Personnel Bd.*,
42 Cal. App.3d 646 (1974) .................................................................. 34

*Computer Commc'ns, Inc. v. Codex Corp. (In re Computer Commc'ns, Inc.)*, 824 F.2d 725 (9th Cir. 1987) ................................................ 23

*Crespin v. Kizer*
226 Cal.App.3d 498 (1990) ................................................................ 43

*Do Sung Uhm v. Humana, Inc.*,
620 F.3d 1134 (9th Cir. 2010) ............................................................ 40

*In re Excel Innovations, Inc.*,
502 F.3d 1086 (9th Cir. 2007) ............................................................ 30

*In re Extraction Oil & Gas, Inc.*,
No. 20-11548 (CSS), 2020 WL 7074142 (Bankr. D. Del. Dec. 3, 2020) .......... 22

*In re First American Health Care, Inc.*,
208 B.R. 985 (Bankr. S.D. Ga. 1996) ................................................. 46

*Friends of the Wild Swan v. Weber*,
767 F.3d 936 (9th Cir. 2014) .............................................................. 31

*In re Fruehauf Trailer Corp.*,
444 F.3d 203 (3d Cir.2006) ................................................................ 24

*In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*,
567 B.R. 820 (Bankr. C.D. Cal. 2017) ............................................... 45

*Gruntz v. County of Los Angeles (In re Gruntz)*,
202 F.3d 1074 (9th Cir. 2000) ............................................................ 22

*Guzman v. Shewry*,
522 F.3d 941 (9th Cir. 2009) ........................................................ 17, 38

iv

122384540\V-4

*Habibi v. Barr*,
   445 F. Supp. 3d 990 (S.D. Cal. 2020) ...................................................30, 31, 45

*Harris v. Board of Supervisors*,
   366 F.3d 754 (9th Cir. 2004) ...................................................................43

*In re Healthmaster Home Health Care, Inc.*,
   Case No. 95-10548, Adv. Pro. 95-1031, 1995 WL 928920 (Bankr.
   S.D. Ga. Apr. 13, 1995) .................................................................46, 47

*Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*,
   997 F.2d 581 (9th Cir. 1993) ...................................................................27

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022) ...................................................................42

*Hunt v. Superior Court*,
   21 Cal.4th 984 (1999) .............................................................................43

*Indep. Living Ctr. Of S. Cal., Inc. v. Maxwell-Jolly*,
   572 F.3d 644 (9th Cir. 2009) ...................................................................41

*K–Mart Corp. v. Oriental Plaza, Inc.*,
   875 F.2d 907 (1st Cir.1989) ...................................................................42

*Krystal Cadillac Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*
   *(In re Krystal Cadillac Oldsmobile GMC Truck, Inc)*, 142 F.3d 631
   (3d Cir. 1998) ..........................................................................................26

*Lackner v. St. Joseph Convalescent Hospital, Inc.*,
   106 Cal. App.3d 542 (1980) ...................................................................38

*Leiblein v. Shewry*
   137 Cal. App.4th 700 (2003) .............................................................37, 38

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
   571 F.3d 873 (9th Cir. 2009) ...................................................................31

*Mastrovincenzo v. City of N.Y.*,
   435 F.3d 78 (2d Cir. 2006) ...................................................................31

*Medicar Ambulance Co., Inc. v. Shalala (In re Medicar Ambulance*
   *Co., Inc.)*, 166 B.R. 918 (Bankr. N.D. Cal. 1994).....................24, 27, 28, 29, 32

*In re Minoco Grp. of Cos., Ltd.*,
   799 F.2d 517 (9th Cir. 1986) ...................................................................26

*NLRB v. Superior Forwarding, Inc.*,
   762 F.2d 695 (8th Cir. 1985) ...................................................................30

*Oak Park Health Ctr., LLC v. Johnson*,
   No. 09 CV 217, 2009 WL 331563 (E.D. La. Feb. 10, 2009) ...........................44

*Pathfinder Healthcare, Inc. v. Thompson*,
   177 F. Supp. 2d 895 (E.D. Ark. 2001) ...................................................43

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

*In re Public Serv. Co. of N.H.,*
   884 F.2d 11 (1st Cir. 1989) ......................................................................26

*Ridgeview Manor of the Midlands, L.P. v. Leavitt,*
   No. 3:07-cv-861, 2007 WL 1110915 (D.S.C. Apr. 9, 2007) ...........................44

*Robbins v. Superior Court,*
   38 Cal.3d 199 (1985) .............................................................................41

*Ross-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of N.Y.,*
   *Inc.,* 749 F.2d 124 (2d Cir. 1984) ..........................................................45

*S.E.C. v. G.C. George Sec., Inc.,*
   637 F.2d 685 (9th Cir. 1981) ...............................................17, 30, 40, 43

*Sacramento Homeless Union v. Cnty. of Sacramento,*
   No. 222CV01095TLNKJN, 2022 WL 3019735 (E.D. Cal. July 29, 2022).......45

*Segal v. Rochelle,*
   382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966) .................................25

*Sullivan v. Town & Country Home Nursing Servs., Inc. (In re Town &*
   *Country Home Nursing Servs., Inc.),* 963 F.2d 1146 (9th Cir. 1991) ...............40

*TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc.,*
   913 F.2d 676 (9th Cir. 1990) .................................................................26

*Tri-State Generation & Transmission Assoc., Inc. v. Shoshone River*
   *Power, Inc.,* 805 F.2d 351 (10th Cir. 1986) ............................................46

*True Health Diagnostics LLC v. Alex M. Azar et al. (In re THG*
   *Holdings LLC),* 604 B.R. 154 (Bankr. D. Del. 2019) ..........23, 24, 25, 28, 29, 32

*Vencor Nursing Or., L.P. v. Shalala,*
   63 F. Supp.2d 1 (D.D.C. 1999)...............................................................43

**Statutes**

11 U.S.C. § 101.......................................................................................23

11 U.S.C. § 105...............................................................................1, 7, 30

11 U.S.C. § 362.......................................1, 3, 7, 22, 23, 24, 25, 27, 30

11 U.S.C. § 362(a)(3) .........................................................................24, 26

11 U.S.C. § 541...............................................................................24, 26, 27

11 U.S.C. §§ 1107 and 1108 ....................................................................9

28 U.S.C. § 2201, *et seq.*.........................................................................22

42 U.S.C. § 254.....................................................................................10, 11

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122384540\V-4

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

42 U.S.C. § 1396 ..................................................................................... 10, 47

California. Code. Regulations §§ 50000-59999 ........................................ 12

California Welfare and Instutions Code §§ 14000, et seq. ......................... 12

California Welfare and Institutions Code § 14107.11 .......................... 13, 32, 33, 37

California Welfare and Instituions Code § 14171 ..................................... 37

California Welfare and Institutions. Code § 14184.200 ............................ 47

California Health and& Safety. Code §1367.03 ........................................ 48

Medi-Cal Act ............................................................................................. 12

Social Security Act. Title XIX 42 U.S.C. §§ 1396, *et seq.* ...................... 11

**Other Authorities**

22 C.C.R §§ 51016 et seq. ......................................................................... 37

22 C.C.R. §§ 53000, et seq. ....................................................................... 12

28 C.C.R. § 1300.67.1 ............................................................................... 12

28 C.C.R., § 1300.67.2 .......................................................................... 47, 48

42 C.F.R. § 431.107 ................................................................................... 12

42 C.F.R. § 438.66 ..................................................................................... 47

42 C.F.R. § 455.23 .......................................................................... 13, 17, 33

42 Code of Federal Regulations § 51c.303(e), (f) ..................................... 11

76 Fed. Reg. 5861, 5934 ............................................................................ 35

Code of Federal Regulations, Title 42, § 455.23(e) ................................. 35

Fed. R. Bankr. P.  1007(d) .......................................................................... 4

Fed. R. Bankr. P. 2002(i) ............................................................................ 4

Fed. R. Bankr. P. 7001(7) ....................................................................... 1, 4

Fed. R. Bankr. P. 7001(9) .......................................................................... 22

Fed. R. Bankr. P. 7065 ................................................................................. 4

Fed. R. Bankr. P. 7004(b)(6) and 9013 ...................................................... 4

Fed. R. Bankr. P. 7065 ............................................................................... 30

Fed. R. Civ. P. 65(b)(1) ............................................................................. 30

122384540\V-4

Fed. R. Civ. P. 4(j) ................................................................................. 4

Fed. R. Evid. 201(b) ............................................................................... 4

Local Bankruptcy Rule 7065 .................................................................. 1

Local Bankruptcy Rule 9013-9 ............................................................... 1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122384540\V-4

1

## **EMERGENCY MOTION**

Pursuant to §§ 105(a) and 362 of title 11 of the United States Code (the "Bankruptcy Code") and Local Bankruptcy Rule 9013-9, or, alternatively, Rule 65 of the Federal Rules of Bankruptcy Procedure, made applicable by 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Bankruptcy Rule 7001(7), and Local Bankruptcy Rule 7065,[1] Borrego Community Health Foundation (the "Debtor" or "Borrego"), the debtor and debtor in possession in the above-captioned chapter 11 case (the "Case") and plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), hereby moves, on an emergency basis (the "Motion"): (1) for the entry of an order (substantially in the form attached hereto as **Exhibit "A,"** the "Proposed Order") enforcing the automatic stay to prevent the California Department of Health Care Services, acting by and through its director Michelle Baas (collectively, "DHCS"), from suspending all Medi-Cal payments and taking other related acts; or, alternatively; (2) for the entry of order restraining and enjoining (substantially in the form attached hereto as **Exhibit "B,"** the "TRO") DHCS from causing immediate and irreparable harm to the Debtor, its estate, and thousands of patients by suspending all Medi-Cal payments and taking other related acts which will, inevitably, cause the Debtor to close its clinics and cease providing essential medical services to low income and rural patients in Southern California.

In support of this Motion, the Debtor respectfully submits the Declarations of Rose MacIsaac and Samuel R. Maizel (annexed hereto) and the Declaration of Dr. Jacob Nathan Rubin (filed concurrently herewith) (collectively, the "Declarations"). Additionally, the Debtor respectfully submits declarations and statements from patients, clinic managers, community advocates for the elderly, LGBTQ+, and Latinx communities, the Borrego Springs Fire Department, and the

---

[1] All references to "§" or "sections" herein are to sections of the Bankruptcy Code unless otherwise stated.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

Borrego Springs Unified School District, District, all demonstrating that the public interest is best served by ensuring that the Debtor continues to be able to provide patient care. The Debtor also relies on the *Declaration of Isaac Lee, the Debtor's Chief Restructuring Officer of Borrego Community Health Foundation, in Support of Debtor's First Day Motions* (the "Lee First Day Declaration") [Docket No. 7].

## BACKGROUND INFORMATION

On September 12, 2022, the Debtor filed the voluntary petition for relief under chapter 11 of the Bankruptcy Code. On September, 26, 2022, the Debtor filed the complaint against DHCS [Adv. Docket No. 1][2] (the "Complaint"), which commenced the Adversary Proceeding.

The Debtor is a nonprofit federally qualified health center ("FQHC") that provides health care services to low income and rural patients (collectively, "Patients") in San Diego and Riverside Counties through a system of eighteen clinics, two pharmacies, and six mobile units. In 2021, the Debtor provided approximately 386,000 patient care visits to over 94,000 patients. Borrego's services include comprehensive primary care, urgent care, behavioral health, dental services, specialty care, transgender health, women's health, prenatal care, veteran's health, chiropractic services, tele-health, and pharmacy.

As set forth in the Lee First Day Declaration, the Debtor filed this Case to protect its patient population and explore all available restructuring options, particularly since its patient population faces risks as a result of recent steps taken by DHCS. DHCS administers the California Medicaid Program, which is called "Medi-Cal." Medi-Cal pays approximately 44% of the Debtor's revenue. Lee First Day Declaration, at ¶ 16. On August 26, 2022, DHCS notified the Debtor that its Medi-Cal payments would be suspended as of September 29, 2022. DCHS denied the

---

[2] References to the "Adv. Docket No. __" are to this Adversary Proceeding and references to "Docket No. __" are to the Debtor's Case.

122384540\V-4

1   Debtor's request to extend the date or rescind the proposed suspension. Lee First Day

2   Declaration, at ¶ 30. Further, the Debtor has been notified by health plans contracted

3   with the Debtor, such as the Inland Empire Health Plan, that DCHS instructed them

4   (i) to lodge "block transfer" plans with DHCS showing how the health plan would

5   transfer all its insured patients to other providers of medical services, and (ii) not to

6   assign new patients to the Debtor, despite contracts between the health plans and the

7   Debtors. Lee First Day Declaration, at ¶ 30. These acts, if allowed to proceed, will

8   result in the almost immediate shut-down of operations by the Debtor. *See id.*, at

9   ¶¶ 30-31.

10              **SUMMARY OF RELIEF REQUESTED**

11         The enforcement and the implementation of the suspension violate the

12   automatic stay, would cause irreparable harm to the Debtor, and would put tens of

13   thousands of patients at risk, so the Debtor is moving on an emergency basis for a

14   determination that the automatic stay applies, or, alternatively, issuance of a

15   temporary restraining order to prevent the imposition of the suspension pending

16   further review by the Court.

17         Specifically, the Debtor seeks a ruling, among other things, that: (i) DHCS'

18   enforcement of its decision set forth in its prepetition letter, dated August 19, 2022,

19   to suspend all payments under Medi-Cal to the Debtor effective September 29,

20   2022, is a violation of the automatic stay under §§ 362(a)(1), (3), and (6);

21   (ii) DHCS' ongoing withholding of payments for in-house dental services is a

22   violation of the automatic stay because it constitutes an act to take possession of

23   property of the estate or from the estate, exercise control over property of the estate,

24   or to collect, assess, or recover a claim against the Debtor that arose prepetition

25   under §§ 362(a)(3) and (6); and (iii) DHCS' efforts to compel parties that have

26   contracts with the Debtor, including health plans such as Inland Empire Health

27   Plan, to block transfer patients from the Debtor and refuse to assign new patients

28   to the Debtor, are violations of the automatic stay because they constitute acts to

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122384540\V-4

take possession of property of the estate or from the estate, exercise control over property of the estate, and to collect, asses, or recover a claim against the Debtor that arose prepetition under §§ 362(a)(3), and (6). Alternatively, the Debtor seeks the entry of a temporary restraining order, pursuant to Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure, enjoining or restraining DHCS from continuing with its suspension of Medi-Cal payments.

## **ADDITIONAL INFORMATION**

The Motion is based on the annexed Memorandum of Points and Authorities (the "Memorandum") and the Declarations filed in support thereof, and the arguments of counsel and other admissible evidence properly brought before the Court at or before the hearing regarding the Motion. In addition, the Debtor requests that the Court take judicial notice of all documents filed with the Court in this Case, pursuant to Federal Rule of Evidence 201(b).

In accordance with LBR 9013-9(d), Bankruptcy Rules 7004(b)(6) and 9013, and Federal Rule of Civil Procedure 4(j), the Debtor will serve this Motion, the attached Memorandum of Points and Authorities, the Declarations, any notice of hearing, and all supporting papers on, and has provided telephonic notice, pursuant to 9013-9(f) to: (i) the Office of the United States Trustee; (ii) the Attorney General of California; (iii) DHCS, its director Michelle Baas, and its counsel; and (iv) the California Health and Human Services Agency and its Secretary, Mark Ghaly. The Debtor has further served by overnight delivery: (i) any alleged secured creditors; (ii) the twenty largest general unsecured creditors appearing on the list filed in accordance with Bankruptcy Rule 1007(d); and (iii) parties that filed with the Court and served upon the Debtor requests for notice of all matters in accordance with Bankruptcy Rule 2002(i).

In accordance with Bankruptcy Rule 7065 and LBR 7065-1, the Debtor has: (i) commenced the Adversary Proceeding before filing this Motion and Memorandum; (ii) attached a form of Proposed Order and TRO; and (iii) attached

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

the declaration evidencing service of the document.

Pursuant to LBR 9013(f), any party who opposes the Motion must immediately notify the Bankruptcy Judge's law clerk of its position by telephone. Written opposition to the emergency motion is not required to be filed unless the Court otherwise directs.

In the event the Court grants the relief requested by the Motion, the Debtor shall provide notice of the entry of the order granting such relief upon each of the foregoing parties and any other parties in interest as the Court directs. The Debtor submits that such notice is sufficient and that no other or further notice be given.

## CONCLUSION

**WHEREFORE**, for all the foregoing reasons and such additional reasons as may be advanced at or prior to the hearing regarding this Motion, the Debtor respectfully requests that the Court enter an order: (i) holding that the automatic stay applies to the suspension threatened by DHCS, as set forth above, and entering the Proposed Order; or, in the alternative, (ii) issuing a TRO to prevent the suspension from going into effect pending further review by the Court; and (iii) granting such other and further relief as is just and proper under the circumstances.

Dated: September 26, 2022            DENTONS US LLP
                                     SAMUEL R. MAIZEL
                                     TANIA M. MOYRON

                                     By: */s/ Tania M. Moyron*
                                     Proposed Attorneys for the Chapter 11
                                     Debtor and Debtor In Possession

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122384540\V-4

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Borrego Community Health Foundation (the "Debtor") is a Federally Qualified Health Center ("FQHC") operating a network of community clinics that provide a broad array of comprehensive primary care, urgent care, behavioral health, dental services, specialty care, transgender health, women's health, prenatal care, veteran's health, chiropractic services, tele-health, and pharmacy services. The Debtor provides these services throughout parts of Southern California that the federal government formally recognizes as medically underserved areas (collectively, "MUAs" and each a "MUA"). The Debtor is a significant part (if not the only part) of the health care "safety net" in the communities in which it operates. Since the Debtor's focus is providing care in underserved areas, the majority of the Debtor's patients are Medi-Cal beneficiaries without meaningful access to other similar health care. The Department of Health Care Services and its director (the "Director") Michelle Baass (collectively, "DHCS") has notified the Debtor that Borrego will have all payments by the Medi-Cal program suspended, effective September 29, 2022. DHCS has inside knowledge of the Debtor's operations and finances. As DHCS knows, Medi-Cal payments represent a significant percentage of the Debtor's revenue. Despite the requirement that such a suspension be temporary, for the reasons set forth herein, this suspension will be the equivalent of a "death penalty" for the Debtor, to the detriment of its creditors and, importantly, its patients.

In response to this threat by DHCS, the Debtor commenced the Case to, among other things, obtain the protection of the automatic stay, protect its patient population, and explore all available restructuring options. However, despite being fully aware of the commencement of the Case and the imposition of the automatic stay, DHCS has told counsel for the Debtor that the suspension will go into effect on September 29, 2022. DHCS is taking this extraordinary step despite the fact that: (1) the actions that give rise to alleged fraud by the Debtor ceased years ago, and DHCS has knowledge

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

of this; (2) DHCS is closely watching the Debtor and its operations, including through a full-time monitor embedded within the Debtor; and (3) the Debtor has at all times been in substantial compliance with the conditions of its continued operation, as set forth in the written settlement agreement between DHCS and the Debtor, dated January 26, 2021. To avoid the destruction of the Debtor's medical treatment system, causing immediate and irreparable harm to it, as well as to tens of thousands of patients, the Debtor is compelled to seek emergency relief.

As the suspension and other acts by DHCS set forth below violate the automatic stay under § 362 of title 11 of the United States Code (the "Bankruptcy Code"), as well as the Debtor's due process rights, and would create irreparable harm, the Motion seeks an order, pursuant to §§ 105 and 362, ruling that: (i) DHCS' enforcement of its decision set forth in its prepetition letter dated August 19, 2022, to suspend all payments under Medi-Cal to the Debtor effective September 29, 2022, is a violation of the automatic stay under §§ 362(a)(1), (3), and (6); (ii) DHCS' ongoing withholding of payments for in-house dental services is a violation of the automatic stay because it constitutes an act to take possession of property of the estate or from the estate, exercise control over property of the estate, or to collect, assess, or recover a claim against the Debtor that arose prepetition and is in violation of §§ 362(a)(3) and (6); and (iii) DHCS' efforts to compel parties that have contracts with the Debtor, including health plans such as Inland Empire Health Plan (collectively, the "Health Plans" and each a "Health Plan"), to block transfer patients from the Debtor and refuse to assign new patients to the Debtor, are violations of the automatic stay because they constitute acts to take possession of property of the estate or from the estate, exercise control over property of the estate, or to collect, asses, or recover a claim against the Debtor that arose prepetition in violation of §§ 362(a)(3), and (6).  Alternatively, the Debtor seeks the entry of a temporary restraining order, pursuant to Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Rules (the "Bankruptcy Rules"), enjoining or restraining

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

7

DHCS from continuing with its suspension of Medi-Cal payments.

In support of the Motion, the Debtor respectfully submits the declarations of Rose MacIsaac (the "MacIsaac Declaration"), Samuel R. Maizel (the "Maizel Declaration," annexed hereto with the MacIsaac Declaration), and the Declaration of Dr. Jacob Nathan Rubin (the "PCO Declaration") (filed concurrently herewith), the Patient Care Ombudsman appointed in this Case. Additionally, the Debtor respectfully submits declarations and statements (collectively, the "Community Declarations") from patients; clinic managers; community advocates for the elderly, LGBTQ+, and Latinx communities; the Borrego Springs Fire Department; and the Borrego Springs Unified School District, District, all demonstrating that the public interest is best served by ensuring that the Debtor continues to be able to provide patient care. The Debtor also relies on the *Declaration of Isaac Lee, the Debtor's Chief Restructuring Officer of Borrego Community Health Foundation, in Support of Debtor's First Day Motions* (the "Lee First Day Declaration") [Docket No. 7].

## II.    STATEMENT OF FACTS

### A.    GENERAL BACKGROUND

1.    On August 26, 2022, DHCS notified the Debtor that its Medi-Cal payment would be suspended as of September 29, 2022. Lee First Day Declaration, at ¶ 30. DCHS denied the Debtor's request to extend the date or rescind the proposed suspension. *Id.*

2.    On September 12, 2022 ("Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor filed this Case to protect its patient population and explore all available restructuring options, particularly since its patient population faces material risks as a result of the threatened suspension. Lee First Day Declaration, at ¶ 31.

3.    The Debtor is a nonprofit FQHC providing high-quality, comprehensive, compassionate primary health care to the people in its communities, regardless of their ability to pay, by partnering with licensed medical professionals across Southern

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

California. Lee First Day Declaration, at ¶ 10. In 2021, the Debtor provided approximately 386,000 patient care visits to over 94,000 patients. Lee First Day Declaration, at ¶ 12. The Debtor did so through its operation of 18 clinics, primarily in underserved desert and inland communities throughout San Diego, Riverside, and—until recently—San Bernardino counties. The Debtor provides essential services in family practice, pediatrics, OB/GYN, internal medicine, urgent care, HIV/Hepatitis C and Covid-19-related testing and vaccinations to over 94,000 patients, most of whom cannot obtain affordable comprehensive primary care from other sources. *Id.* at ¶ 10. The Debtor specializes in culturally-competent care for a number of specialized populations, including care for migrant farmworkers and the LGBTQ and transgender communities. *Id.* at ¶ 13. During the recent pandemic, the Debtor tested tens of thousands of Californians for Covid-19 infections and vaccinated tens of thousands of people against Covid-19. The Debtor's continued operation is in the public interest—indeed, its very designation as an FQHC demonstrates as much—and, despite the harm it has suffered and the way it has been manipulated by its former executives and trustees, it delivers high-quality health care to people who need it.

4.  The Debtor's services also include comprehensive primary care, urgent care, behavioral health, dental services, specialty care, transgender health, women's health, prenatal care, veteran's health, chiropractic services, tele-health, and pharmacy. *Id.* at ¶ 14. Additional background regarding the Debtor, including an overview of the Debtor's business and additional events leading up to this Case, is set forth in the Lee First Day Declaration.

5.  Since the commencement of the Case, the Debtor has been operating its business as debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

6.  On September 16, 2022, the Office of the United States Trustee appointed Dr. Jacob Nathan Rubin as the Patient Care Ombudsmen (the "PCO").

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

9

7. On September, 26, 2022, the Debtor filed the complaint against DHCS, which commenced this Adversary Proceeding.

8. To date, no official committee or examiner has been appointed in this Case by the Office of the United States Trustee.

**B. THE DEBTOR'S STATUS AS AN FQHC**

9. As set forth above, the Debtor is a nonprofit 501(c)(3) FQHC, which is a health care provider that is located in a medically underserved area (an "MUA") or that serves a "special medically underserved population comprised of migratory and seasonal agricultural workers, the homeless, and residents of public housing." 42 U.S.C. §§ 1396(1)(2)(B) & 254b(a)(1). Only certain public and nonprofit private entities who furnish health care services to medically underserved populations may qualify as FQHCs. 42 U.S.C. § 254b(c)(1). In order to be designated as an FQHC and receive federal grant funding, an entity must submit an application to United States Department of Health & Human Services - Health Resources and Services Administration ("HRSA") that includes extensive information about, among other things, the demographics of the patient population in the area served by the entity, how the entity plans to furnish mandated types of care to the medically underserved population, how the entity plans to potentially expand access to care in its service areas, and how the entity will ensure that patients who speak languages other than English can be adequately served in a culturally sensitive manner. 42 U.S.C. § 254b(j)(5).

10. FQHCs constitute a Congressionally-created health care "safety net" for people with no insurance coverage and/or little or no income, and continued operation of the Debtor as an FQHC is in the public interest. To elaborate, FQHCs are required by statute to offer a number of specified, core primary care services, including without limitation health services related to family medicine, pediatrics, obstetrics, as well as diagnostic laboratory and radiologic services and several types of preventive health services. 42 U.S.C. § 254b(b)(1). FQHCs also may offer certain "additional health

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

services," like behavioral health and substance abuse treatment, upon obtaining approval from HRSA. 42 U.S.C. § 254b(b)(2). FQHCs are required to make services available to people residing in the MUA they service regardless of ability to pay. To this end, FQHCs must maintain a set fee schedule to which they can adjust based on and individual's specific financial situation and are prohibited from denying services to anyone solely because the person cannot pay for the care even if a discount is offered. 42 U.S.C. § 254b(k)(3)(G).

11.    Through a combination of federal statues, regulations and a "Compliance Manual" promulgated by HRSA, FQHCs are subject to extensive requirements regarding, among other things, clinical staffing, hours of operations and locations, quality improvement measures, management, contracting, sub-awards and entity governance.[3] HRSA policies also state that FQHCs are responsible for complying with all applicable state licensing laws and coverage and payment rules imposed by any government health care benefit programs, such as Medicare and Medicaid. Along those lines, in order to maximize third-party reimbursement revenue, FQHCs also are expected to make "every reasonable effort" to enroll in state Medicaid programs and be able to bill and collect payment for services from such programs. 42 U.S.C. § 254(k)(3)(e); *see also* 42 Code of Federal Regulations ("C.F.R.") § 51c.303(e), (f). Once an entity is approved as an FQHC and to receive federal grant funding, the entity remains subject to extensive supervision by HRSA, including through regular audits, known in HRSA parlance as "Operational Site Visits" or "OSVs," to ensure the entity is complying with federal rules and grant conditions. In addition, as a general matter, HRSA actively monitors individual FQHCs and the MUAs they serve to ensure that people residing in MUAs have adequate access to care.

---

[3] *See generally* HRSA, Bureau of Primary Health Care, "Health Center Compliance Manual" available at https://bphc.hrsa.gov/compliance/compliance-manual (last visited September 22, 2022).

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

## C.    PAYMENTS FOR DEBTOR'S SERVICES UNDER THE MEDI-CAL PROGRAM

12.    The Medi-Cal program is California's implementation of the federal Medicaid program, a joint federal and state program for rendering health care services to the needy and disabled under Title XIX of the Social Security Act. 42 U.S.C. §§ 1396, *et seq.* California has enacted the Medi-Cal Act to implement Medi-Cal. Welf. & Inst. Code §§ 14000, *et seq.* In addition to statutory constraints, the Medi-Cal program is subject to extensive regulation. *See* 22 Cal. Code. Regs. ("C.C.R.") §§ 50000-59999.) Among other things, these regulations and statutes create an administrative framework, determine beneficiary eligibility, and establish the delivery system for certain beneficiaries and services. DHCS is the single state agency charged with administering Medi-Cal.

13.    In order for FQHCs like the Debtor to be paid for services furnished to Medi-Cal beneficiaries, they must enter into agreements with state Medicaid agencies like DHCS. *See* 42 C.F.R. § 431.107(b). Once providers enter into such agreements with a Medicaid agency, they are considered "enrolled" in the program and then may submit bills to the program to claim payment for services rendered to beneficiaries of the program. DHCS is responsible for processing Medi-Cal provider enrollment applications and, once a provider is enrolled in the Program, monitoring provider compliance with program rules.

14.    There are both "fee-for-service" and managed care components of California's Medi-Cal program. Under the managed care component, commercial health plans contract with DHCS to administer medical benefits to patients who enroll in particular managed care programs. *See generally* 22 C.C.R. §§ 53000, *et seq.* Medi-Cal managed care plans are subject to special rules about maintaining an adequate network of providers to ensure beneficiary access to services, communications with contracted providers and communications with managed care enrollees. *See id.* Among other requirements, all such health plans must see to it that care within their

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

service area is delivered in a manner which provides continuity of care. 28 C.C.R. § 1300.67.1. Under both Medicaid managed care rules and more general managed care rules, health plans are charged with protecting beneficiary access to care and improving the overall care experience of managed care enrollees. The Medi-Cal managed care programs that contracted with the Debtor are referred to herein as the "Health Plans."

15.    Pursuant to California Welfare and Institutions Code § 14107.11, the Director may suspend making payments to a provider if there are "credible allegations of fraud" against the provider, unless it is determined that a "good cause" exception applies. Cal. Welf. & Inst. Code § 14107.11(a). Under § 14107.11, DHCS has the duty to evaluate the appropriateness of a suspension based on whether there is good cause. *See* Cal. Welf. & Inst. Code § 14107.11(a). What constitutes good cause is established by a federal Medicaid regulation specifically incorporated by reference into the California statute. Particularly relevant for the present case, that federal regulation states that "good cause" is present when beneficiary access to items or services may be jeopardized because the provider serves a large number of "beneficiaries within a HRSA designated medically underserved area." 42 C.F.R. § 455.23(e)(4)(ii).

## D.    THE FIRST MEDI-CAL SUSPENSION

16.    On October 20, 2020, the California Department of Justice ("DOJ"), Division of Medi-Cal Fraud and Elder Abuse ("DMFEA"), executed search warrants at two of the Debtor's administrative offices. MacIsaac Declaration, at ¶ 9. The DOJ had been previously scheduled to meet at the Debtor's offices that day for a meeting where the Debtor was going to voluntarily present its concerns regarding dental providers contracted with it. *Id.*

17.    Thereafter, by letter, dated November 18, 2020, the Debtor was advised that DHCS was temporarily suspending the Debtor's Medi-Cal provider numbers, pursuant to Welfare and Institutions Code § 14107.11 and 42 C.F.R. § 455.23,

effective that same day, due to an ongoing investigation by the DMFEA. MacIsaac Declaration, at ¶ 10. A suspension of a provider number has the effect of preventing a provider from being paid for services provided to Medicaid beneficiaries.

18.     The Debtor appealed the temporary suspension through a meet-and-confer process. MacIsaac Declaration, at ¶ 11. The Debtor and its representatives met with DHCS and explained how a narrowly-tailored payment suspension would be more appropriate than an outright suspension of all payments and how there was good cause to permit the Debtor to continue to operate because, among other reasons, was delivering services to MUAs by HRSA. *Id.*

19.     A short time later, by letter dated January 29, 2021, DHCS notified the Debtor that it was modifying the payment suspension to apply to dental claims only. MacIsaac Declaration, at ¶ 12. DHCS was able to narrowly draw the suspension, because the only area under investigation was the Debtor's contract dental services where the Debtor contracted with area dentists who were not employed by the Debtor to provide dental services on behalf of the Debtor and for its patients. *Id.*

20.     While the payment suspension was in place from November 18, 2020 until January 29, 2021, DHCS retained approximately $15,000,000 in billed services that would otherwise have been payable to the Debtor. MacIsaac Declaration, at ¶ 13. The modified payment suspension for dental claims has remained in place at all times since the November 18, 2020, and it still in place today. Despite this, and in order to further its charitable mission, the Debtor has continued to provide dental services despite the payment suspension, because patients desperately need the services.

21.     The Debtor estimates that DHCS has withheld at least an additional $6,700,000 dollars owed for dental claims since the suspension went into effect prepetition. MacIsaac Declaration, at ¶ 14.

**E.     THE SETTLEMENT AGREEMENT AND MONITOR RESOLVING THE FIRST MEDI-CAL SUSPENSION**

22.     The Debtor executed a formal settlement agreement with DHCS on

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

January 27, 2021 (the "Settlement Agreement"). MacIsaac Declaration, at ¶ 15. The Debtor had no option other than to sign the Settlement Agreement and no substantive terms were negotiable. *Id.* There was no meaningful opportunity to avoid a temporary suspension without acceding to DHCS' demands. *Id.* The Settlement Agreement required the Debtor to retain an independent monitor. *Id.* DHCS selected Berkely Research Group ("BRG") as the compliance consultant or monitor. Without any viable alternative or an option to refuse, the Debtor acquiesced and retained BRG pursuant to the Settlement Agreement. *Id.*

23.      Nonetheless, the Debtor worked diligently with BRG and DHCS to improve the Debtor's quality and operations, including billing and compliance. Despite the Debtor's best efforts, BRG's subsequent reports resulted in DHCS demanding the Debtor execute two separate Corrective Action Plans ("CAPs") that were drafted by BRG, were not negotiable, and the Debtor had to accept the continuation of a partial temporary suspension. MacIsaac Declaration, at ¶ 17. Any refusal would have resulted in a full payment suspension, thereby putting the Debtor out of business.

24.      The Debtor diligently endeavored to comply with the Settlement Agreement and CAPs. MacIsaac Declaration, at ¶ 18. It substantially and materially complied with the terms of the agreements. DHCS' asserted ability to reimpose the full payment suspension at any time meant that the Debtor had no meaningful opportunity to resist DHCS and BRG, even when their allegations were flawed or based on misinterpretations. *Id.* BRG and DHCS imposed a standard of performance on the Debtor that is not only unattainable, but not legally required to participate in Medi-Cal. *Id.*

25.      Regardless, the Debtor made great strides and performed what was necessary to comply with the Settlement Agreement and CAPs. MacIsaac Declaration, at ¶ 18. The performance was such that in the summer of 2022 the Debtor concluded that the Monitor and BRG were no longer appropriate and that DHCS

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

should further tailor the payment suspension to apply only to <u>contract</u> dental claims; in other words, DCHS should start paying for dental claims provided by the Debtor itself. *Id.*

26.    During the suspension, the Debtor has provided 30,347 dental visits that were uncompensated. MacIsaac Declaration, at ¶ 20. These services were provided through an in-house program entirely disconnected from the contract dental program under investigation, and to date the Debtor is aware of no allegation of fraud with this program.

27.    Thus, in May 2022, the Debtor requested that DHCS meet with it to discuss further modifying the payment suspension to permit payment of in-house dental claims and to consider whether the Monitor and BRG, which was extremely expensive and paid for by the Debtor (fees for BRG to date exceed $2.6 million), were still necessary. MacIsaac Declaration, at ¶ 21. DHCS and the Debtor met on July 7, 2022, and DHCS requested that, within two weeks, the Debtor submit any documentation to support its position that the Debtor's performance under the Settlement Agreement and CAPs was sufficient. *Id.* at ¶ 21. On July 22, 2022, the Debtor submitted voluminous documentation in response to DHCS' areas of identified concerns under the Settlement Agreement, CAPs, and other areas that DHCS and the Monitor identified at the July 7, 2022 meeting. *Id.* at ¶ 23. The Debtor followed up several times with the Department on the written submission, including asking for DHCS to agree to proposed audit methodologies, and to address open areas under the Settlement Agreement and CAPs. *Id.* By way of example, the Settlement Agreement called for the Debtor to conduct an internal audit of contracted dental claims that were billed to DHCS. The Debtor proposed a sampling and extrapolation methodology that was in conformity with state auditing standards, but DHCS would not respond with any feedback, much less any approval. *Id.*

28.    The purpose of the audit was to inform DHCS of any potential overpayment amount impacted by contract dental. MacIsaac Declaration, at ¶ 24.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

16

1    Such work calculating an overpayment amount would be useless, if DHCS did not
2    agree with the audit methodology. *Id.* However, neither BRG nor DHCS approved
3    the audit plans, and the Debtor could not perform the audit. Multiple written requests
4    for feedback have been entirely ignored. *Id.*

5    **F.    THE SECOND MEDI-CAL PAYMENT SUSPENSION**

6        29.    On August 19, 2022, DHCS provided two separate letters to the Debtor's
7    CEO. The first letter was from Bruce Lim, DHCS' Deputy Director. The letter from
8    Mr. Lim explained that DHCS did not find the Debtor's written submission
9    persuasive, and stated, in relevant part, that DHCS was going to reimpose a 100%
10    Medi-Cal suspension on all the Debtor's services effective September 29, 2022. *See*
11    MacIsaac Declaration, at ¶ 5; Lee First Day Declaration, at ¶ 30.

12        30.    In a separate letter stamped "CONFIDENTIAL," Bob Sands, Assistant
13    Deputy Director for DHCS, provided additional notice of the temporary suspension
14    for the same reasons alleged in Mr. Lim's letter, clearly intended to comply with
15    federal law, including 42 C.F.R. §455.23.[4] MacIsaac Declaration, at ¶ 26.

16        31.    The Debtor is also informed and believes that DHCS (i) provided the
17    August 19, 2022 letter to health plans whose beneficiaries are assigned to the Debtor
18    pursuant to contracts between the Debtor and those health plans, and (ii) demanded
19    the health plans establish a plan to move all of their beneficiaries to other providers

20

21    [4] DHCS typically does not publicize a temporary suspension, because the Ninth
22    Circuit has recognized a liberty interest when DHCS publicizes charges. *See, e.g.,*
*Guzman v. Shewry*, 552 F.3d 941, 955 (9th Cir. 2009). In this case, however, not only
23    did DHCS publicize the temporary suspension in the letter from Mr. Lim, which was
publicly available to anyone who requested it, but it took the unprecedented step of
24    providing a spokesperson to the media to make sure the public was aware of the
temporary suspension. For example, the San Diego Union Tribune reported on
25    Aug. 30, 2022, "State health officials will halt all Medi-Cal reimbursements to the
Borrego Community Healthcare Foundation for the second time in two years, saying
26    the nonprofit provider has failed to meet its obligations under a settlement reached
early last year." *See* https://www.sandiegouniontribune.com/news/watchdog/story/
27    2022-08-30/borrego-health-medi-cal-suspension. DHCS did this knowing that the
Debtor had no meaningful opportunity for a name-clearing hearing to respond to
28    DHCS and that such action violated, among other things, the Debtor's liberty
interests.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

17

through a "bulk transfer of lives." MacIsaac Declaration, at ¶ 27. A bulk transfer of lives is irreversible. Once the bulk transfer is implemented, the Debtor will have no patients and will cease to be able to operate. This is an additional action by DHCS with a permanent impact. *Id.* When the Debtor's Medi-Cal payments were suspended in 2020, it continued to provide uninterrupted care to its patients without payment. *Id.*

32.    Notably, the allegations made by DHCS and reported by the San Diego Union Tribune were untrue. MacIsaac Declaration, at ¶ 28. Even more problematic, the spokesperson for DHCS cited an inappropriate basis for a temporary suspension. *Id.* A lack of performance under the Settlement Agreement was not a permissible basis for a 100% temporary suspension under the statutory provisions cited by DHCS in the suspension letter. *Id.* DHCS' imposition of a 100% payment suspension is not based on a credible allegation of fraud or an ongoing investigation. *Id.* Instead, DHCS is effectively terminating the Debtor's participation in the Medi-Cal program for reasons it would not be able to otherwise.

34.    As explained above, DHCS was already aware that the Debtor had been under investigation since 2020. MacIsaac Declaration, at ¶ 31. In response, the Debtor stopped all contract dental programs and had not submitted any contract dental claims. *Id.* The Debtor was also cooperating with criminal and civil investigators. There is no plausible theory that the Debtor was engaging in ongoing fraud with so much scrutiny – it had DHCS, BRG, and civil and criminal DOJ scrutinizing its practices. *Id.* The Debtor even recently brought its own lawsuit against the former staff and contractors who were committing fraud for their own benefit at the expense of the Debtor for years under the contract dental program, until new leadership and management took over. *Id.*

35.    In short, there was no justification under the law to reimpose a 100% payment withhold. MacIsaac Declaration, at ¶ 32. The limited payment suspension already addressed the concern DHCS had with what the government was investigating criminally – dental services. *Id.* There is no allegation of any other criminal

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122384540\V-4

investigation and no explanation why a tailored suspension would not be sufficient, much less how there was no longer good cause to permit the Debtor to continue to provide services to patients in underserved areas. *Id.*

36.    There is not a "credible" allegation of fraud at issue for the new suspension, rather there is a disingenuous allegation of fraud to try to justify an improper termination. MacIsaac Declaration, at ¶ 33. There also is no risk to Medi-Cal's financial security. In fact, the previous partial withhold was a way for DHCS to recoup some losses that may have occurred from current Medi-Cal revenue.

37.    With a 100% payment suspension reimposed, there is no more revenue to recoup. MacIsaac Declaration, at ¶ 34.

## G.    THE MEDI-CAL SUSPENSION WILL CAUSE IRREPARABLE HARM TO THE DEBTOR, ITS PATIENTS AND THE ESTATE

38.    DHCS has been informed that the automatic stay applies to the threatened suspension of all Medi-Cal payments, and DHCS has been informed of the substantial risks to the Debtor's patients. *See* Maizel Declaration, at ¶ 4. Nonetheless, on September 19, 2022, DHCS informed the Debtor, through counsel, that DHCS intended the suspension to go into effect as threatened. *Id.* Consequently, the Debtor sent DHCS precedent to support the Debtor's position that the automatic stay prevents DHCS from suspending Medi-Cal payments and taking other acts against the Debtor and property of the estate. *Id.*, at ¶ 5. Despite the foregoing, postpetition, on September 22, 2022, counsel for DHCS informed counsel for the Debtor that DHCS intended the suspension to go into effect as threatened. *Id.*, at ¶ 6. On Sunday, September 25, 2022, Joseph R. LagMagna, from Hooper, Lundy & Bookman, corresponded by email with DHCS representatives as part of the "ongoing meet and confer" process. In that correspondence, he requested that DHCS agree to postpone the planned suspension for a "reasonable period of time" and stated that if the suspension were not postponed, bankruptcy counsel would be filing a complaint and seeking a temporary restraining order in the bankruptcy case. Mr. Wang was

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

forwarded that email by me shortly after the email was sent. On Monday, September 26, 2022, an attorney from the Office of Legal Services for the DHCS replied by email that "DHCS denies the characterization … of the Department's communications." *Id.*, at ¶ 7.

39.     If the suspension is not enjoined, the Debtor will have to immediately:

- Shut down all 18 clinics and two pharmacies;

- Close six administrative office locations;

- Cease operating and park its six mobile units;

- Cease all services, including pediatric care, urgent care, behavioral health, dental services, specialty care, transgender health, women's health, prenatal care, veteran's health and telehealth for our approximately 77,000 patient population;

- Cancel all patient appointments;

- Terminate all of its approximately 700 employees; and

- Cease operations.

MacIsaac Declaration, at ¶ 41; *see also* PCO Declaration, at ¶¶ 36-46.

## H.    IRREPARABLE HARM TO PATIENTS AND COMMUNITIES

40.     The Debtor is informed and believes that there is simply no meaningful way to ensure its 94,000 plus patients have access to care in the event it must discontinue services. MacIsaac Declaration, at ¶ 35. Without the Debtor and its clinics, patients will have to travel hours and extreme distances to seek care, which is exacerbated by the lack of public transportation options. *Id.*

41.     Even if patients were able to travel to other providers, the alternate providers likely do not have capacity to handle the influx of patients. MacIsaac Declaration, at ¶ 36. It is well-established that the areas in which the Debtor operates are underserved areas. The care network, even with the Debtor, is inadequate. There are simply not other providers to absorb Borrego's patients. *Id.*

42.     Even there were sufficient capacity (there is not), the alternate providers do not have the expertise to serve the Debtor's unique patient population.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

20

MacIsaac Declaration, at ¶ 37. The Debtor is intimately familiar with the unique needs of its patient population, and provides critically important and culturally-competent care to meet those unique needs. For example, the Debtor serves many transgender patients and even has transgender patient advocates on staff to assist with their unique healthcare needs. *Id.*

43.    The Debtor is a trusted care provider for the migrant farmworker community thanks to its efforts to meet them where they live, work, and play to provide care. MacIsaac Declaration, at ¶ 38. During the pandemic, the Debtor ran COVID-19 testing sites that started at dawn and were located at the gas station on the farmworkers' route to the fields to make it accessible to the farmworkers, even doing drive-through testing for those riding on tractors and combines. *Id.*

44.    The Debtor provides this type of culturally competent care to numerous hard-to-reach populations, including undocumented immigrants, people living with HIV/AIDS, and many others. MacIsaac Declaration, at ¶ 38. An attempt to transfer care to another provider will break these patient connections. These patient relationships, when broken, are not easily re-established. *Id.*

45.    Based on the foregoing, and as set forth in the MacIsaac Declaration, the Debtor, its estates, and patients will suffer irreparable harm if the automatic stay is not enforced and DHCS is not enjoined by suspending Medi-Cal payment. MacIsaac Declaration, at ¶ 40. In further support of the Motion, and as set forth above, the Debtor submits the Community Declarations and hereby incorporates the statements therein from patients, clinic managers, community advocates for the elderly, LGBTQ+, and Latinx communities, the Borrego Springs Fire Department, and the Borrego Springs Unified School District which demonstrate the significant harm that will be suffered by DHCS' enforcement of actions against the Debtor and the suspension of Medi-Cal payments.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

## III.   DISCUSSION

**A.   DHCS HAS AND WILL VIOLATE THE AUTOMATIC STAY BY THE CONTINUED ENFORCEMENT OF ACTIONS AGAINST THE DEBTOR, THE PROPOSED SUSPENSION, WITHHOLDING REIMBURSEMENT, AND EXERCISING CONTROL OVER CONTRACTS WITH HEALTH PLANS**

### 1.   *Overview of the Automatic Stay and Request for Relief without Further Proceedings*

At its core, this adversary proceeding and Motion seek to enforce the automatic stay under § 362 of the Bankruptcy Code to stop the threatened intentional violation of the automatic stay by DHCS—a party that is familiar with bankruptcy and its mandates but has indicated that it is simply going to ignore the requirements of the Bankruptcy Code in this instance.

The Complaint first requests declaratory relief, pursuant to Bankruptcy Rule 7001(9), and 28 U.S.C. § 2201, *et seq*., that the automatic stay bars DHCS from (a) suspending Medi-Cal payments to the Debtor and (b) exercising control over property of the Debtor's estate by (i) withholding payments for in-house dental services, and (ii) directing the Health Plans to block transfer patients elsewhere and refuse to assign new patients to the Debtor, both in violation of the Health Plan's contractual obligations to the Debtor. *See* Complaint, Claim I.

The Debtor has also asserted a claim for enforcement of the automatic stay for these stay violations. *See* Complaint, Claim II. In this case, not only are DHCS' intentional stay violations already harming the Debtor and its creditors—which is sufficient for the Court to order that they stop and schedule further proceedings for damages—but DHCS' conduct threatens to harm the Debtor's patients, the majority of whom have no meaningful alternative for regular primary care within their communities.

Relief is proper in this instant because the automatic stay is "self-executing, effective upon the filing of the bankruptcy petition[,]" and each of the complained-of acts is or will be in knowing violation of the automatic stay. *Gruntz v. County of Los*

22

*Angeles (In re Gruntz)*, 202 F.3d 1074, 1081 (9th Cir. 2000). Thus the Court has power to—and should, for the sake of efficiency—determine that DHCS has and will violate the automatic stay without further proceedings. *See In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS), 2020 WL 7074142, at *4 (Bankr. D. Del. Dec. 3, 2020) (determining that the bankruptcy court can enforce the automatic stay by motion rather than requiring an adversary proceeding because it is enforcement of an existing, statutorily-created injunction).

### 2. Basis for Relief under Section 362 of the Bankruptcy Code

The automatic stay is one of the most fundamental protections provided by the Bankruptcy Code. *True Health Diagnostics LLC v. Alex M. Azar et al. (In re THG Holdings LLC)*, 604 B.R. 154, 160 (Bankr. D. Del. 2019) (*citing Cuffee v. Atlantic Bus. & Cmt. Dev. Corp.*, 901 F.2d 325, 327 (3rd Cir. 1990)). As the Ninth Circuit recognized:

> [T]he purpose of the automatic stay is to give the debtor a breathing spell from creditors, to stop all collection efforts, and to permit the debtor to attempt repayment or reorganization. Congress intended the scope of the stay to be broad. All proceedings are stayed, including arbitration, license revocation, administrative, and judicial proceedings.

*Computer Commc'ns, Inc. v. Codex Corp. (In re Computer Commc'ns, Inc.)*, 824 F.2d 725, 729 (9th Cir. 1987) (internal citations and quotations omitted).

Section 362 makes clear that filing a voluntary petition for relief under the Bankruptcy Code "operates as a stay, applicable to *all entities*" against:

> *the commencement or continuation*, including the issuance or employment of process, of a judicial, *administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title*, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>
> *any act to obtain possession* of property of the estate or of property from the estate *or to exercise control* over property of the estate;
>
> *any act* to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title[.]

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

11 U.S.C. §§ 362(a)(1), (3), & (6) (emphasis added).[5]

DHCS' conduct has and will violate these provisions of § 362 as set forth below.

> **a.** **DCHS's Continuation of Actions Against the Debtor Violate the Stay & The Implementation of the Proposed Suspension of Medi-Cal Payments Would Violate the Automatic Stay**

First, DHCS' continuation of actions against the Debtor, including the enforcement of the prepetition proposed suspension, violate the automatic stay. 11 U.S.C. § 362(a)(1).

Second, implementing the proposed suspension of the Debtor's Medi-Cal payments post-petition would violate §362(a)(3) of the Bankruptcy Code, as an impermissible effort to obtain possession of or exercise control over property of the estate. *In re THG Hldgs LLC*, 604 B.R. at 161 ("[T]he Court finds that the Defendants' withholding of post-petition reimbursement payments is a violation of the automatic stay as it does not fall within the police power exception."); *Medicar Ambulance Co., Inc. v. Shalala (In re Medicar Ambulance Co., Inc.)*, 166 B.R. 918, 928 (Bankr. N.D. Cal. 1994) (fiscal intermediary ordered to discontinue its suspension of Medicare payments and to turn over to the debtor all amounts placed in the suspense account.). Alternatively, to the extent DHCS asserts that it is attempting to collect against a prepetition claim—a point the Debtor does not concede—this also would violate §§362(a)(1) or (6).

Property of the estate is broadly defined to include any and "all legal or equitable interests of the debtor in property as of the commencement of the case[,]" proceeds of the same, and "[a]ny interest in property that the estate acquires after commencement of the case." 11 U.S.C. §§ 541(a)(1), (6), and (7). "It is also well

---

[5] By its terms, § 362 applies to "all entities," and § 101 of the Bankruptcy Code defines "entity" to include a "governmental unit[.]" The term "governmental unit," in turn, includes an "instrumentality of… a State[,]" such as DHCS. 11 U.S.C. § 101(15), (27).

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122384540\V-4

established that [even] the mere opportunity to receive an economic benefit in the future is property with value under the Bankruptcy Code." *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 211 (3d Cir.2006) (*quoting Segal v. Rochelle*, 382 U.S. 375, 379, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966)).

Here, the Debtor's right to bill for and be paid for services provided to patients, is a property interest that falls squarely within §541 and the Supreme Court's instruction in *Segal v. Rochelle*. Thus, just as "post-petition Medicare reimbursements are indisputably property of the estate[,]" so too are post-petition Medi-Cal payments. *In re THG Holdings LLC*, 604 B.R. at 160. Indeed, collections of reimbursements from Medi-Cal are the very life-blood of the Debtor's business, and DHCS' planned suspension would quickly cause the Debtor to cease operations, thereby harming the Debtor, its creditors and estate, and, most importantly, the patients and communities it serves.

### b. DHCS' Refusal to Pay the Debtor for "In House" Dental Services Violates the Automatic Stay

*Third*, both before and after the Petition Date, DHCS has improperly and impermissibly refused to pay the Debtor millions of dollars for "in house" dental services provided to patients. These funds are needed now to ensure continued delivery of health care services, thereby protecting patients and preserving the value of the Debtor's estate for repayment of claims to creditors. Refusal to pay the Debtor for services rendered violates § 362(a) for the same reasons that suspension of payments does, as set forth immediately above.

In summary, DHCS is exercising control or dominion over property of the estate—collections of accounts receivable owed to the Debtor for services delivered prepetition and postpetition. DHCS has done so without permission from this Court. DHCS' acts, which are in knowing violation of the automatic stay, are harming the Debtor and its ability to provide care to patients by depriving it of revenue needed *right now* to provide essential medical services and further its reorganization.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

25

Lastly, given that the funds impermissibly withheld by DHCS are for "in house" dental services rather than contracted with outside providers, there is no credible argument that withholding such funds is being done to prevent fraud or abuse of Medi-Cal, as all fraud and billing irregularity stopped long ago (and the Debtor itself has implemented steps to recover funds from those who are actually responsible for any fraud).

### c.    DHCS Is Impermissibly Attempting to Terminate the Debtor's Contracts with the Health Plans

*Fourth*, DHCS has violated § 362(a)(3)'s prohibition against taking any and all acts to obtain possession over or exercise control over property of the estate by virtue of DHCS' direction to the Health Plans to "block transfer" patients to new providers and to assign patients that would normally assigned to the Debtor based on their location to another provider. DHCS' directives amount to an impermissible attempt to terminate the Debtor's contracts with the Health Plans.

The Ninth Circuit has "construed section 541 of the Bankruptcy Code… to include contract rights as 'property' of the bankruptcy estate." *TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc.*, 913 F.2d 676, 688 (9th Cir. 1990) (*citing In re Computer Commc'ns, Inc*, 824 F.2d at 729). Thus the Debtor's contracts with the Health Plans are contracts that are property of the estate. During a bankruptcy case, contracts between debtors and third parties remain "in effect," and nondebtor parties are bound to honor and perform such contracts. *See In re Public Serv. Co. of N.H.*, 884 F.2d 11, 14 (1st Cir. 1989). Any effort to terminate a contract without court permission violates the automatic stay. *See generally, In re Minoco Grp. of Cos., Ltd.*, 799 F.2d 517 (9th Cir. 1986) (holding effective termination of a contract is subject to the automatic stay).

This is true even if a governmental agency that is not a party to the contract purports to interfere with and terminate the contract because "section 362(a)(3) applies to actions against third parties as well as actions against the debtor, unlike

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

subsection (a)(1) which ordinarily stays only actions against the debtor." *See Krystal Cadillac Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp. (In re Krystal Cadillac Oldsmobile GMC Truck, Inc)*, 142 F.3d 631, 637 & n.11 (3d Cir. 1998) (state motor vehicle board's determinations effectively ordering termination of a franchise agreement in violation of the automatic stay).

Against this backdrop, DHCS is acting in clear violation of the automatic stay. DHCS has dictated that the Health Plans, which have contracts with the Debtor, must move patients to new providers, although there are basically none in the Debtor's service area. DHCS has further mandated that the Health Plans cannot assign new patients to the Debtor, despite contractual provisions that they do so. Although the patients themselves are not property of the Debtor's estate, the right to continue to provide treatment and be paid for those treatments pursuant to contracts between the Debtor and the Health Plans is a property right of the Debtor within the ambit of § 541 of the Bankruptcy Code and protected by §§ 362 and 365 of the Bankruptcy Code.

### 3.    Section 362(b)(4) Does Not Apply

DHCS should not be able to rely on § 362(b)(4) to avoid liability for violating the automatic stay. Section 362(b)(4) simply does not apply to the facts before the Court.

Section 362(b)(4) states that the filing of a bankruptcy petition "does not operate as a stay— …of an action or proceeding by a governmental unit . .. to enforce such governmental unit's… police and regulatory power[.]" Consistent with Congressional policy that the automatic stay have a broad reach, "[e]xceptions to the automatic stay[,]" such as section 362(b)(4), "should be read narrowly." *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 590 (9th Cir. 1993). Courts reviewing arguments about the applicability of § 362(b)(4) apply two alternative tests: the pecuniary purpose test and the public policy test.

> Under the pecuniary purpose test, the court must determine whether the government action relates primarily to the protection of the government's pecuniary interest in the debtor's property or to matters

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

of public safety and welfare. By contrast, under the public policy test, the court must determine whether the government's action is intended to either effectuate public policy or to adjudicate private rights. If the court determines that the government's action is intended either to protect the government's pecuniary interest in the debtor's property or to adjudicate private rights, the government regulatory exemption will not apply and the automatic stay will be imposed.

*Id.* at 591 (internal citations and quotations omitted); *In re Medicar Ambulance Co.*, 166 B.R. at 926 (describing the pecuniary purpose test and the public policy test in the context of a suspension of Medicare payments postpetition). DHCS satisfies neither test.

Here, DHCS' conduct cannot be for any purpose other than protecting its pecuniary interest. As set forth in the discussion of facts above and in the Complaint, there are no allegations that the Debtor has engaged in fraud postpetition. To the contrary, upon learning of concerning facts regarding billings for contracted dental services, the Debtor initiated a meeting with DHCS to disclose relevant facts and work to resolve issues. Subsequently, the Debtor agreed to installation of a monitor, who provided regular reports and updates to DHCS.

On similar facts involving allegations of prepetition fraud, the court in *THG Holdings* determined that the federal government violated the automatic stay by withholding postpetition reimbursements where there was no allegation of postpetition fraud. *In re THG Holdings LLC*, 604 B.R. at 161. Specifically, the Court held:

[A]s discussed above, the Defendants have not put forth any evidence that [the debtor] engaged in fraud post-petition or that there have been any overpayments post-petition. … The only reasonable conclusion is that the Defendants are withholding post-petition payments on account of pre-petition overpayment determinations—the exact conduct that the pecuniary interest test was designed to prohibit. Therefore, the Court finds that the Defendants' withholding of post-petition reimbursement payments is a violation of the automatic stay as it does not fall within the police power exception.

*Id.*

Similarly, in *In re Medicar Ambulance Co.* the court reviewed the argument

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

that the police or regulatory exception to the automatic stay excused a Medicare fiscal intermediary's suspension of Medicare payments to a Medicare provider where there were allegations of prepetition fraud. The court rejected the arguments, holding that "[t]he suspension of Medicare payments is not exempted under either test. Applying the pecuniary purpose test, HHS concedes that the suspended payments are property of the estate. Enforcement of the suspension directly and impermissibly conflicts with the court's control of property of the estate. Under the public policy test, HHS would be allowed to take actions to fix the amount of civil penalties or to determine Medicar's continued eligibility to participate in the Medicare system since these actions enforce public policy, not private rights. However, inasmuch as the suspension is an attempt to enforce a monetary claim, it exceeds the scope of the police power exception no matter which test is used." *Medicar Ambulance*, 166 B.R. at 927.

This Court should reach the same conclusion as the courts in *THG Holdings* and *Medicar Ambulance*; the police or regulatory exception does not protect DHCS. To the contrary, DHCS, a sophisticated and regular participant in health care bankruptcy cases, is impermissibly refusing to provide the Debtor reimbursement that the Debtor is owed and needs in order to preserve its business and estate, as well as to continue to protect and provide services to patients in furtherance of its charitable mission.

### 4.    *Conclusion*

The Court should determine that DHCS violates the automatic stay by imposing the threatened suspension, by refusing to turn over prepetition payments due to the Debtor and mandating that the Health Plans cease assigning new patients to the Debtor and initiating a block transfer of existing patients, which is tantamount to an impermissible effort to terminate or exercise control over the Debtor's contracts with the Health Plans.

Lastly, as set forth above, while the relief requested is presented through an adversary proceeding and this Motion, the Court has power to and should take

29

immediate steps to protect the Debtor's estate—not only in the furtherance of the Debtor's reorganization efforts but also to ensure that patients who depend on the Debtor's services for their health and safety are not harmed by DHCS' knowing violation of the automatic stay.

## B.    ALTERNATIVELY, A TEMPORARY RESTRAINING ORDER SHOULD BE ISSUED BECAUSE THE DEBTOR WILL SUFFER IMMEDIATE AND IRREPARABLE INJURY IF THE SUSPENSION IS ENFORCED

The Court has authority to enjoin DHCS pursuant to section 105 of the Bankruptcy Court, which permits courts to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Code]." 11 U.S.C. § 105(a). "Section 105(a) gives the bankruptcy courts the power to stay actions that are not subject to the 11 U.S.C. § 362(a) automatic stay but 'threaten the integrity of a bankrupt's estate.'" *In re Excel Innovations, Inc*., 502 F.3d 1086, 1093 (9th Cir. 2007) (*quoting Canter v. Canter (In re Canter*), 299 F.3d 1150, 1155 (9th Cir. 2002)). Bankruptcy courts, thus, may use their powers under § 105 "to assure the orderly conduct of the reorganization process." *Carabetta Enters., Inc. v. City of Ashbury Park (In re Carabetta Enters., Inc.),* 162 B.R. 399, 406 (Bankr. D. Conn. 1993) (*quoting Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin United Corp. Litig*.), 765 F.2d 343, 348 (2d Cir. 1985)). Pursuant to section 105 of the Bankruptcy Code, and under Rule 65 of the Federal Rules of Civil Procedure (the "Civil Rules"), the Court has authority to issue a temporary restraining order until such time as a hearing can be held on a motion for a preliminary injunction. Fed. R. Civ. P. 65(b)(1); Fed. R. Bankr. P. 7065; *see, e.g., NLRB v. Superior Forwarding, Inc*., 762 F.2d 695, 698 (8th Cir. 1985) (bankruptcy court is empowered under § 105 to enjoin federal regulatory proceedings when those proceedings would threaten the assets of the debtor's estate).

To obtain a TRO where, as here, the nonmoving party has notice of the relief sought, the Debtor must satisfy one of two "variants of the same standard." *Habibi v.*

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

*Barr*, 445 F. Supp. 3d 990, 994-95 (S.D. Cal. 2020) (quoting *Alliance for the Wild Rockies v. Pena,* 865 F.3d 1127, 1135 (9th Cir. 2020)). The Debtor must either establish that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest, or, alternatively, a TRO is appropriate where there are "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff…, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Habibi*, 445 F. Supp. 3d at 995; *see also Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) ("[I]f a plaintiff can only show that there are serious questions going to the merits — a lesser showing than likelihood of success on the merits — then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied.") (internal quotation marks and citations omitted). "The balance of equities and public interest factors merge '[w]hen the government is a party.'" *Habibi v. Barr*, 445 F. Supp. 3d at 995 (*quoting Drakes Bay Oyster Co. v. Jewell* , 747 F.3d 1073, 1092 (9th Cir. 2014) and *Nken v. Holder* , 556 U.S. 418, 435 (2009)).

Typically, a TRO or preliminary injunction seeks to "maintain the status quo pending a trial on the merits." *Mastrovincenzo v. City of N.Y.,* 435 F.3d 78, 89 (2d Cir. 2006); *see also Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,* 571 F.3d 873, 878–79 (9th Cir. 2009). The "status quo" refers to "the last, uncontested status which preceded the pending controversy." *Id.*

The Debtor's Complaint alleges two claims – one seeking a declaratory judgment that the automatic stay applies to DHCS' actions (described above) and the other alleging a violation of due process. The Court should issue a temporary restraining order substantially in the form requested with respect to each claim for the following reasons.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

**1.**     ***The Debtor Is Likely to Succeed on the Merits***

**a.**     **The Automatic Stay Claims**

As set forth above, the automatic stay bars DHCS from (a) suspending Medi-Cal payments to the Debtor and (b) exercising control of property of the estate by (i) withholding payments for in-house dental services and (ii) threatening to direct the Health Plans to block transfer patients elsewhere in violation of the Health Plan's contractual obligations to the Debtor and to refuse to assign new patients to the Debtor. *In re True Health Diagnostics LLC,* 604 B.R. 154; *In re Medicar Ambulance Co., Inc.*, 166 B.R. 918 (fiscal intermediary ordered to discontinue its suspension of Medicare payments and to turn over to the debtor all amounts placed in a suspense account). Thus, the Debtor is likely to succeed on the merits or, at a minimum, has raised serious questions about DCHS's actions.

In light of this, and "because the Bankruptcy Code itself establishes the basis for enforcement of the automatic stay[,]" at least one bankruptcy court has held there is no need to consider any of the other *Winter* factors prior to issuing a temporary restraining order with respect to the automatic stay claim. Specifically, in *In re THG Holdings LLC*, the bankruptcy court held:

> Specifically, by showing that the post-petition Medicare payments are property of [the debtor's] estate, and that none of the exceptions under [S]ection 362 of the Code apply, including the police powers exception, [the debtor] has shown that it is entitled to relief, thus establishing a likelihood of success. There is no need for [the debtor] to show irreparable harm because Section 362 does not require a showing of irreparable harm for the automatic stay to apply. …Similarly, Section 362 does not impose a requirement that the balance of the equities favors the debtor, nor that imposition of the automatic stay is in the public interest. Indeed, requiring such a showing would read into Section 362 requirements for application of the automatic stay that Congress did not provide for in the Code. Thus, the Court finds that [the debtor] has established the necessary requirements for application of the automatic stay.

604 B.R. at 162 (internal citations omitted). Thus, the Debtor has, at a minimum, met its burden with respect to the factor of showing a likelihood of success on the merits as to the automatic stay violation.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

32

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

### b.    The Due Process Claim

#### i    There Is No Ongoing "Credible Allegation of Fraud" which Is Absolutely Required to Support a Suspension

DHCS' suspension notice is expressly predicated on Welfare and Institutions Code § 14107.11 and C.F.R., Title 42, § 455.23. Those laws both require a "credible allegation of fraud" for a Medi-Cal suspension to be imposed. Both rules use "credible allegation of fraud" in the present tense. The rules do not—and should not—allow DHCS to use past fraud as a reason to suspend the Debtor now. The Debtor—due to the acts of a former officers, board members and contractors, which have been purged and are now being sued—allegedly submitted fraudulent claims on behalf of contracted dentists, all of whom have been terminated, and which were paid by Medi-Cal. Those allegations have been investigated, reported and are being resolved. These past fraudulent bills cannot—and should not—served as a basis for a present suspension.

To the contrary, the focus of the law is on fraudulent claims going forward, not old issues. For instance, 42 C.F.R. § 455.23(e)(2) states that its purpose is to "protect Medicaid funds." The use of the forward-looking verb is important there. Similarly, 42 C.F.R. § 455.23(f)(3)(ii) states that a suspension can be lifted if it is not needed to "ensure that potentially fraudulent claims were not *continuing* to be paid." (Emphasis added.) Here, DHCS' investigation focused on the Debtor's now-terminated contract dental program. It is beyond dispute that the program was ended months ago, and there is nothing that need to be done to "protect Medicaid funds" or avoid "continuing" fraudulent claims payment.

That there is a temporal connection between the underlying fraud and the suspension is confirmed by the statute. Cal. Welf. & Inst. Code § 14107.11(a) states, "*Upon receipt* of a credible allegation of fraud…" a provider can be suspended from participation in the Medi-Cal program. (Emphasis added.) Here, the allegations of fraud were received by DHCS years prior to the August 19, 2022 notice of suspension.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

*ii      The Suspension Will Not Be "Temporary"*

The Code of Federal Regulations, 42 C.F.R. § 455.23(c), provides that "suspension under this section *will be temporary*...." (Emphasis added.) DHCS' proposed suspension is not temporary, and the agency makes no effort to hide that reality. To the contrary, DHCS media statements make clear that the suspension is intended to cause—to use DHCS own words—the Debtor to "cease operations." DHCS' actions are also inconsistent with a temporary suspension. For instance, DHCS instructed the health plans to prepare to "bulk transfer" the Debtor's patients to other providers. This action will cause the immediate and permanent closure of the Debtor.

*iii      The Sanctions Are Unlawfully Excessive*

Considering the facts and circumstances of this case, DHCS' decision to effectively force the Debtor to cease operations is so excessive as to be arbitrary. California law establishes that although DHCS has discretion with respect to the propriety of a penalty, "if the penalty imposed was under all of the facts and circumstances clearly excessive, the court is not powerless to act." *Catricala v. State Personnel Bd.,* 42 Cal. App.3d 646, 646 (1974).

The federal government explained how states are to tailor suspensions, and that the states have flexibility to only suspend payments in part, explaining:

> For example, as stated in the preamble to the current regulation, there may be times where an investigation is solely and definitively centered on *only a specific type of claim* in which case a State may determine it is appropriate to impose a payment suspension on only that type of claim. Likewise, a State might determine that an investigation of a credible allegation of fraud is limited to *a particular business unit or component of a provider* such that a suspension need not apply to certain business units or components of a provider.
>
> Balancing these approaches, we proposed to allow States to implement a partial payment suspension, or, where appropriate, to convert a previously imposed full payment suspension to a partial payment suspension, if justified via a good cause exception. The good cause exceptions for partial suspension at paragraphs (f)(1) and (2) mirror those

34

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

1       at paragraphs (e)(4) and (3), respectively, and allow the
2       State to *adopt a partial payment suspension where*
        *suspension in whole would so jeopardize a recipient's*
3       *access to items or services as to endanger the recipient's*
        *life or health, or where the State deems it in the best*
4       *interests of the Medicaid program.* At paragraph (f)(3), we
        proposed that a State may avail itself of the good cause
5       exception to suspend payments only in part if the nature of
        the credible allegation is *focused solely and definitively on*
6       *only a specific type of claim or arises from only a specific*
        *business unit of a provider, and the State determines and*
7       *documents in writing that a payment suspension in part*
        *would effectively ensure that potentially fraudulent claims*
        *were not continuing to be paid.*
8

9  76 Fed. Reg. 5861, 5934 (emphasis added).

10       When all relevant facts are considered here, the complete suspension sought to

11  be imposed here is "clearly excessive." As explained above, the Debtor is an FQHC

12  and, by definition and mission, offers an extensive range of medical, dental,

13  behavioral health and other modes of health care services in geographical areas

14  where there otherwise have little to no access to such services. And again, the

15  regions where FQHCs operate (including and especially the Debtor here) have

16  higher proportions of people who depend on Medi-Cal. This means that the

17  Debtor's suspension from Medi-Cal necessarily will adversely impact Medi-Cal

18  beneficiary access to health care services. Yet, notwithstanding the pivotal role the

19  Debtor fills as a safety net provider in multiple areas throughout Southern

20  California, DHCS elected to preclude the entire organization from participating in

21  Medi-Cal, despite the fact that the prior allegations of fraud were limited to certain

22  business lines (contract dental, which ended in its entirety nearly two years ago).

23  This is the very definition of an excessive sanction. Indeed, less severe sanctions

24  exist <u>and have been in place for many months</u>. The Debtor has been operating under

25  the strict supervision of DHCS, including a full-time, embedded compliance monitor,

26  for the better part of two years; there is simply no reason why this lesser sanction

27  would not protect DHCS' (and the public's) interests going forward.

28       Indeed, the law specifically and explicitly anticipates this precise situation.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

Even if there was a credible allegation of ongoing fraud (there is not), there is a "good cause" exception to suspension that DHCS could have—and should have—invoked here. Code of Federal Regulations, Title 42, § 455.23(e) states that DHCS can find "that good cause exists not to suspend payments…to an individual or entity against which there is an investigation of a credible allegation of fraud if any of the following are applicable: …

> (2) Other available remedies implemented by the State more effectively or quickly protect Medicaid funds.
>
> …
>
> (4) beneficiary access to items or services would be jeopardized by a payment suspension because of either of the following:
>
> (i) An individual or entity is the sole community physician or the sole source of essential specialized services in a community.
>
> (ii) The individual or entity serves a large number of beneficiaries within a HRSA-designated medically underserved area.

Both subsection (2) and (4) are applicable here. For subsection (2), DHCS has other remedies available to it, and indeed is already using them. DHCS has installed a full-time, embedded Monitor with the Debtor to supervise all aspects of its operations, which will more than adequately protect Medi-Cal funds.

For subsection (4), as discussed herein, if the suspension is not enjoined, the Debtor will be forced to cease operations, lay off employees, and will be unable to provide services to the community it serves. The Debtor is the entity which provides the sole source of community physicians and specialists in underserved areas of Southern California, as the regulation sets forth. The Debtor also serves a large number of beneficiaries within those underserved areas. Accordingly, DHCS could—and should—opt not to suspend payments to the Debtor, even if there was a credible allegations on ongoing fraud.

122384540\V-4

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

| | |
|---|---|
| 1 | |
| 2 | |

iv    *DHCS Cannot Argue the Suspension Is in Furtherance of an Offset*

DHCS has indicated that it intends to argue that this suspension is somehow necessary for them to recoup funds via offsets. This argument is wholly without merit. As discussed herein, if the Debtor's primary source of revenue is cut off, there will be no sums due for the Department to offset against.

This is an argument to skirt DHCS' own due process requirements. State law provides a process for DHCS to audit a provider, provide notice of findings, demand repayment, provide writes to an administrative hearing, and then offset for prior overpayments. *See* Welf. & Inst. Code § 14171, *see also* 22 CCR §§ 51016 *et seq.* (providing "Provider Audit Appeals" procedures). For the past two years, DHCS has initiated no such process. DHCS may not skirt those due process requirements by now initiating an offset by alleging a credible allegation of fraud.

Indeed, DHCS' temporary suspension for "credible allegation[s] of fraud" is brought under Welf. & Inst. Code § 14107.11. That statute provides that " [u]pon receipt of a credible allegation of fraud… the [D]epartment may… [c]ollect any Medi-Cal program overpayment identified through an audit or examination." *Id*. at § 14107.11(a). "Audits or Examination Report" means "a document that presents the final audit or examination findings and is formally issued to the provider by the Department upon the completion of the audit or examination." Here, no such findings have been issued.

v    *DHCS Has Not Afforded the Debtor Due Process*

Under the circumstances presented here, DHCS has not afforded the Debtor adequate due process with respect to the imposition of the Medi-Cal sanctions. Due process is the opportunity to be heard at a meaningful time and in a meaningful manner. There are not bright line rules for what constitutes due process, but rather the concept is flexible and calls for "such procedural protections as the particular situation demands." *See Leiblein v. Shewry* 137 Cal. App.4th 700, 721 (2003)

122384540\V-4

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

(internal citations omitted). Determining whether a particular administrative procedure satisfies due process standards requires an analysis of several factors: (1) the private interest involved; (2) the risk of an erroneous deprivation of that interest through the procedures used and any probable value of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedural requirements would entail. *See id.* These factors all weigh in favor of the Debtor. DHCS has known about these issues for over two years, affording plenty of time for adequate process.

### vi    The Debtor Has a Vital Interest in Medi-Cal Participation

The Debtor's continued right to participate in Medi-Cal is significant. Indeed, multiple California courts have recognized that due process implications are triggered when a provider that has been participating in the Medi-Cal program is excluded. *See Leiblein,* 137 Cal. App.4th at 720; *Mednik,* 175 Cal. App.4th at 642. In this case, the Debtor's interest in continuing to participate in Medi-Cal is heightened by the organization's status as an FQHC. The Debtor is legally and duty bound to provide care to underserved areas and substantial portions of patients who reside in the Debtor's service areas are Medi-Cal beneficiaries. The Debtor therefore cannot fulfill its mission as an FQHC if it cannot participate in Medi-Cal.

In addition, while Medi-Cal exclusion alone is enough to trigger due process safeguards, case law indicates that a party's interest can be magnified when the denial of Medi-Cal participation is combined with harm to the party's reputation due to government publication of information related to the Medi-Cal exclusion. *See Lackner v. St. Joseph Convalescent Hospital, Inc.,* 106 Cal. App.3d 542, 557 (1980); *see also Guzman v. Shewry,* 522 F.3d 941, 955 (9th Cir. 2009). Here, DHCS has caused damage to the Debtor's reputation by advising third parties, such as Medi-Cal health plans and members of the media, that the Debtor would

38

1   be suspended from Medi-Cal based on allegations of fraud. Of course, those health

2   plans, in turn, have communicated or will communicate that information to their

3   enrollees and other providers, and the media members have communicated or will

4   communicate that information to the public.

5

6              *vii*     *Deprivation of The Debtor's Interest Would Be Wrongful and Erroneous*

7         With respect to the second element of the due process analysis, based on

8   information currently available, the risk that the Debtor is being wrongly deprived

9   of its interest in participating in Medi-Cal is high. Again, the Debtor's exclusion

10  from Medi-Cal is predicated—in whole—on an "allegation of fraud," for conduct

11  that was indisputably ceased years ago.

12

13             *viii*    *DHCS' Interests Are Already Fully Protected by Safeguards Already in Place*

14        With respect to the final factor in the due process analysis, there is no dispute

15  that DHCS has an interest in preventing fraud. However, the Debtor's suspension

16  without due process would not impinge on those interests. First, DHCS' interest in

17  preventing fraud is already being more than sufficient addressed. For the past months,

18  the Debtor has operated, without significant incident, under the strict supervision of

19  DHCS, including a full-time, embedded compliance Monitor overseeing all the

20  Debtor operations. Accordingly, there is no significant risk of further fraud, and

21  DHCS' interest in that regard is already met.

22

23            *ix*     *The Debtor Should Be Excused from Further Pursuing Any Supposed Administrative Remedies*

24        The Debtor anticipates that DHCS will argue that this Court should not

25  intervene in this situation since the Debtor has not yet exhausted all of the

26  administrative remedies to it to challenge the Medi-Cal sanction determination,

27  including the "appeal" that is permitted. However, DHCS' expected failure-to-

28  exhaust defense should fail because binding precedent from the Ninth Circuit holds

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

39

that bankruptcy courts need not defer to arguments regarding exhaustion of administrative remedies. Moreover, here none of the administrative remedies are "adequate" to provide relief to The Debtor.

First, the Ninth Circuit has recognized in similar circumstances that bankruptcy jurisdiction is unique, and bankruptcy courts need not defer pending exhaustion of administrative remedies. *See Do Sung Uhm v. Humana, Inc*., 620 F.3d 1134, 1141 fn. 11 (9th Cir. 2010) (Noting that exhaustion of administrative remedies not required in bankruptcy cases because of the "broad jurisdictional grant over all matters conceivable having an effect on the bankruptcy estate."); *Sullivan v. Town & Country Home Nursing Servs., Inc. (In re Town & Country Home Nursing Servs., Inc.)*, 963 F.2d 1146, 1154 (9th Cir. 1991) ("The BAP... found 'the better reasoned position' to be that 'where there is an independent basis for bankruptcy court jurisdiction, exhaustion of administrative remedies pursuant to other jurisdictional statutes is not required.' …We agree.").

Second, the exhaustion requirement is subject to exceptions, including (i) when the administrative remedy is inadequate, and (ii) where its pursuit would be futile, idle or useless. *See S.E.C. v. G.C. George Sec., Inc.,* 637 F.2d 685, 688 n. 4 (9th Cir. 1981) (discussing a number of exceptions to the general rule requiring exhaustion, including where exhaustion would be futile or the remedy would be inadequate). Both of the aforementioned exceptions apply here.

This written appeal process will not be available until *after* the provider is suspended from the Medi-Cal program. The written administrative appeal process also does not contain any of the safeguards of a trial-type hearing and is not even considered by the DHCS, itself, to be an adjudicative hearing.

Accordingly, the administrative appeal process that applies in this situation does not present an adequate remedy for the Debtor. That appeal can only resolve the "credibility" of the evidence of fraud DHCS relied upon in imposing sanctions on the Debtor, which—as discussed at length herein—is not the true issue. Moreover, since

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122384540\V-4

the administrative appeal process will take months to conclude, the Debtor's very existence, and the dire harm to its patients and the community that will result if the Debtor is forced to close its doors, will occur long before the Debtor's appeal will be acted upon. In addition, since DHCS will hear the appeal to its own decision, it is also a futile proceeding.

### 2.   The Debtor Will Suffer Irreparable Harm from the Proposed Suspension

When the Court evaluates the harm in deciding whether to grant injunctive relief, a court should rule "in favor of the party most likely to be injured… if denial of an injunction would result in great harm to the plaintiff, and the defendant would suffer little harm if it were granted, then it is in abuse of discretion to fail to grant a preliminary injunction." *Robbins v. Superior Court,* 38 Cal.3d 199, 205 (1985). DHCS can present no argument that there "exists some critical public interest that would be injured by the grant of preliminary relief." *Indep. Living Ctr. Of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009) (*quoting Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed.Cir.1988)). Here, there is no discernible public interest that would be injured by the grant of a TRO. On the contrary, the requested relief promotes the public interest by preserving the status quo and access to critical medical and pharmacy services.

Here, the Debtor and the patients and communities it serves will suffer irreparable harm in the form of reduced (or eliminated) access to healthcare services, and the disruption of relationships with current healthcare providers, which are likely to lead to adverse health outcomes, including the possibility of death. DHCS and the public, on the other hand, will not suffer any harm whatsoever. Although not applicable under these specific circumstances, the only harm that DHCS would even argue is a financial loss. However, "in balancing the hardships, [this is] a choice between potential financial loss on the part of the [DHCS] versus potential loss of life on the part of the public." *Barenfeld v. City of Los Angeles*, 162 Cal.App.3d 1035,

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

1042 (1984). In such a question, the balance clearly tips in favor of the Debtor. *Id.*

There can be no dispute over the fact that the Debtor would suffer irreparable harm if DHCS' total suspension is allowed to go into effect, because the undisputed facts are that the Debtor will be forced out of business if the total suspension is imposed. This is irreparable harm.

> [T]he threat of being driven out of business is sufficient to establish irreparable harm. [T]he loss of… an ongoing business representing many years of effort and the livelihood of its… owners, constitutes irreparable harm. What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages. Thus, showing a threat of "extinction" is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable.

*hiQ Labs, Inc. v. LinkedIn Corp.,* 31 F.4th 1180, 1188 (9th Cir. 2022) (internal citations omitted). Similarly, "harm to goodwill, like harm to reputation, is the type of harm not readily measurable of fully compensable in damages—and for that reason, more likely to be found 'irreparable'." *K–Mart Corp. v. Oriental Plaza, Inc*., 875 F.2d 907, 915 (1st Cir.1989).

If not enjoined, DHCS' suspension from participation in the Medi-Program will, in short order, force the Debtor to cease operations and go out of business. Specifically, if the suspension goes into effect, the Debtor would have to immediately:

• Shut down all eighteen (18) clinics and two (2) pharmacies, close six (6) administrative office locations;

• Cease operating and park six (6) mobile units, which deliver care to children in schools, migrant workers where they work, and to other hard-to-reach populations;;

• Cease all services, including pediatric care, urgent care, behavioral health, dental services, specialty care, transgender health, women's health, prenatal care, veteran's health and telehealth for approximately 77,000 patients;

• Cancel all patient appointments;

• Terminate approximately 700 employees; and

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

- Begin liquidation proceedings

*See* MacIsaac Declaration, ¶ 41. This is tantamount to the death penalty for the Debtor.

In turn, if the Debtor can no longer provide services to the patients and communities it serves, then there will be no other safety net providers in the area to serve the patients left behind. Those patients' access to healthcare will be severely limited, if not completely cut off. Courts have recognized that limiting or denying access to medical care can constitute irreparable harm. For example, *Harris v. Board of Supervisors,* 366 F.3d 754, 766 (9th Cir. 2004) the Ninth Circuit affirmed a preliminary injunction barring Los Angeles County from closing a hospital that served indigent patients, because reducing available public health care facilities would likely cause the patients irreparable harm. *Id.* at 766; *see also Hunt v. Superior Court*, 21 Cal.4th 984, 999-1000 (1999) (no error to grant interim relief where "absent a preliminary injunction, plaintiffs would be without medical services essential to the control and treatment of life-threatening conditions"); *Alford v. Cnty. of San Diego,* 151 Cal.App.4th 16, 22 (2007) (injunction where patient was "not receiving all the medical care he needs"); *Crespin v. Kizer* (1990) 226 Cal.App.3d 498, 507 (1990) (injunction to prevent disruption of Medi-Cal benefits for long-term care and renal dialysis).) Multiple courts in cases involving requests for injunctive relief by health care providers threatened with exclusion from particular government health care programs have recognized that is appropriate to consider the potential harm to the provider's patients created by the government conduct sought to be enjoined. *See, e.g. Bracco v. Lackner*, 462 F. Supp. 436, 452-453 (N.D. Cal. 1978); *Vencor Nursing Or., L.P. v. Shalala*, 63 F. Supp.2d 1, 12 (D.D.C. 1999); *John Andrus Mem'l Inc.*, 600 F. Supp.2d 563, 572-573 (S.D.N.Y. 2009).

Federal and state law recognizes the grave risks patient face when they are transferred from their health care providers by the government. "The damage to individuals in terms of physical and emotional deterioration, and increased mortality incidence as a result of 'transfer trauma' has been recognized by the federal courts."

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

43

*Bracco v. Lackner*, 462 F. Supp. 436, 453 (N.D. Cal. 1978) (citations omitted). In fact, Courts in other jurisdictions have repeatedly found that, in the context of health care facilities facing decertification, the potential harm to existing residents constitutes irreparable harm. *See*, *e.g.*, *Pathfinder Healthcare, Inc. v. Thompson*, 177 F. Supp. 2d 895, 897 (E.D. Ark. 2001) (finding "[p]articularly compelling" the "certain irreparable harm" to the plaintiff-facility's residents "if they are forced to move unnecessarily"); *Mediplex of Mass., Inc.*, 39 F. Supp. 2d at 100 (finding that the "potential for transfer trauma" could lead to "harm of substantial dimensions should the preliminary injunction plaintiff seeks not be entered"); *Libbie Rehab. Ctr.*, 26 F. Supp. 2d at 132 (D.D.C. 1998) (finding that the "likelihood of irreparable injury in dislocating the residents of [the plaintiff-facility] is clear and strongly influences this Court's conclusion that the preliminary injunction should issue"); *Int'l Long Term Care, Inc.*, 947 F. Supp. at 19 (D.D.C. 1996) (finding that without a preliminary injunction, residents of the plaintiff-facility risked "an unnecessary and potentially destructive transfer from which many of them may sustain significant physical or psychological trauma"); *Oak Park Health Ctr., LLC v. Johnson*, No. 09 CV 217, 2009 WL 331563, at *3 (E.D. La. Feb. 10, 2009) (agreeing with decisions finding potential transfer trauma constitutes irreparable harm); *Ridgeview Manor of the Midlands, L.P. v. Leavitt*, No. 3:07-cv-861, 2007 WL 1110915, at *6 (D.S.C. Apr. 9, 2007) (finding threat of irreparable harm caused by relocation of facility's residents).

While the above cases involved skilled nursing facilities, the loss of trusted primary care providers is no less impactful. In the Declarations, several declarants have explained that the Debtor's patients are extremely anxious about being transferred to new providers, particularly members of the transgender community who do not have confidence that their care providers will have the same training, background, and respect they are receiving from Borrego Health. The PCO similarly expressed concern to the LGBTQIA patients. *See* Rubin Declaration ¶¶ 31, 32, 36-46. The PCO also highlighted the risks to non-LGBTQIA patients. Not only do they lack

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

access to care, but they also suffer the attendant stress and anxiety of trying to find other solutions and develop new care relationships. The result is the same impact as transfer trauma. *See* Rubin Declaration ¶ 32.

Based upon all of the foregoing, the "irreparable injury" factor is easily established here.

### 3.    *Balance of Equities and Public Interest*

The balance of equities and public interest merge when the government is the defendant. *Habibi*, 445 F. Supp. 3d at 995. In this case, it is clear that each factor—standing alone or merged—favors issuing a TRO. First, balancing the equities requires the Court to review the relative harm that could befall the Debtor and DHCS if the TRO is or is not granted. *Sacramento Homeless Union v. Cnty. of Sacramento*, No. 222CV01095TLNKJN, 2022 WL 3019735, at *14 (E.D. Cal. July 29, 2022). The nub of the issue is whether "the balance of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined." *Id.* (internal quotation omitted).

The equities unquestionably tip in favor of the Debtor. The status quo at this juncture is that the Debtor is a functioning nonprofit business providing important health care services as an FQHC, a special governmental program enacted to protect underserved populations. Permitting DHCS' knowing violations of the automatic stay to continue threatens the Debtor's viability and ability to reorganize. Without Medi-Cal funds, the Debtor's estate will not be able to, for instance, pursue an orderly going-concern sale or other traditional path to emerge from Chapter 11. *Cf. In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 567 B.R. 820, 832 (Bankr. C.D. Cal. 2017) (considering factor regarding issuing stay of order and noting "[t]he injury to the Debtor resulting from issuance of a stay will be substantially greater than the injury to the Attorney General from denial of a stay. The estate is in a precarious financial position and is desperately in need of the funds from the sale."). Especially pertinent in a young Chapter 11 case such as this one, the Ninth Circuit has stated that the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

45

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

"threat of being driven out of business is enough to establish irreparable harm." *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 17 1470, 1474 (9th Cir. 1985); *see also Ross-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of N.Y., Inc.*, 749 F.2d 124, 125-26 (2d Cir. 1984) (loss of "an ongoing business… constitutes irreparable harm"). On the other hand, the only "harm" that DHCS will suffer if a TRO is granted is that it will be "forced" to continue to pay for Medi-Cal services which the Debtor actually provides and for which the Debtor is fully entitled to be reimbursed under the applicable statutes and regulations for about two weeks until a hearing on a preliminary injunction. The balance of the equities clearly tips in favor of the Debtor.

Second, the public interest also clearly tips in favor of the Debtor for several reasons. Courts have recognized that the "public interest" in some categories of cases is actually the interests of those served by the litigating parties. *See Tri-State Generation & Transmission Assoc., Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) ("The 'public interest' in a public utility case is actually the interest of purchasers of electric power"). In many respects, health care is a public good rather than a purely market-based activity, similar to public utilities. Thus it is appropriate to consider the interests of the patients, and the health plans and payors who are responsible for ensuring an adequate network of providers for their members or insureds. For example, in *In re First American Health Care, Inc.*, 208 B.R. 985 (Bankr. S.D. Ga. 1996), the court, in the context of enjoining future Medicare suspensions notwithstanding a criminal conviction of debtor's operators, noted that "the public interest provides the most compelling reason" for granting the injunctive relief sought in that case. *Id.* at 991. This was because "[w]hile the public has an interest in insuring that public funds are properly spent on such programs as Medicare ... the real human consequences of cessation of [payments] far outweighs that interest." *Id.* Similarly, in *In re Healthmaster Home Health Care, Inc.*, Case No. 95-10548, Adv. Pro. 95-1031, 1995 WL 928920 (Bankr. S.D. Ga. Apr. 13, 1995), in the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

context of enjoining a Medicare suspension of payments, the court held that the "public interest cries out here for the immediate restoration of the cash flow into the [debtor's] business operation." 1995 WL 928920, at *3. This determination was based on the "uncontradicted evidence" that no other providers were available to take over patient care, much of which was of serious medical nature. *Id.*

Here, the Debtor is fulfilling a public, charitable purpose in accordance with Congressional policy to provide health care services to underserved populations. Moreover, Congress has also mandated that the automatic stay protect debtors from exactly the type of conduct engaged in and threatened to be engaged in by DHCS. Protecting these public purposes on a temporary basis until such time as the Court can hold a hearing on the appropriateness of a preliminary injunction far outweighs any interest that DHCS could plausibly assert given that there is no ongoing fraud, DHCS has had the benefit of a monitor of its choosing, there is a PCO, and the Debtor is subject to transparency and supervision before this Court.

Additionally, DHCS' suspension will cause network adequacy issues in violation of Medicare statutes. States that elect to enroll individuals in managed care plans (as does California) must ensure access to care. See 42 U.S.C. § 1396u–2 (a)(1)(A). Federal regulations require states to develop and enforce specific time and distance and timely access standards. Specifically, DHCS has failed to ensure, as required by 42 C.F.R. § 438.66(d)(1), that the plans being assigned enrollees in the Debtor's area of operations have the ability and capacity to adequately serve these new enrollees. And, as discussed above, DHCS has failed to comply with state law requirements for DHCS to conduct a plan readiness review for populations subject to mandatory Medi-Cal enrollment. *See* Welf. & Inst. Code § 14184.200; DHCS APL 21-015, Benefit Standardization and Mandatory Managed Care Enrollment Provisions of the California Advancing and Innovating Medi-Cal Initiative (Oct. 18, 2021), available at https://www.dhcs.ca.gov/formsandpubs/Documents/MMCD APLsandPolicyLetters/APL2021/APL21-015.pdf. Without the Debtor, DHCS will

47

have a number of network adequacy issues, which it appears it has not addressed, including ensuring:

•       There are enough PCPs within the network to meet a physician-to-enrollee ratio of at least one PCP for every 1,200 enrollees of the MCP. *See* 28 C.C.R., § 1300.67.2(d).

•       That PCPs must be available for a nonurgent appointment within ten business days of the request for appointment. *See* Health & Saf. Code §1367.03(5)(C); *See also* 28 C.C.R., § 1300.67.2(c)(5)(C).

•       There must be at least one specialist within 75 minutes or 45 miles from the beneficiary's place of residence. *See Id.* § 14197(c)(1)(C).)

•       Specialty care and ancillary care must be available for a nonurgent appointment within fifteen business days of the request for appointment. *See* Health & Saf. Code §1367.03(5)(D); *see also* Health & Saf. Code §1367.03(5)(F); 28 C.C.R., §§ 1300.67.2(c)(5)(D), (c)(5)(G).)

Accordingly, until and unless DHCS completes an assessment of all of the above-stated network adequacy issues and determines that all network adequacy standards are met, DHCS must be enjoined from the going forward with the suspension of the Debtor. DHCS' assessment must include analysis specific to the geographic area covered by the Debtor and consider the impact of the suspension on Medi-Cal beneficiaries in this area. Network adequacy requirements are intended to ensure that Medi-Cal beneficiaries have timely access to care; the proposed suspension will have the opposite effect.

## IV.    **CONCLUSION**

For all of the reasons set forth above, the Court should find that the automatic stay applies to DHCS conduct. Alternatively, the Court should issue a TRO to protect the Debtor from DHCS' knowing violation of the automatic stay. The Debtor requests that such relief be implemented immediately and for a period of at least fourteen (14) calendar days or until such time as the Court schedules and holds

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

1    a hearing on the Debtor's request for a preliminary injunction for the duration of this

2    proceeding.

3    Dated: September 26, 2022                    DENTONS US LLP
                                                   SAMUEL R. MAIZEL
4                                                  TANIA M. MOYRON

5

6                                                  */s/ Tania M. Moyron*
                                                   Proposed Attorneys for the Chapter 11
7                                                  Debtor and Debtor In Possession

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

49

122384540\V-4

**<u>DECLARATION OF ROSE MACISAAC</u>**

I, Rose MacIsaac, hereby state and declare as follows:

1.      I am the Chief Executive Officer ("CEO") of Borrego Community Health Foundation (the "Debtor"). I have over 10 years of experience in healthcare leadership. Before being appointed as Interim CEO in August 2022, I served as Chief Financial Officer commencing in February 2022. Previously I served as Chief Financial Officer ("CFO") and then CFO and Chief Operating Officer from October 2019 to February 2022, for OLE Health in Napa, California; CFO for One Community Health Sacramento in Sacramento, California from June 2018 to October 2019; controller and later CFO for Asian Health Services from November 2014 to September 2018; and Accounting Manager for ALLDATA in Elk Grove, California from October 2012 to November 2014. I have a B.S. in Accounting from the University of Phoenix and am a graduate of the University of California, San Francisco Clinic Leadership Institute in 2017. I am a Certified Healthcare Financial Professional from the Healthcare Financial Management Association in 2019.

2.      I am providing this declaration in support of the *Emergency Motion: (I) To Enforce The Automatic Stay Pursuant To 11 U.S.C. § 362; Or, Alternatively (II) For Temporary Restraining Order* (the "Motion").

3.      In my role as CEO, I am appointed by and responsible to the Board and am charged with providing leadership, overall direction and administration of the Debtor's operations. I am responsible for (i) interpreting and applying the policies of the Board; (ii) establishing and implementing basic procedures within which the various activities of the Debtor will be conducted; and (iii) assisting the Board in developing short and long-range goals for the organization and evaluating the Debtor's activities. Additionally, my responsibilities include, but are not limited to: (a) analyzing operations to evaluate the Debtor's performance and its staff in meeting objectives; (b) determining areas of potential cost reduction, program improvement, or policy change; (c) directing and coordinating the Debtor's financial and budget activities in order to fund operations, maximize investments, and increase efficiency; (d) conferring with board members and staff members to discuss issues, coordinate activities, and resolve problems; (e) preparing annual budgets for approval, including those for funding and implementation programs; (f) negotiating and

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    approving contracts and agreements with providers, suppliers, distributors, federal and state

2    agencies, and other organizational entities; (g) reviewing reports submitted by staff members in

3    order to recommend approval or suggest changes; and (h) appointing department heads or managers,

4    and assigning or delegating responsibilities to them.

5        4.    I am knowledgeable and familiar with the Debtor's day-to-day operations, business

6    and financial affairs, and the circumstances leading to the commencement of the Debtor's

7    bankruptcy case.

8        5.    The Department of Health Care Services ("DHCS") has notified the Debtor that the

9    Debtor will have all payments by the Medi-Cal program suspended, effective September 29, 2022.

10   Medi-Cal payments represent a significant percentage of the Debtor's revenue.

11       6.    The Debtor is a Federally Qualified Health Center ("FQHC") operating a network of

12   community clinics that provide a broad array of  comprehensive primary care, urgent care,

13   behavioral health, dental services, specialty care, transgender health, women's health, prenatal care,

14   veteran's health, chiropractic services, tele-health, and pharmacy throughout Southern California

15   that the federal government formally recognizes as medically underserved areas ("MUAs").  The

16   Debtor is a significant part (if not the only part) of the health care "safety net" in the communities

17   in which it operates. Since the organization's focus is providing care in underserved areas, the

18   majority of the Debtor's patients are Medi-Cal beneficiaries without meaningful access to other

19   health care. Despite the requirement that such a suspension be temporary, DHCS, which has

20   essentially inside knowledge of the Debtor's operations and finances, knows full well that this

21   suspension will be the equivalent of a "death penalty" for the Debtor and has seemingly pursued

22   this process to accomplish the goal of putting the Debtor out of business.

23       7.    In response to this threat by DHCS, the Debtor commenced the Bankruptcy Case to,

24   among other things, obtain the protection of the automatic stay and to protect its patient population

25   and explore all available restructuring options.

26       8.    DHCS is taking this extraordinary step to enforce to, among other things, suspend

27   Medi-Cal payments despite the fact that: (1) the actions that give rise to the alleged fraud ceased

28   months ago, and DHCS has knowledge of this; (2) DHCS is closely watching the Debtor and its

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

2

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  operations, including through a full-time Monitor embedded within the Debtor; and (3) the Debtor

2  has at all times been in substantial compliance with the conditions of its continued operation, as set

3  forth in the written settlement agreement between DHCS and the Debtor, dated January 26, 2021.

4  To avoid the destruction of the Debtor's medical treatment system, causing immediate and

5  irreparable harm to it, as well as to thousands of patients, the Debtor is compelled to seek emergency

6  relief to forestall imposition of the suspension.

7         9.     I am informed and believe that (i) on October 20, 2020, the California Department

8  of Justice ("DOJ"), Division of Medi-Cal Fraud and Elder Abuse ("DMFEA") executed search

9  warrants at two of the Debtor's administrative offices; and (ii) the DOJ had been invited to the

10  Debtor's offices that day for a meeting where the Debtor was going to voluntarily present its

11  concerns regarding dental providers contracted with it.

12        10.    I am informed and believe that by letter dated November 18, 2020, the Debtor was

13  advised that DHCS was temporarily suspending the Debtor's Medi-Cal provider numbers, effective

14  that same day, due to an ongoing investigation by the DMFEA.

15        11.    I am informed and believe that (i) the Debtor appealed the temporary suspension

16  through the meet-and-confer process; and (ii) the Debtor and its representatives met with DHCS and

17  explained how a narrowly-tailored payment suspension would be more appropriate and how there

18  was good cause to permit the Debtor to continue to operate, for among other reasons, the fact it was

19  delivering services to underserved areas designated by HRSA.

20        12.    I am informed and believe that (i) by letter dated January 29, 2021, DHCS notified

21  the Debtor that it was modifying the payment suspension to apply to in-house dental claims only;

22  and (ii) DHCS was able to narrowly draw the suspension, because the only area under investigation

23  was the Debtor's contract dental services – services where the Debtor contracted with area dentists

24  to provide dental services on behalf of the Debtor and for its patients.

25        13.    I am informed and believe that while the payment suspension was in place from

26  November 18, 2020 until January 29, 2021, DHCS retained approximately $15,000,000 in billed

27  services that would otherwise have been payable to the Debtor.  The modified payment suspension

28  for dental claims has remained in place at all times since the November 18, 2020, and it still in place

122386638\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  today.  The Debtor has continued to provide dental services despite the payment suspension, because

2  patients desperately need the services.

3       14.    The Debtor estimates that DHCS has withheld at least an additional $6.7 dollars of

4  dental claims since the suspension went into effect prepetition.

5       15.    I am informed and believe that (i) the Debtor executed a formal settlement agreement

6  with DHCS on January 27, 2021 ("Settlement Agreement"); (ii) the Debtor had no option other than

7  to sign the Settlement Agreement and no substantive terms were negotiable; and (iii) there was no

8  meaningful opportunity to avoid a temporary suspension without acceding to DHCS' demands.

9       16.    A requirement of the Settlement Agreement was for the Debtor to retain an

10  independent monitor.  DHCS selected Berkely Research Group ("BRG") as the compliance

11  consultant or monitor.  Without any viable alternative or an option to refuse, the Debtor retained

12  BRG pursuant to the Settlement Agreement.

13      17.    I am informed and believe that (i) the Debtor worked diligently with BRG and DHCS

14  to improve the Debtor's quality and operations, including billing and compliance; (ii)  despite the

15  Debtor's best efforts, BRG's subsequent reports resulted in DHCS demanding the Debtor execute

16  two separate Corrective Action Plans ("CAPs") that were drafted by BRG, were not negotiable, (iii)

17  the Debtor had to accept the continuation of a partial temporary suspension; and (iv) any refusal

18  would have resulted in a full payment suspension and putting the Debtor out of business.

19      18.    The Debtor diligently endeavored to comply with the Settlement Agreement and

20  CAPs.  It substantially and materially complied with the terms of the agreements. DHCS's asserted

21  ability to reimpose the full payment suspension at any time meant that the Debtor had no meaningful

22  opportunity to resist DHCS and BRG, even when their allegations were flawed or based on

23  misinterpretations.  BRG and DHCS imposed a standard of performance on the Debtor that is not

24  only unattainable, but I am informed and believe, not legally required to participate in Medi-Cal.

25      19.    Regardless, the Debtor made great strides and performed what was necessary to

26  comply with the Settlement Agreement and CAPs.  The performance was such that in the summer

27  of 2022 the Debtor concluded that the Monitor and BRG were no longer appropriate and that DHCS

28  should further tailor the payment suspension to apply only to contract dental claims; in other words

122386638\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1   start paying for dental claims provided by the Debtor itself.

2       20.     During the suspension, the Debtor has provided 30,347 dental visits that were

3   uncompensated.  These services were provided through an in-house program entirely disconnected

4   from the contract dental program that was under investigation, and to date the Debtor is aware of no

5   allegation of any problems with this program.

6       21.     Thus, in May 2022, the Debtor requested that DHCS meet with it to discuss further

7   modifying the payment suspension to permit payment of in-house dental claims and to consider

8   whether the Monitor and BRG, which was extremely expensive (fees for BRG to date exceed $2.6

9   million), were still necessary.

10      22.     DHCS and the Debtor met on July 7, 2022, and DHCS requested that, within two

11  weeks, the Debtor submit any documentation to support its position that the Debtor's performance

12  under the Settlement Agreement and CAPs was sufficient.

13      23.     On July 22, 2022, the Debtor submitted voluminous documentation in response to

14  DHCS's areas of identified concerns under the Settlement Agreement, CAPs, and other areas that

15  DHCS and the Monitor identified at the July 7, 2022 meeting.  The Debtor followed up several times

16  with the Department on the written submission, including asking for DHCS to agree to proposed

17  audit methodologies, and to address open areas under the Settlement Agreement and CAPs.  For

18  example, the Settlement Agreement called for the Debtor to conduct an internal audit of contracted

19  dental claims that were billed to DHCS.  The Debtor proposed a sampling and extrapolation

20  methodology that was in conformity with state auditing standards, but DHCS would not respond

21  with any feedback, much less any approval.

22      24.     The purpose of the audit was to inform DHCS of any potential overpayment amount

23  impacted by contract dental.  Such work calculating an overpayment amount would be useless, if

24  DHCS did not agree with the audit methodology.  However, neither BRG nor DHCS approved the

25  audit plans, and the Debtor could not perform the audit. Multiple written requests for feedback have

26  been entirely ignored.

27      25.     On August 19, 2022, DHCS provided two separate letters to me.  The first letter was

28  from Bruce Lim, DHCS's Deputy Director.  The letter from Mr. Lim explained that DHCS did not

1  find the Debtor's written submission persuasive, and stated, in relevant part, that DHCS was going

2  to reimpose a 100% Medi-Cal suspension on all the Debtor's services.

3     26.    In a separate letter that was stamped "CONFIDENTIAL," Bob Sands, Assistant

4  Deputy Director for DHCS, provided additional notice of the temporary suspension for the same

5  reasons alleged in Mr. Lim's letter (the "Sands Letter").

6     27.    The Debtor is also informed and believes that (i) DHCS provided the Sands Letter to

7  health plans whose beneficiaries are assigned to the Debtor pursuant to contracts between the Debtor

8  and those health plans, and (ii) DHCS demanded the health plans establish a plan to move all of

9  their beneficiaries to other providers through a "bulk transfer of lives." A bulk transfer of lives is

10 irreversible. Once the bulk transfer is implemented, the Debtor will have no patients and will cease

11 to be able to operate.  This is an additional action by DHCS with a permanent impact.  When the

12 Debtor's Medi-Cal payments were suspended in 2020, it continued to provide uninterrupted care to

13 its patients without payment.

14    28.    Notably, the allegations made by DHCS and reported by the Union Tribune were

15 untrue.  Even more problematic, I am informed and believe that the spokesperson for DHCS cited

16 inappropriate basis for a temporary suspension because a lack of performance under the Settlement

17 Agreement was not a permissible basis for a 100% temporary suspension under the statutory

18 provisions cited by DHCS in the suspension letter.

19    31.    As explained above, DHCS was already aware that the Debtor had been under

20 investigation since 2020.  In response, the Debtor stopped all contract dental programs and had not

21 submitted any contract dental claims.  The Debtor was also cooperating with criminal and civil

22 investigators.  There is no plausible theory that the Debtor was engaging in ongoing fraud with so

23 much scrutiny – it had DHCS, BRG, and civil and criminal DOJ scrutinizing its practices.  The

24 Debtor even recently brought its own lawsuit against the former staff and contractors who were

25 committing fraud for their own benefit at the expense of the Debtor for years under the contract

26 dental program, until new leadership and management took over.

27    32.    I am informed and believe that there was no justification under the law to reimpose

28 a 100% payment withhold, in part because the limited payment suspension already addressed the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

6

1    concern DHCS had with what the government was investigating criminally – dental services.  I am

2    not aware of any allegation of any other criminal investigation and no explanation why a tailored

3    suspension would not be sufficient, much less how there was no longer good cause to permit the

4    Debtor to continue to provide services to patients in underserved areas.

5        33.    I am informed and believe that there is not a "credible" allegation of fraud at issue

6    for the new suspension, rather there is a disingenuous allegation of ongoing fraud to try to justify an

7    improper termination.

8        34.    I believe there also is no risk to Medi-Cal's financial security.  In fact, the previous

9    partial withhold was a way for DHCS to recoup some losses that may have occurred from current

10   Medi-Cal revenue.  With a 100% payment suspension reimposed, there is no more revenue to

11   recoup. The suspension is about DHCS's frustration, not the Debtor exposing the Medi-Cal program

12   to any ongoing fraud.

13       35.    I am informed and believes that there is simply no meaningful way to ensure its

14    94,000  plus patients have access to care.  Without the Debtor and its clinics, patients will have to t

15     ravel hours and extreme distances to seek care, which is exacerbated by the lack of public

16   transportation options.

17       36.    Even if patients were able to travel to other providers, the alternate providers likely

18   do not have capacity to handle the influx of patients. It is well-established that the areas in which

19   the Debtor operates are underserved areas. The care network, even with the Debtor, is inadequate.

20   There are simply not other providers to absorb the Debtor's patients.

21       37.    Even there were sufficient capacity (there is not), the alternate providers do not have

22   the expertise to serve the Debtor's unique patient population.  The Debtor is intimately familiar with

23   the unique needs of its patient population, and provides critically important and culturally-

24   competent care to meet those unique needs. For example, the Debtor serves many transgender

25   patients and even has transgender patient advocates on staff to assist with their unique healthcare

26   needs.

27       38.    The Debtor is a trusted care provider for the migrant farmworker community thanks

28   to its efforts to meet them where they live, work, and play to provide care. During the pandemic, the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

7

Debtor ran COVID-19 testing sites that started at dawn and were located at the gas station on the farmworkers' route to the fields to make it accessible to the farmworkers, even doing drive-through testing for those riding on tractors and combines.

39.    The Debtor provides this type of culturally competent care to numerous hard-to-reach populations, including undocumented immigrants, people living with HIV/AIDS, and many others.  An attempt to transfer care to another provider will break these patient connections. These patient relationships, when broken, are not easily re-established.

40.    I believe that the Debtor, its estates, and patients will suffer irreparable harm if the automatic stay is not enforced and DHCS is not enjoined from suspending Medi-Cal payment.

41.    If not enjoined, DHCS' suspension from participation in the Medi-Program will, in short order, force the Debtor to cease operations and go out of business.  Specifically, if the suspension goes into effect, the Debtor would have to immediately: (a) shut down all 18 clinics and two pharmacies; (b) close six administrative office locations; (c) cease operating and park six mobile units, which deliver care to children in schools, migrant workers where they work, and to other hard-to-reach populations; (d) cease all services, including pediatric care, urgent care, behavioral health, dental services, specialty care, transgender health, women's health, prenatal care, veteran's health and telehealth for our patients; (e) cancel all patient appointments; (f) terminate all of our approximately 700 employees; and (g) begin liquidation proceedings.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

///

Executed this 26th day of September 2022, at San Diego,  California      .

_____
Rose MacIsaac

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

122386638\V-1

## DECLARATION OF SAMUEL R. MAIZEL

I, Samuel R. Maizel, hereby state and declare as follows:

1. I am a partner in the law firm of Dentons US LLP ("Dentons"), located at 601 S. Figueroa Street #2500, Los Angeles, CA 900017, and have been duly admitted to practice law in the Commonwealth of Pennsylvania and the State of California and the United States District Court for the Southern District of California.

2. I am one of the attorneys representing Borrego Community Health Foundation, the debtor and debtor-in-possession in the above-captioned chapter 11 case and plaintiff in this adversary proceeding (the "Debtor"). Dentons is the proposed counsel to the Debtor.

3. I am providing this declaration to apprise the Court of certain facts relevant to the pending *Emergency Motion: (I) To Enforce The Automatic Stay Pursuant To 11 U.S.C. § 362; Or, Alternatively (II) For Temporary Restraining Order* (the "Motion").

4. On Monday, September 19, 2022, my partner Tania Moyron and I spoke by telephone with Kenneth Wang, the Deputy Attorney General from the Office of the Attorney General for the State of California who appeared on behalf of the California Department of Health Care Services ("DHCS") at the Debtor's "first-day" hearing on September 13, 2022. During the discussion we informed Mr. Wang that the Debtor had concluded that DHCS's threatened suspension of payments, which was to go into effect on September 29, 2022, would be a violation of the automatic stay imposed by section 362 of the Bankruptcy Code. Mr. Wang said that DHCS intended for the suspension to go into effect as planned on September 29, 2022. We told Mr. Wang that we would send him the citations to judicial precedent upon which we relied, and we agreed to speak again after he had an opportunity to review the precedent and speak with his client.

5. At 7:03pm prevailing Pacific time, on September 19, 2022, I sent Mr. Wang an email, which included citations to the two cases we thought most relevant to the argument that the proposed suspension of Medi-Cal payments was subject to the automatic stay: *True Health Diagnostics LLC v. Azar (In re THG Holdings LLC)*, 604 B.R. 154 (Bankr. D. Del. 2019) and *In re Medicar Ambulance Co., Inc.*, 166 B.R. 918 (Bankr. N.D. Cal. 1994).

6. On Thursday, September 22, 2022, my partner Tania Moyron and I had a zoom

DENTONS US LLP<br>601 SOUTH FIGUEROA STREET, SUITE 2500<br>LOS ANGELES, CALIFORNIA 90017-5704<br>(213) 623-9300

1

conference with Mr. Wang and another individual representing DHCS. We asked him if he had considered the cases we had cited to him and whether DHCS had reconsidered its intent to impose the suspension on September 29, 2022, despite the effect of the automatic stay. He repeated that DHCS intended for the suspension to go into effect as planned on September 29, 2022. We asked him to have DHCS reconsider this decision, in that it would force the Debtor to take actions to stop the suspension from going into effect to protect access to medical care for the Debtor's patients. He said that he would speak to his client, but as of the filing of this declaration we have received no further information from Mr. Wang about DHCS's position on the suspension (or anything else).

7. On Sunday, September 25, 2022, Joseph R. LagMagna, from Hooper, Lundy & Bookman, corresponded by email with DHCS representatives as part of the "ongoing meet and confer" process. In that correspondence, he requested that DHCS agree to postpone the planned suspension for a "reasonable period of time" and stated that if the suspension were not postponed, bankruptcy counsel would be filing a complaint and seeking a temporary restraining order in the bankruptcy case. Mr. Wang was forwarded that email by me shortly after the email was sent. On Monday, September 26, 2022, an attorney from the Office of Legal Services for the DHCS replied by email that "DHCS denies the characterization … of the Department's communications." Nothing more was said.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 26th day of September 2022, at Los Angeles, California.

_____
Samuel R. Maizel

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

2

**Exhibit "A"**
**(Proposed Order)**

**CSD 3000C** [07/01/18]

Name, Address, Telephone No. & I.D. No.

SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com
TANIA M. MOYRON (Bar No. 235736)
tania.moyron@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 900017-5704
Telephone: 213 623 9300

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF CALIFORNIA
325 West F Street, San Diego, California 92101-6991

| | |
|---|---|
| In Re    Borrego Community Health Foundation<br><br>Debtor. | **LODGED**<br><br>BANKRUPTCY NO.    22-02384 |
| Borrego Community Health Foundation<br><br>Plaintiff(s) | ADVERSARY NO.  22-90056 |
| v.  California Department of Health Care Services<br><br>Defendant(s) | Date of Hearing:<br>Time of Hearing:<br>Name of Judge:  Honorable Laura S. Taylor |

## ORDER ON
**Emergency Motion to (I) Enforce the Automatic Stay or (II) Alternatively for Temporary Restraining Order**

The court orders as set forth on the continuation pages attached and numbered 2 through 2 with exhibits, if any,

for a total of 2 pages.  Notice of Lodgment Docket Entry No. _____ .

//

//

//

//


DATED: _____        _____

                                      Judge, United States Bankruptcy Court

CSD 3000C [07/01/18]                                                                                    Page **2** of **2**

---

ORDER ON Emergency Motion to (I) Enforce the Automatic Stay or (II) Alternatively for Temporary Restraining Order
DEBTOR:Borrego Community Health Foundation                          CASE NO.:22-02384
                                                                   ADV. NO.: 22-90056

---

At the above referenced date, time and location, the Court held an emergency hearing on Debtor's Emergency Motion to (I) Enforce the Automatic Stay or, Alternatively, (II) for Temporary Restraining Order (the "Emergency Motion") [Adv. Docket No. ___] filed by Borrego Community Health Foundation (capitalized terms not otherwise defined herein have the meanings ascribed to them in the Emergency Motion), the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Debtor"). Having considered the Motion, the Complaint for Declaratory Judgment and Preliminary and Permanent Injunctive Relief, or in the Alternative, for Writ of Mandate, filed by the Debtor [Adv. Docket No. 1] (the "Complaint"), the declarations and evidence in support of the Motion, any responses or replies to the Motion, and the arguments of counsel on the record; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties in interest and necessary to avoid immediate and irreparable harm; and the Court having found that the Debtor provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances,

THE COURT RULES:

The automatic stay under section 362 of the Bankruptcy Code does not permit the DHCS to take any Department Action (as defined in the Complaint), and : (i) DHCS' enforcement of its decision set forth in its prepetition letter, dated August 19, 2022, to suspend all payments under Medi-Cal to the Debtor effective September 29, 2022, is a violation of the automatic stay under §§ 362(a)(1), (3), and (6); (ii) DHCS' ongoing withholding of payments for in-house dental services is a violation of the automatic stay because it constitutes an act to take possession of property of the estate or from the estate, exercise control over property of the estate, and or to collect, assess, or recover a claim against the Debtor that arose prepetition under §§ 362(a)(3) and (6); and (iii) DHCS' efforts to compel parties that have contracts with the Debtor, including health plans such as Inland Empire Health Plan, to block transfer patients from the Debtor and refuse to assign new patients to the Debtor, are violations of the automatic stay because they constitute acts to take possession of property of the estate or from the estate, exercise control over property of the estate, and to collect, asses, or recover a claim against the Debtor that arose prepetition under §§ 362(a)(3), and (6) (with each action described in this paragraph, including the Department Actions, a DHCS Stay Violation).

The Debtor will be irreparably harmed by any DHCS Stay Violation.

IT IS HEREBY ORDERED THAT:

1.     The Motion is granted.

2.     DHCS shall comply with the automatic stay and not suspend Medi-Cal payments to the Debtor and shall take necessary corrective action to the extent required.

3.     The Debtor is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.  DHCS shall cooperate with the Debtor to resolve any issues regarding effectuation of this Order.

4.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

**Exhibit "B"**
**(Proposed Order)**

**CSD 3000C** [07/01/18]
Name, Address, Telephone No. & I.D. No.

SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com
TANIA M. MOYRON (Bar No. 235736)
tania.moyron@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 900017-5704
Telephone: 213 623 9300

### UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
325 West F Street, San Diego, California 92101-6991

| In Re    Borrego Community Health Foundation | **LODGED** |
| --- | --- |
| Debtor. | BANKRUPTCY NO.   22-02384 |
| Borrego Community Health Foundation | ADVERSARY NO.  22-90056 |
| Plaintiff(s) | |
| v.  California Department of Health Care Services, by and through its Director, Michelle Baass | Date of Hearing: |
| Defendant(s) | Time of Hearing: |
| | Name of Judge:  Honorable Laura S. Taylor |

## ORDER ON
**Emergency Motion to (I) Enforce the Automatic Stay or (II) Alternatively for Temporary Restraining Order**

The court orders as set forth on the continuation pages attached and numbered <u>2</u> through <u>2</u> with exhibits, if any,

for a total of <u>2</u> pages.  Notice of Lodgment Docket Entry No. _____ .

//

//

//

//

DATED: _____

_____
Judge, United States Bankruptcy Court

CSD 3000C [07/01/18]                                                                                              Page **2** of **2**

ORDER ON Emergency Motion to (I) Enforce the Automatic Stay or (II) Alternatively for Temporary Restraining Order
DEBTOR:Borrego Community Health Foundation                                        CASE NO.:22-02384
                                                                                  ADV. NO.: 22-90056

At the above referenced date, time and location, the Court held an emergency hearing on Debtor's Emergency Motion: (I) To Enforce the Automatic Stay Pursuant To 11 U.S.C. § 362, or, Alternatively, (II) for Temporary Restraining Order (the "Emergency Motion") [Adv. Docket No. ___] filed by Borrego Community Health Foundation (capitalized terms not otherwise defined herein have the meanings ascribed to them in the Emergency Motion), the debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy case (the "Debtor").  Having considered the Complaint for Declaratory Judgment and Preliminary and Permanent Injunctive Relief, or in the Alternative, for Writ of Mandate, filed by the Debtor [Adv. Docket No. 1] (the "Complaint"), the declarations and evidence in support of the Motion, any responses or replies to the Motion, and the arguments of counsel on the record; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties in interest and necessary to avoid immediate and irreparable harm; and the Court having found that the Debtor provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances,

THE COURT RULES:

The Court rules that: (i) the California Department of Health Care Services' ("DHCS") proposed postpetition suspension of all Medi-Cal payments to the Debtor, effective September 29, 2022, is a violation of the automatic stay under §§ 362(a)(1), (3), and (6); (ii) DHCS' ongoing withholding of payments for in-house dental services is a violation of the automatic stay because it constitutes an act to take possession of property of the estate or from the estate, exercise control over property of the estate, and or to collect, assess, or recover a claim against the Debtor that arose prepetition under §§ 362(a)(3) and (6); and (iii) DHCS' efforts to compel parties that have contracts with the Debtor, including health plans such as Inland Empire Health Plan, to block transfer patients from the Debtor and refuse to assign new patients to the Debtor, are violations of the automatic stay because they constitute acts to take possession of property of the estate or from the estate, exercise control over property of the estate, and to collect, asses, or recover a claim against the Debtor that arose prepetition under §§  362(a)(3), and (6) (with each action described in this paragraph, including the Department Actions, a DHCS Stay Violation).

The DHCS Stay Violation would cause immediate and irreparable harm to the Debtor, its estate, and thousands of patients by suspending all Medi-Cal payments and taking other related acts which would, inevitably, cause the Debtor to close its clinics and cease providing essential medical services to low income and rural patients in Southern California.

IT IS HEREBY ORDERED THAT:

1.   The TRO sought in the Motion is granted.

2.   DHCS is hereby enjoined from continuing with its suspension of Medi-Cal payments..

3.   DHCS, and all those acting in active concert and participation with it, is enjoined from taking any DHCS Stay Violation.

4.   The Debtor is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.  DHCS shall cooperate with the Debtor to resolve any issues regarding effectuation of this Order.

5.   This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.