SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com
TANIA M. MOYRON (Bar No. 235736)
tania.moyron@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Telephone:   213 623 9300
Facsimile:    213 623 9924

JOSEPH R. LAMAGNA (Bar No. 246850)
jlamagna@health-law.com
DEVIN M. SENELICK (Bar No. 221478)
dsenelick@health-law.com
JORDAN KEARNEY (Bar No. 305483)
jkearney@health-law.com
HOOPER, LUNDY & BOOKMAN, P.C.
101 West Broadway, Suite 1200
San Diego, California 92101
Telephone:   619 744 7300
Facsimile:    619 230 0987

*Proposed Attorneys for the Chapter 11
Debtor and Debtor In Possession*

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF CALIFORNIA

In re

BORREGO COMMUNITY HEALTH
FOUNDATION, a California nonprofit
public benefit corporation,

      Debtor and Debtor in Possession.

_____

BORREGO COMMUNITY HEALTH
FOUNDATION, a California nonprofit
public benefit corporation,

                 Plaintiff,

    v.

CALIFORNIA DEPARTMENT OF
HEALTH CARE SERVICES, by and
through its Director, Michelle Baass,

                 Defendant.

Case No. 22-02384-11

Chapter 11 Case

Adv. Pro. No. 22-90056

**REPLY IN SUPPORT OF *EMERGENCY MOTION: (I) TO ENFORCE THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; OR, ALTERNATIVELY (II) FOR TEMPORARY RESTRAINING ORDER*; DECLARATION IN SUPPORT THEREOF**

Judge: Honorable Laura S. Taylor
Date:   October 6, 2022
Time:  2:00 p.m.
Place: Jacob Weinberger U.S. Courthouse
       Department 3 – Room 129
       325 West F. St.
       San Diego, CA 92101

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122431583\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

1    Borrego Community Health Foundation, a Federally Qualified Health Center
2    and the plaintiff and the debtor and debtor in possession in the above-captioned cases
3    (the "Debtor"), hereby submits its reply to the opposition (the "Opposition" or the
4    "Opp.") filed by the Department of Health Care Services ("DHCS") and in support of
5    the *Emergency Motion: (I) To Enforce The Automatic Stay Pursuant To 11 U.S.C. §*
6    *362; Or, Alternatively (II)  For Temporary Restraining Order* (the "Motion") [Adv.
7    Pro. Docket No. 3].   In response to the Opposition and in further support of the
8    Motion, the Debtor respectfully submits the Declaration of Kenneth Soda, M.D.,
9    annexed hereto (the "Soda Declaration").   The Debtor respectfully states as follows:

10                        **I.      INTRODUCTION**

11    For nearly two years, DHCS has threatened to suspend the Debtor's Medi-Cal[1]
12    payments based on its "ongoing" fraud investigation related to conduct in the Debtor's
13    external dental program that shut down in 2020.  Now, postpetition, DHCS shifts its
14    attack against the Debtor and raises issues of patient care in a transparent attempt to
15    shoehorn its conduct into the police and regulatory exception under § 362(b)(4) of
16    title 11 of the United States Code (the "Bankruptcy Code").[2]  To boot, DHCS fails to
17    provide sufficient evidence in support of its allegations related to patient care.
18    Through the declarations of the Patient Care Ombudsmen (the "PCO"), the record
19    demonstrates that the only party that has gravely endangered patient care is DHCS
20    through its postpetition acts. Indeed, today DHCS suspended Medi-Cal payments
21    despite the automatic stay, this Court's order, and DHCS' agreement to maintain the
22    status quo.

23    DHCS has and continues to violate the automatic stay.  As demonstrated by the
24    fact that DHCS temporarily suspended payments to the Debtor rather than suspending

---

[1] Unless otherwise defined, all meanings shall have the same meanings ascribed to them in the Motion.

[2] All references to "§" or "sections" herein are to sections of the Bankruptcy Code unless otherwise stated.

1

the Debtor as a healthcare provider, DHCS clearly acted to protect its pecuniary interest. Further, DHCS' actions to suspend payment to the Debtor reveal that DHCS is protecting only its individual interest and not advancing a public policy interest. Consequently, the automatic applies to stay DHCS' payment suspension.

Alternatively, if the Court finds the automatic stay does not apply or reserves a ruling pending further consideration, the Debtor is entitled to a Temporary Restraining Order ("TRO") to maintain the status quo pending further proceedings and/or a decision by the Court. First, absent a TRO, the Debtor and its patients will suffer irreparable harm. DHCS provides assurances that it has complicated and aspirational plans to transfer patients among a patchwork of providers, including parking "mobile clinics" nearby and by somehow arranging transportation for them. DHCS ignores that these patients are real people with real health concerns and are not simply numbers in a computer. DHCS completely ignores the testimony of the PCO and the PCO's direct, personal observations that reality on the ground does not match DHCS' plans. DHCS has not offered any evidence whatsoever to even suggest that the PCO's observations were inaccurate. Instead, it offers bureaucratic plans and threats that if the managed care plans (such as Inland Empire Health Plan or Blue Shield of California) ("MCPs") do not meet those expectations, they will be subject to corrective action plans, which include providing up to six months to remedy deficiencies, during which time patient harm will continue to occur. Stated simply, the Debtor's patients should not be pawns in DHCS' efforts to force the Debtor to go out of business. DHCS apparently believes that patient harm is a small price to pay to force the Debtor to close its doors. However, the Debtor strongly believes that the Bankruptcy Code protects it, and by extension, its patients, from DHCS' conduct, and provides both it and its patients a "breathing spell" to ensure that patients do not suffer irreparable harm.

The likelihood of success on the merits is also in the Debtor's favor. DHCS ignores persuasive precedent recognizing that the automatic stay applies to similar

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

2

suspensions.  DHCS also ignores binding Ninth Circuit precedent holding that debtors need not exhaust administrative remedies before a bankruptcy court can assert jurisdiction over a similar dispute.  Further, DHCS asserts two bases to impose a payment suspension.  First, it repeats vague assertions of a "credible allegation of fraud."  Yet, DHCS' own brief offers only that there is a "continuing" investigation for alleged fraud.  *See* Busby Decl. at ¶ 40.  Thus, DHCS finally concedes what has long been suspected, the only alleged fraud at issue is the same purported fraud that resulted in the partial payment suspension for in-house dental.  There is no new fraud or exposure for DHCS as a result of the Debtor's ongoing participation in Medi-Cal, and DHCS itself previously found good cause to avoid complete payment suspension based on that allegation of fraud. Second, DHCS vaguely asserts, for the first time, that the temporary suspension is based on issues related to patient care, but offers no evidence in support of that assertion.  Moreover, that assertion is belied by the fact that DHCS did not suspend the Debtor from providing ongoing medical services to patients, but merely sought to deny the Debtor payment for providing those services.

The balancing of harm strongly supports issuance of a TRO.  Here, imposition of the payment suspension will result in irreparable harm to the Debtor, which will be unable to continue to provide medical care to thousands of low income and rural patients, and those patients have few alternatives to care provided by the Debtor.  Meanwhile, DHCS will suffer no harm.  It will merely be required to continue to pay for medical services otherwise qualified for payment under the Medi-Cal program, with no allegations of fraud related to those treatments.

Finally, the public interest is aligned with the Debtor, which as a Federally Qualified Health Center, exists to provide culturally competent care to underserved, low income and rural populations.

Therefore, if the Court does not rule that the automatic stay protects the Debtor and its patients, the Court should issue a TRO to make sure that protection exists.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

3

## II.    FACTS IN REPLY

1.    The Debtor fully describes the factual background in the Motion, but a number of factual assertions made by DHCS require a response herein.

### A.    Background Regarding Monitor

2.    As an initial matter, although DHCS discusses the installation of the monitor (the "Monitor") in the Debtor's operation, DHCS omits from its factual summary what led to the reimposition of the proposed 100% temporary suspension. Shortly after the Monitor's appointment, the Debtor began questioning the appropriateness of the Monitor's oversight, especially given the cost of the monitor, which was paid solely by the Debtor (now more than $2.6 million).  *See* Soda Declaration, at ¶ 13.

3.    In May 2022, the Debtor requested that DHCS consider removing the Monitor, and the financial burden that comes with the Monitor. The Debtor and representatives of DHCS met in July 2022 and discussed that issue. *Id*.  The Debtor followed up several times but received no response from DHCS. *Id.*  On August 19, 2022, DHCS sent the suspension notice. *Id.*

### B.    Alleged Care Deficiencies

4.    In the Opposition, DHCS focuses on alleged "care deficiencies" under the Settlement Agreement and Corrective Action Plans ("CAP")s, rather than ongoing "credible allegations of fraud."  However, all of these "quality of care" allegations are based on information that DHCS apparently obtained from the Monitor, although DHCS fails to provide any evidence from the Monitor.  Rather, DHCS offers raw numbers of items, which are completely meaningless without context.  The Court is left with no objective criteria to evaluate DHCS' assertions that the quality of the medical services provided by the Debtor is not meeting the applicable standard of care.

5.    In addition, DHCS argues that Debtor should be suspended from Medi-Cal payments because it struggles to keep up with demand for healthcare services in

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

4

the area that Debtor serves. Apparently, DHCS' solution to fix an over-subscribed, under-funded healthcare system in rural parts of Southern California is to suspend the primary provider of such services in that area. DHCS does not explain how removing dozens of clinics and hundreds of medical professionals from the supply side of this equation will fix this problem. Since, of course, this is an indefensible position, it suggests that DHCS' motivation is punitive, and without regard to patient harm.

*Grievances*

6.    DHCS asserts that during the period of January 3 to August 12, 2022, the Debtor had 584 grievances reported. Opp., at 7. DHCS fails to tell the Court that during that same period, the Debtor had approximately 213,000 patient encounters. *See* Soda Declaration, at ¶ 5. The grievance rate converts to 2.7 patient grievances per one thousand encounters. *Id.* According to the July 2022 *Managed Care Performance Monitoring Dashboard Report* issued by DHCS, available at https://www.dhcs.ca.gov/dataandstats/reports/Documents/MC_Performance_Dashboard/MC-Performance-Monitoring-Dashboard.pdf, the average patient grievance per one thousand encounters over the prior 4 quarters of data provided by DHCA was 2.7, suggesting that the Debtor's grievance count is aligned with its peers.

*Timely Care/Access*

7.    DHCS alleges delayed access through a metric known as Third Next Available. This is an arbitrary measure of how quickly patients can schedule care if they reject the first and second available appointments offered to them. There is no benchmark or expectation set by DHCS or any other resource for a reasonable TNAA time. The DMHC does not even use the TNAA metric. Regardless, the Debtor's next available and second next available are impressive. Soda Declaration, at ¶ 6. In the vast majority of cases a next available appointment would be the <u>same</u> day. *Id.* A second available would typically be days later. *Id.* The urgent care network is so robust that patients have great flexibility to take advantage of what works for their schedule without TNAA being relevant to them. *Id.* DHCS provides the Court with

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

a metric based on where patients reject the first available and the second available appointment and is purportedly dissatisfied that the third option would be a mere 13 days out for complex services; and only seven days out for basic services. The Debtor has appropriate performance for TNAA.

*Referrals*

8. There is not an excessive wait time between referrals and receiving services. DHCS and the monitor are focused on referrals that are over 90 days old. Soda Declaration, at ¶ 7. This number represents referrals that have already been processed by the Debtor and the Debtor is waiting for a response from the external specialist and/or the health plans to accept the referral to send to a specialist. *Id.* The closing of the referral by the external specialist or the health plan is out of the control of the Debtor and is the responsibility of the external specialist. *Id.*

*Abandoned Calls*

9. Call abandonment rates are not indicative of a clinical quality issue. Rather, they are a systematic operation process. Soda Declaration, at ¶ 10. Regardless, the Debtor has an action plan and, as a result, the call abandonment rate is trending downwards. *Id.*

*Grievance Resolution*

10. DHCS provides no context as to what would purportedly be adequate or what makes the Debtor's performance inadequate with regard to resolution of grievances. Regardless, resolution of most, if not all, grievances is occurring within the Debtor's goal of 30 days, with most resolved within one week. Soda Declaration, at ¶ 9.

Provider Retention.

11. DHCS references 58 providers lost, but 23 of 58 providers are no longer with the Debtor because: (i) they transferred to another organization as part of the Debtor transferring certain clinics to other FQHC's (15 in total) and (ii) full-time providers changing to per diem status, contract term of short-term locum providers,

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122431583\V-1

unable to accommodate leave of absences, termed or per diems who are no longer active (total of 8).  Soda Declaration, at ¶ 8.  Additionally, DHCS provides no explanation as to why providers have left, so no conclusions can be brought based on this information.

**C.**    **Corrective Action Plans Have Been Implemented and Complied With**

12.    DHCS asserts that it is entitled to impose the payment suspension because the Debtor has, allegedly, failed to "fully" comply with two corrective action plans.  DHCS cites one item from Correction Action Plan Number 1, that the Debtor has not "fully" provided a business plan for a worst-case scenario, but provides no information to allow the Court to evaluate this information in context.

13.    DHCS alleges, with regard to Corrective Action Plan Number 2, that one action item is incomplete, with respect to supervisors signing off on payroll records.  However, DHCS fails to provide context, in that the Debtor is in substantial compliance.  Compliance is at 94% for supervisors signing time sheets as of September 2022.  Soda Declaration, at ¶ 18.  DHCS also alleges that board meeting minutes and materials have not been provided, but the Debtor is unaware of any missing materials, and Mr. Busby makes no effort to describe any specific item missing.  Finally, DHCS asserts that almost half-a-dozen CAP items are closed, but were "not implemented timely."  The Debtor disputes the assertion, but the salient point is that the items are closed.

14.    The remaining open CAP items mentioned by DHCS are related to audits where the Debtor has followed up several times to get approval on an audit methodology but received no response.  Soda Declaration, at ¶ 15.  DHCS should not be heard to complain where it has failed to approve the audits.

**D.**    **DHCS's Allegations of Improper Medi-Cal Billing are Misleading.**

*1.*    DHCS's Allegations are Misleading

15.    DHCS argues that the Debtor continued submitting inappropriate Medi-

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122431583\V-1

Cal billings after signing the Stipulated Agreement, citing to a "33% error rate" from an audited sample of telehealth claims, and to error rates for behavioral health, medical, and in-house dental of 21 percent, 22 percent, and 7 percent, respectively. Opp., 15:19-23. DHCS's claims are overstated and misleading.

16.    DHCS fails to inform the Court that *even DHCS agrees the coding variances identified did not rise to the level of fraud*. DHCS has previously agreed that the errors identified within the audit were essentially "run of the mill" coding and billing errors caused during the immense and unprecedented disruption to healthcare provider operations during the COVID-19 pandemic. *See also* Soda Declaration, at ¶ 15. As the Debtor transitioned to telehealth services and made other significant adjustments to provide patient care during the pandemic, its providers, coders, and billers all worked to keep pace with rapidly changing and inconsistent guidance. Furthermore, once the Debtor became aware of the coding and billing concerns identified, the Debtor promptly sought guidance on how to resolve these concerns, and now *has* resolved the concerns – the Debtor has now implemented a 100% claims review. DHCS's focus on variances identified within the March 2022 audit is grossly overstated and ignores the context of the pandemic and the Debtor's efforts to comply with Medi-Cal billing guidance.

17.    Additionally, DHCS fails to explain to the Court the difference between coding and billing. Coding involves extracting billable information from the medical record and clinical documentation, whereas billing uses those codes to create insurance claims and bills for patients to ensure the provider receives appropriate reimbursement. DHCS cites to an alleged "error rate" from a primarily *coding* audit to allege noncompliance with Medi-Cal *billing* requirements within the Stipulated Agreement. Opp., 15:14-16. DHCS's failure to inform the Court of this distinction is critical, as the vast majority of coding errors identified within the March 2022 Wipfli audit did not impact reimbursement for the claim as billed; and in fact, in many cases were not even billed on final claims.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

18.     The audited sample cited by DHCS was prepared by Wipfli auditors who were *not* engaged to conduct an overpayment audit, but rather to complete a 600-chart coding and compliance audit.  As became clear through communications with Wipfli after audit completion, the Wipfli analysis was never intended to establish an overpayment error rate. *See* Attachment "B" of Soda Declaration.  The Wipfli audit did not specify what findings might lead to an overpayment calculation.  Therefore, the Debtor went back through each of the 600 findings with the Wipfli auditors to determine whether the issues raise overpayment liability and to ensure that appropriate steps are put in place to address non-overpayment compliance findings.

19.     Upon detailed review of each of the 600 charts reviewed by Wipfli, while the Debtor found isolated incidents that require returning certain funds (e.g., insufficient documentation that did not appear to be a pattern, missing signatures, etc.), the Debtor  only identified *one* systemic issue that could result in overpayments within the audited sample of telehealth claims.  Besides the foregoing, all remaining coding variances identified and reviewed on a claim-by-claim basis were determined to *not* create overpayment liability, as PPS payment was not impacted by these variances.  In fact, in multiple identified instances, coding variances were identified for codes that would not be billed on a final claim to Medi-Cal.  For example, Place of Service 11 was incorrectly coded on several Medi-Cal FFS claims, but as FFS claims are billed on a UB-04 with no Place of Service Field, this coding variance included as a "coding error" on the audit was not billed on any Medi-Cal FFS claims.  DHCS citing to coding error rates as an example of the Debtor's failure to comply with the Settlement Agreement significantly misstates the issues identified within the audit and their actual impact on billing and reimbursement.

>    2.    The Debtor Has Made Significant Compliance Efforts to Correct Billing Concerns

20.     Regarding the billing issues that were identified within the audit, DHCS alleges that the Debtor took no corrective action at the time of discovery of improper

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

telehealth billing to correct the issue until June 28, 2022. (DHCS Opp., 15:26-28.) This is incorrect. On June 28, 2022, the Debtor implemented a 100% claims review to ensure that no improper claims were submitted, and the Debtor also took significant and concerted efforts prior to this date to ensure it is not submitting improper claims to Medi-Cal. The Debtor is in the process of a wholesale reassessment and reorganization of its revenue cycle, including but not limited to the following corrective actions taken:

- The Debtor's compliance team created a Revenue Cycle Support Plan, which formalizes the process for pre-submission claim scrubbing for telehealth (and behavioral health) claims.

- The Debtor engaged Wipfli to complete training for issues identified through its audits. Wipfli completed at least seven separate trainings between March and August 2022 related to FQHC coding and billing, evaluation and management coding, telehealth coding, medical record documentation, and behavioral health coding.

- The Debtor also engaged Wipfli to complete monthly audits of 10% of claims, with preliminary Wipfli audit findings for May 2022 indicating improvement in provider coding of telehealth consistent with provider participation in Wipfli's trainings.

*See* Attachment "A" to the Soda Declaration.

21. The March 2022 audit by Wipfli was the first audit of its kind. This metric by nature is a lagging indicator because it is a post-claims review. However, the July audit, as expected and predicted by Wipfli, showed considerable improvement within prior billed claims. Additionally, as of June 28, 2022, the Debtor *has implemented a 100% claims review for telehealth and behavioral health claims.* This ensures that no improper claims are submitted. DHCS alleges that "Borrego has acknowledged that there are still ongoing deficiencies with telehealth billing." (DHCS Opp., 16:2-3.) However, DHCS fails to acknowledge the Debtor's recent 30-claim audit which found zero errors in claim coding or billing – audit results which were presented directly to DHCS on September 16, 2022. Soda Declaration, at ¶ 15.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

### III. DISCUSSION

**A. DHCS' FUNDAMENTALLY FLAWED ARGUMENTS THAT THE PAYMENT SUSPENSION IS EXEMPTED FROM THE AUTOMATIC STAY UNDER SECTION 362(b)(4) MUST BE REJECTED.**

Section 362(b)(4) provides, in relevant part, that the filing of a bankruptcy petition does not operate as a stay "of an action or proceeding by a governmental unit" to enforce such governmental unit's "police and regulatory power." 11 U.S.C. § 362(b)(4). Section 362(b)(4) is interpreted narrowly consistent with Congressional policy that the automatic stay have a broad reach and in furtherance of the purpose of the automat stay to protect all creditors. *Far Out Prod., Inc. v. Oskar*, 247 F.3d 986, 995 (9th Cir. 2001) (noting the existence of narrow equitable exceptions to the automatic stay); *see also Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 590 (9th Cir. 1993); *Medicar Ambulance Co., Inc. v. Shalala (In re Medicar Ambulance Co., Inc.)*, 166 B.R. 918, 926 (Bankr. N.D. Cal. 1994).

Courts have developed two tests known as the "pecuniary purpose test" and the "public policy test" to determine whether a governmental proceeding falls within the police or regulatory power exception. *See In re Universal Life Church, Inc.*, 128 F.3d 1294, 1297 (9th Cir. 1997); *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d at 590; *NLRB v. Continental Hagen Corp.*, 932 F.2d 828, 833–34 (9th Cir.1991); *In re Medicar Ambulance Co.*, 166 B.R. at 926 (describing the pecuniary purpose test and the public policy test in the context of a suspension of Medicare payments postpetition). The Ninth Circuit explains the two tests as follows:

> Under the pecuniary purpose test, the court determines whether the government action relates primarily to the protection of the government's pecuniary interest in the debtor's property or to matters of public safety and welfare. If the government action is pursued solely to advance a pecuniary interest of the governmental unit, the stay will be imposed.
>
> The public policy test distinguishes between government actions that effectuate public policy and those that

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122431583\V-1

adjudicate private rights.

*In re Universal Life Church*, 128 F.3d at 1297 (internal quotation marks and citations omitted).

DHCS cites *Bd. Of Governors of the Fed. Reserve Sys. V. MCorp Fin.* ("*MCorp.*"), 502 U.S. 32, 40 (1991) to argue that the court may not examine [i] the "government's *subjective motives or* [ii] the merits of the underlying police power actions." Opp. at 19, n. 4 (emphasis added). However, DHCS' argument that the government's "subjective motivations" may not be examined is simply wrong; to the contrary, this is the entire point of a § 362(b)(4) inquiry. And that argument is unsupported by the decision in *MCorp.*, which has no discussion concerning "motivations" and only proscribes against investigating the "validity" of the investigation by the government.[3]

Here, it is clear that DHCS is only seeking to protect its pecuniary interest, by suspending payments, and the proposed payment suspension for healthcare services based on prepetition allegations is subject to the automatic stay and not exempt under

---

[3] DHCS also ignores the facts of *MCorp.*, wherein the Supreme Court reviewed a situation where there was an ongoing enforcement litigation against MCorp by a regulatory agency. The Supreme Court stated:

> "that the Board proceedings, like many other enforcement actions, may conclude with the entry of an order that will affect the Bankruptcy Court's control over the property of the estate, … If and when the Board's proceedings culminate in a final order, and if and when judicial proceedings are commenced to enforce such an order, then it may well be proper for the Bankruptcy Court to exercise its concurrent jurisdiction under 28 U.S.C. § 1334(b). We are not persuaded, however, that the automatic stay provisions of the Bankruptcy Code have any application to ongoing, nonfinal administrative proceedings."

But here DHCS has already taken actions that result in effectively enforcing a judgment by suspending payments – an action that "will affect the Bankruptcy Court's control over property of the estate." Thus, as the Supreme Court recognized, it is entirely proper for this Court to exercise its jurisdiction and apply the automatic stay. Moreover, here the Debtor does not seek "a broad reading" of § 362(b)(4), but rather merely the application of well settled precedent applying the pecuniary purpose or public interest tests to DHCS' conduct.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

12

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

§ 362(b)(4).  Blatantly ignoring the case law cited above spanning 30 years, DHCS stretches the police and regulatory power to a breaking point by incorrectly arguing that the proposed payment suspension satisfies the police and regulatory exception to the automatic stay.  Opp., at 14-17.  DHCS is simply wrong.  As set forth above, if it was truly seeking to protect the public safety and welfare from the Debtor, it would have directly moved to stop the Debtor from providing medical care — but it did not.  To the contrary, it makes clear in its opposition, that the Debtor may continue providing medical care even to Medi-Cal patients – it just cannot get paid for that care.[4]

The Court should reject DHCS' arguments for the following reasons:

***First***, as set forth above, the suspension by a government entity of payment for healthcare services based on prepetition allegations, such as raised by DHCS here, are subject to the automatic stay and not exempt under either test pursuant to §  362(b)(4). *True Health Diagnostics LLC v. Alex M. Azar et al. (In re THG Holdings LLC)*, 604 B.R. 154, 161 (Bankr. D. Del. 2019) (the court held that the Defendants' withholding of post-petition Medicare reimbursement payments is a violation of the automatic stay as it does not fall within the police power exception); *In re Medicar Ambulance Co.*, 166 B.R. at 928 (fiscal intermediary ordered to discontinue its suspension of Medicare payments and to turn over to the debtor all amounts placed in the suspense account).  Courts also have held that the suspension of payments that a debtor would otherwise be entitled to receive from a government agency is a violation of the automatic stay in a number of contexts. *See e.g., id.* (noting that the "suspension of payments by HHS is precisely the type of preferential treatment the automatic stay is intended to

---

[4] DHCS also cites to *In re Charter First Mortgage, Inc.*, 42 B.R. 380, 382 (Bankr.D.Or. 1984), but that case doesn't support their proposition; it held "[I]t is clear to this court that in applying the pecuniary purpose test, it must look to what specific acts the government wishes to carry out and determine if such execution would result in an economic advantage to the government or its citizens over third parties in relation to the debtor's estate." Of course if DHCS suspends all payments it will have an economic advantage over other creditors.

prevent"); *see also Small Business Admin. v. Rinehart,* 887 F.2d 165, 168 (8th Cir. 1989) (finding SBA hold on debtor's funds violated the stay even though the funds were being placed in a suspense account and not actually being applied to indebtedness); *In re Tidewater Mem'l Hosp., Inc.,* 106 B.R. 876 (Bankr. E.D. Va. 1989) (finding the government violated the automatic stay based on withholding of Medicare program payments thereby preventing the debtor hospital from having opportunity for rehabilitation and reorganization).

DHCS fails to address *In re Medicar* at all, and fails to distinguish *In re THG Holdings LLC* by ignoring the Delaware bankruptcy court's analysis of the police and regulatory exception to the automatic stay.  The application of these cases leads to the inescapable conclusion that the proposed payment suspension is not exempted from the stay.

**Second**, DHCS misconstrues the "pecuniary purpose" test.  Although DHCS correctly states that "[t]he purpose of the pecuniary purpose test is to prevent a governmental unit obtaining an advantage over creditors or potential creditors in the bankruptcy proceeding," Opp. at 16 (quoting *City and County of San Francisco v. PG & E Corp.*, 433 F.3d at 1124), DHCS argues that, because it initially sought to impose the total suspension prepetition, it did not mean to obtain an advantage over creditors of the Borrego estate.  DHCS, however, mis-reads the Ninth Circuit holding which only indicated the primary purpose of the pecuniary purpose test is to protect creditors from obtaining an advantage over other creditors. *PG & E Corp.*, 433 F.3d at 1125 ("If the primary purpose of the suit is to effectuate public policy, then the exception to the automatic stay applies. However, [a] suit does not satisfy the public purpose test if it is brought primarily to advantage discrete and identifiable individuals or entities rather than some broader segment of the public.") (internal quotations omitted); *In re Medicar Ambulance Co., Inc.*, 166 B.R. 918, 926 (Bankr. N.D. Cal. 1994); ;  *see also In re First All. Mortg. Co.*, 263 B.R. 99, 109 (B.A.P. 9th Cir. 2001) ("Traditionally, courts have looked at what effect the action will have on the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

14

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

bankruptcy estate, and the supremacy of federal laws.").   In fact, as set forth above, Ninth Circuit precedent requires statutory exceptions to the automatic stay, like the police and regulatory exception, to be interpreted narrowly to ensure "that all creditors are treated fairly and equally." *In re Glasply Marine Indus., Inc.*, 971 F.2d 391, 395 (9th Cir. 1992).  Based on the foregoing, allowing DHCS to impose a total suspension on payments to the Debtor would inevitably provide DHCS an advantage over other creditors, who would hope to obtain a distribution from the estate but would be foreclosed from any distribution because DHCS would cause the Debtor to shut down.

Additionally, the Ninth Circuit has repeatedly held that under the pecuniary purpose test, the court must determine "whether the government action relates primarily to the protection of the government's pecuniary interest in the debtor's property or to matters of public safety and welfare." *In re Dingley,* 852 F.3d 1143, 1146 (9th Cir. 2017) (quoting *In re Universal Life Church*, 128 F.3d 1294, 1297 (9th Cir. 1997)); *In re First All. Mortg. Co.*, 263 B.R. at 107.  Here, as set forth above, it is clear that DHCS is only seeking to protect its pecuniary interest by suspending payments; if DHCS was truly seeking to protect the public safety and welfare from the Debtor, it would have directly moved to stop the Debtor from providing medical care — but it did not. *See Medicar*, 166 B.R. at 927 ("However, inasmuch as the suspension [of Medicare payments] is an attempt to enforce a monetary claim, it exceeds the scope of the police power exception [. . .]").  Instead, DHCS has made clear that the Debtor may continue providing medical care to Medi-Cal patients. Despite the foregoing history evidenced in the record, DHCS now changes its narrative in an attempt to shoehorn its acts into § 362(b)(4).

In fact, the very regulation on which DHCS relies makes clear that a *suspension* of payments is, in and of itself, recognized as a remedy designed to address a *pecuniary* interest rather than a public health interest.  More specifically, 42 C.F.R. § 455.23(a) directs a state Medicaid agency (here DHCS) to "suspend all Medicaid *payments* to a provider after the agency determines there is a *credible allegation of*

1   *fraud* for which an investigation is pending . . . unless the agency has good cause to

2   not suspend payments or to suspend payment only in part" (emphasis added). Thus

3   the regulatory regime developed by the Centers for Medicare and Medicaid Services

4   ("CMS") requires suspension of *payments* – not debarment from the program – upon

5   a credible allegation of fraud. In other words, CMS is directing DHCS to protect the

6   "public fisc" if and when a provider seeks *payment* on a fraudulent basis.

7        That suspension under 42 C.F.R. § 455.23 fulfills a pecuniary purpose rather

8   than some other public policy is also clear from the standards CMS authorizes DHCS

9   to use when determining whether there is good cause not to suspend payments (in

10  whole or in part). Under the same regulation, DHCS may consider, among other

11  things, whether "[o]ther available remedies implemented by the State more

12  effectively or quickly *protect Medicaid funds*." 42 C.F.R. § 455.23(e)(2) (emphasis

13  added). Thus the regulation makes clear that it is appropriate to permit a provider

14  accused of a credible allegation of fraud continue to deliver services and receive

15  Medicaid payments—if there are other ways to "protect Medicaid funds." If the

16  primary concern was some other public policy objective, then CMS would not permit

17  a provider to continue to receive Medicaid payments.

18       Moreover, DHCS's reliance on *In re Thomassen* is misplaced. *In re*

19  *Thomassen*, 15 B.R. 907, 908 (B.A.P. 9th Cir. 1981). In *Thomassen*, a doctor-

20  physician had license revocation proceedings instituted against him by the California

21  Board of Medical Quality Assurance for malpractice, professional incompetence, and

22  "dishonesty in financial dealings." The court held that the proceedings were exempt

23  from the automatic stay, because the state had an interest in punishing such

24  misconduct and in preventing future acts of misconduct. That is unlike here, where

25  DHCS is not seeking to stop the Debtor from providing care, even to Medi-Cal

26  patients, but rather only seeking to stop paying for that care. This is far different from

27  the remedy being sought in *Thomassen*, where the revocation of a doctor's medical

28  license for medical malpractice and professional incompetence protected the public.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

16

Similar reasoning applies to the cases cited by DHCS: (i) *In re Berg*, 198 B.R. 557, 563 (B.A.P. 9th Cir. 1996), aff'd, 230 F.3d 1165 (9th Cir. 2000) concerning a debtor-attorney that faced sanctions *payable directly to a third party* for misconduct (i.e., in *In re Berg* there was no pecuniary interest for the government to seek because it was not a payee of the funds); and (ii) *In re Poule*, 91 B.R. 83 (B.A.P. 9th Cir. 1988), concerning protecting the public against the "consequences of incompetent workmanship and deception."

**Third**, DHCS does not and cannot demonstrate that the payment suspension is an action to effectuate public policy under the public purpose test. As held by the Ninth Circuit, under the public purpose test, the court determines whether the government seeks to effectuate public policy or to adjudicate private rights. *PG & E Corp.*, 433 F.3d at 1125; *In re Yun*, 476 B.R. 243, 253 (B.A.P. 9th Cir. 2012) (noting that the public purpose pecuniary interest tests "are both factual determinations to be made based on the presentation of evidence."). A suit does not satisfy the public purpose test if it is brought primarily to advantage discrete and identifiable individuals or entities rather than some broader segment of the public." *Id.*

Here, DHCS seeks to suspend payments to the Debtor to advantage itself, a clearly identifiable entity, rather than some broader segment of the public. To the contrary, its efforts disadvantage a broader segment of the public by causing this important health care provider to cease operations. As such, any action by DHCS to suspend payments to the Debtor will not further public policy, but will hurt the individuals in need of the Debtor's services.

**Fourth**, DHCS' arguments that funds owed by DHCS to the Debtor for the provision of medical services are not property of the estate run afoul of § 541 of the Bankruptcy Code. DHCS ignores that property of the estate is broadly defined in § 541 of the Bankruptcy Code to include various forms of property "wherever located and by whomever held [.]" 11 U.S.C. § 541(a). Among the forms of property included in the Debtor's estate are "all legal or equitable interests of the debtor in

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

property as of the commencement of the case." 11 U.S.C. § 541(a)(1). As the Debtor pointed out in the Motion, even "the mere opportunity to receive an economic benefit in the future is property with value under the Bankruptcy Code." *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 211 (3d Cir.2006) (*quoting Segal v. Rochelle*, 382 U.S. 375, 379, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966)). Courts have consistently held that a debtor's account receivables, which is what the withheld funds represent, are property of a bankruptcy estate. *See*, *e.g.*, *In re Hollister Constr. Services, LLC*, 617 B.R. 45, 51 (Bankr. D.N.J. 2020) ("[A]ccounts receivable become[] property of the bankruptcy estate … [so] a construction lien filed post-petition constitutes an act against property of the estate and is violative of the automatic stay." (citations omitted)); *In re E.D. Wilkins Grain* Co., 235 B.R. 647, 649 (Bankr. E.D. Cal. 1999) ("[A]ccounts receivable ... are part of a bankruptcy estate [and] [i]f a creditor wishes to enforce a claim or lien against property of the estate, it must first obtain relief from the automatic stay."); *In re Express Am., Inc.*, 132 B.R. 535, 539 (Bankr. W.D. Pa. 1991) ("Any action taken by defendant with regard to these accounts receivable in an attempt to collect on a prepetition claim against debtor is in violation of § 362(a)(6), whether or not they are property of debtor or its bankruptcy estate."). Consistent with these decisions and the broad scope of what is property of the estate, in *THG Holdings* the court found Medicare reimbursements that were being withheld to be property of the estate. 604 B.R. at 160.

Given that there is no factual dispute over the fact that the Debtor (a) will continue to provide medical services which DHCS will refuse to pay for, and (b) has provided in-house dental services (before and after the pre-petition suspension) for which it would ordinarily be entitled to payment, DHCS has failed to advance any credible argument that funds it has withheld are *not* property of the estate. All DHCS has asserted is that payment to the Debtor is suspended. As a result, unless DHCS can articulate a reason why the Debtor has no interest in payments that are due, DHCS is *required* to "deliver to [the Debtor], and account for, such property or the value of

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

1    such property[.]"  11 U.S.C. § 542(a).[5]

2        Lastly, to the extent that DHCS is merely seeking to maintain the status quo—

3    a position that is difficult to reconcile with the facts—the Debtor will amend its

4    complaint to add a claim for turnover under § 542 of the Bankruptcy Code.

5    **B.    DHCS    IGNORES    NINTH    CIRCUIT    PRECEDENT    AND**
     **INCORRECTLY    ARGUES    THAT    EXHAUSTION    OF    STATE**
6    **REMEDIES IS REQUIRED.**

7        DHCS blatantly ignores the Ninth Circuit precedent cited in the Motion that

8    demonstrates the Debtor was not required to exhaust administrative remedies.  In an

9    effort to avoid the result of that precedent, DHCS ignores that the requirement to

10   exhaust remedies is subject to exceptions, including where the administrative remedy

11   (i) would cause undue prejudice, (ii) is inadequate, and (iii) is futile, idle or useless.

12   *See* Motion, at 40, showing both circumstances apply here, in accordance with *SEC*

13   *v. G.C. George Sec., Inc.*, 637 F.2d 685, 688 n. 4 (9th Cir. 1981); *see also McCarthy*

14   *v. Madigan,* 503 U.S. 140, 146 (1992) (describing the circumstances in which the

15   interest of the individual weigh against a requirement of administrative exhaustion).

16   DHCS also relies solely on the District Court's decision in *California ex rel. v.*

17   *Villalobos,* 453 B.R. 404 (D. Nev. 2011) ("*Villalobos"),* which is inapposite.

18       The Court should reject DHCS' arguments for at least three reasons.

19       First, the Ninth Circuit has held that if there is a bankruptcy law based claim,

20   the bankruptcy court has jurisdiction and the Debtor does not need to exhaust

21   administrative remedies, even where there are statutes requiring exhaustion given the

22

23   [5] The Supreme Court decision in *City of Chicago v. Fulton*, 141 S.Ct. 585 (2021), does not require
     a different result.  Although the Court held that the mere retention of property by a creditor does
24   not, in and of itself, violate § 362(a)(3)'s prohibition on exercising control over property of the
     estate, the Court recognized that there are instances where an omission or failure to act could, in
25   fact, violate the automatic stay.  Moreover, the Court emphasized that § 362(a)(3) was enacted to
     prevent a party such as DHCS from changing "the status quo with respect to intangible property"
26   through retention and exercise of control over estate assets.  141 S.Ct. 585, at 590, 592.  Thus, to
     the extent that DHCS is exercising control over funds that the Debtor is entitled to in an effort to
27   change the status quo and attempting to collect on an allegedly fraudulent billing claim, then this
     alters the status quo in significant and material ways in violation of § 362(a)(3).
28

application of the automatic stay.  *See* Motion, at 48, citing *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1141 fn. 11 (9th Cir. 2010) (Noting that exhaustion of administrative remedies not required in bankruptcy cases because of the "broad jurisdictional grant over all matters conceivable having an effect on the bankruptcy estate."); *Sullivan v. Town & Country Home Nursing Servs., Inc. (In re Town & Country Home Nursing Servs., Inc.),* 963 F.2d 1146, 1154 (9th Cir. 1991) ("The BAP... found 'the better reasoned position' to be that 'where there is an independent basis for bankruptcy court jurisdiction, exhaustion of administrative remedies pursuant to other jurisdictional statutes is not required.' …We agree.").  It is telling that DHCS ignores these Ninth Circuit cases.

Second, with regard to appeals from DHCS' assertion that the suspension is based on violations of the Settlement Agreement, the plain language of the Settlement Agreement only permits the Debtor to challenge the DHCS action pursuant to Welfare and Institutions Code §§ 14043.65 and 14123.05. *See* Busby Decl., Exh. B, Stipulated Agreement, ¶ 9(d) (iii) ("In the event that DHCS determines that Borrego has failed to perform any of its obligations under this Agreement and further modifies the payment suspension, the Debtor shall be permitted to challenge  DHCS's action pursuant to Welfare and Institutions Code sections 14043.65 and 14123.05.").  The former section provides only the right to ask the director of DHCS to assess the credibility of the allegation supporting the payment suspension. It neither includes a formal hearing nor an opportunity to challenge the payment suspension on the merits. Most importantly, it does not stop the payment suspension, which goes into effect notwithstanding the appeal.[6]  Moreover, any administrative appeal may take up to 150

---

[6] Welfare and Institutions Code § 14043.65 provides in pertinent part:  "Notwithstanding any other law, … any provider  … who has had payments suspended, … may appeal this action by submitting a written appeal, including any supporting evidence, to the director or the director's designee. If the appeal is of a suspension of payment pursuant to Section 14107.11, the appeal to the director or the director's designee shall be limited to the credibility of the allegation supporting the payment suspension, as described in subdivision (d) of Section 14107.11, and shall not encompass

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122431583\V-1

days, during which time the suspension will result in the Debtor being forced to operate without reimbursement, an untenable situation. The latter section does nothing more than allow a "meet and confer" process, which the Debtor already attempted without success.[7]

Thus, DHCS' assertion that the Debtor should have used the applicable administrative remedies prior to this Court taking jurisdiction is without merit, as those remedies are: (1) unduly prejudicial to the Debtor (in that the suspension would result in irreparable financial harm); (2) inadequate (in that the suspension goes into effect nonetheless); and (3) futile in that it would be an appeal to the same party that has now imposed the total suspension, or merely a "meet and confer" which has already proved futile. *See McCarthy v. Madigan,* 503 U.S. at 146.

Third, although DHCS cited *California ex rel. v. Villalobos*, 453 B.R. 404, 410 ("*Villalobos*") (D. Nev. 2011) for the proposition that the Debtor is required to exhaust its administrative remedies before seeking relief before this Court (Opp. at 15), the district court never mentions exhaustion of administrative remedies in its opinion. Further, the *Villalobos* opinion deals with a situation nothing like the situation before this Court – in *Villalobos* there was a pending action by the State in state court related

---

investigation or adjudication of the allegation. The appeal procedure shall not include a formal administrative hearing under the Administrative Procedure Act and shall not result in reactivation of any deactivated provider numbers during appeal. An applicant, provider, or billing agent that files an appeal pursuant to this section shall submit the written appeal along with all pertinent documents and all other relevant evidence to the director or to the director's designee within 60 days of the date of notification of the department's action. The director or the director's designee shall review all of the relevant materials submitted and shall issue a decision within 90 days of the receipt of the appeal. The decision may provide that the action taken should be upheld, continued, or reversed, in whole or in part.   The decision of the director or the director's designee shall be final.   Any further appeal shall be required to be filed in accordance with Section 1085 of the Code of Civil Procedure."

[7] Welfare and Institutions Code § 14123.05 provides in pertinent part: "The department shall develop … a process that enables a provider to meet and confer with the appropriate department officials after the issuance of a letter notifying the provider of a payment suspension, pursuant to Section 14107.11, or a temporary suspension, pursuant to subdivision (a) of Section 14043.36, for the purpose of presenting and discussing information and evidence that may impact the department's decision to modify or terminate the sanction."

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

to undisclosed gifts and gratuities to CalPERs decisions makers, among other allegations. The State, unlike here, moved for a determination that its lawsuit was exempt from the stay pursuant to § 362(b)(4). Here, the State has brought no action in State court against the Debtor, nor did it see fit to ask this Court to rule in advance of its actions as to whether it would violate the automatic stay.

Moreover, DHCS' cite to *Villalobos* case is further puzzling because the court in Villalobos relies extensively on the 9th Circuit's decision *in  City & County of San Francisco v. PG & E Corp*., 433 F.3d 1115 (9th Cir.2006) ("PG & E" ), wherein the Ninth Circuit expressly held that "the phrase 'police or regulatory power' is generally construed to 'refer to the enforcement of state laws affecting health, welfare, morals, and safety, <u>but not regulatory laws that directly conflict with the control of the res or property by the bankruptcy court</u>.'" 433 F.3d at 1123 (emphasis added). Likewise, in *In re RGV Smiles by Rocky L. Salinas D.D.S. P.A.*, 626 B.R. 278, 284 (Bankr. S.D. Tex. 2021) cited by DHCS, the court only granted the state of Texas leave to proceed with a state court action to prosecute and liquidate claims, but the court ordered that "the State of Texas is precluded from taking any action to collect any judgment entered in the State Court Action against [the debtors] outside of the above-styled and numbered chapter 11 bankruptcy case, unless such chapter 11 case is closed or dismissed." *Id.* at 291 (emphasis added)

Of course, DHCS's acts here do "directly conflict with control of the res and property of the estate by this Court," and DHCS is moving to collect, not to establish liability or liquidate a claim.   DHCS ignores that the district court in *Villalobos* addressed a situation where the government sought only the entry of an order for injunctive relief, civil penalties and perhaps restitution, i.e., a money judgment against debtors by which it would simply fix the amount of the government's unsecured claim against the debtors; it would not have converted the government into a secured creditor, forced payment of the prepetition debt or otherwise give the government a pecuniary advantage over other creditors of the debtors' estate. That is not what

DHCS wants to do here – here, DHCS seeks to exercise control over the stream of payments otherwise owed to the Debtor, causing it to cease operations.   Thus, DHCS' argument that this Court must defer exercising its exclusive jurisdiction over property of the estate should be rejected, as it ignores binding Ninth Circuit precedent and the Bankruptcy Code, the facts of this Case, and relies, exclusively on a district court opinion which says nothing about exhaustion of administrative remedies.

### C.    DHCS IS IMPERMISSIBLY ATTEMPTING TO TERMINATE THE DEBTOR'S CONTRACTS WITH MCPS.

DHCS' brief states that it "has not instructed the potentially impacted MCPs to terminate contracts with Borrego."  Opp. at 26:9-11.  This statement is misleading, at best.  <u>First</u>, DHCS' own brief acknowledges that Blue Shield planned to terminate its contract with Debtor, but disclaims that DHCS had anything to do with that decisions. Apparently, according to DHCS, the timing was merely coincidental.  <u>Second</u>, DHCS itself admitted that it was foreseeable that its actions would cause the MCPs to terminate their contracts with Debtor.   In its statement to the media, DHCS said, "DHCS' priority is to ensure the health and well-being of affected Medi-Cal beneficiaries. This includes working to ensure that if <u>Medi-Cal managed care plans (MCPs) terminate their contracts with Borrego</u>, and Borrego ceases operations, there will be a safe transition for all beneficiaries receiving Medi-Cal services through Borrego" (emphasis added).  DHCS' actions do not occur in a vacuum, and DHCS's efforts to distance themselves from the natural and knowing consequences of its actions are without merit.

### D.    ALTERNATIVELY, THE COURT SHOULD ISSUE A TEMPORARY RESTRAINING ORDER BECAUSE THE DEBTOR, ITS ESTATE AND PATIENTS WILL SUFFER IMMEDIATE AND IRREPARABLE INJURY IF THE SUSPENSION IS ENFORCED.

Alternatively, the Debtors request the entry of order restraining and enjoining DHCS from causing immediate and irreparable harm to the Debtor, its estate, and thousands of patients by suspending all Medi-Cal payments and taking other related acts which will, inevitably, cause the Debtor to close its clinics and cease providing

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122431583\V-1

essential medical services to low income and rural patients in Southern California. In support of the TRO and the claims in the Complaint, the Debtors are entitled to the entry of a TRO both under (i) § 105(a) and (ii) because the Debtors satisfy the standards for a TRO. *See* Motion, at 30-48. In support of its argument, the Debtors state as follow:

**1.     DHCS Is Not Likely To Preval On The Merits**

       *a.     The Payment Suspension Is Not Exempted Under § 363(b)(4).*

DHCS first argues against the imposition of a temporary restraining order based on its incorrect argument that its conduct is protected under § 362(b)(4) and that it is not attempting to recoup against the Debtor. The Debtor will not restate all of the arguments set forth above, but will merely summarize the following three points below:

- The payment suspension does **not** meet the pecuniary purpose test. As noted above, in the Ninth Circuit acts designed "primarily to advantage discrete and identifiable individuals or entities rather than some broader segment of the public" are not protected by § 362(b)(4). *PG & E Corp.*, 433 F.3d at 1125. In this instance, not only does DHCS's conduct make clear that it is attempting to place its financial interests ahead of other creditors, but the very purpose of the regulations on which it relies are protection of public funds—not the protection of health, welfare, or safety of patients. This is clear from the fact that payments to the Debtor have been suspended, not participation in Medi-Cal, and the Debtor is fully able to continue to provide health care services. Moreover, the regulatory framework under which DHCS is operating permits the agency to lift the suspension if, among other things, "[o]ther available remedies implemented by the State more effectively or quickly *protect Medicaid funds*." 42 C.F.R. § 455.23(e)(2) (emphasis added). As this makes clear, the regulatory issue in question is whether *payments* should be suspended or not based on the need to *protect Medicaid funds*. The suspension is not about safe delivery of health care. As a result, there is no credible argument that DHCS is doing anything other than protecting its financial interest and, accordingly, its actions are not protected by § 362(b)(4).

- DHCS's assertion that "an alleged absence of ongoing fraud is not a basis to bar the police and regulatory power exemption to the automatic stay" makes no sense at all. Opp. at 26. Again, the regulations permit DHCS to lift a suspension to the Debtor for "good cause" if there are other measures to "protect Medicaid funds[.]" 42 C.F.R. § 455.23(e)(2). This makes clear that the federal government is directing DHCS to protect loss of funds from an ongoing fraudulent scheme by suspending payments—only if a suspension continues to be needed to achieve that goal. To stretch the federal government's directive in § 455.23 to apply

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

to any fraud whenever and wherever it occurred because there might be collateral proceedings that have not concluded gives DHCS limitless power. Courts like *THG Holdings* implicitly reject this view by holding that § 362(b)(4) does not apply when the fraudulent conduct has stopped pre-petition.

      **b.**    *DHCS Has Violated Debtor's Liberty Interest, Entitling Debtor to Due Process Protections*

DHCS spends six lines in its Opposition to conclude, without much in the way of argument, no legal citation, and no evidence whatsoever, that it did not violate Debtor's liberty interest when it went out of its way to publicize Debtor's suspension. DHCS' brief claims that it "merely provided statements in response to inquiries from the media… [.]" Opp. at 28:24-25. The characterization is misleading and tries to minimize DHCS' key role.

DHCS made a media statement communicating that (1) Debtor was suspended, and (2) the reasons for suspension included a credible allegation of fraud and general allegations of poor quality care. First, the allegations were designed to be misleading. As is clear from the briefing, DHCS has no new fraud allegations against Debtor. But DHCS' media statement and the suspension notice made it seem that DHCS asserted some sort of ongoing fraud issues. As Debtor has explained to the Court, this is all part of a misleading message designed to intimidate plans and trigger terminations and reassignment of lives.

Moreover, the media statement highly disparaged Borrego's quality of care without any specifics for the plans to consider. Such statements are highly irregular, because the only statutory authority DHCS has for a suspension is a credible allegation of fraud. The message again served as a subtle message to instruct plans that they should take action.

All of these actions were done in a calculating and irregular way. DHCS produced its confidential notice of payment suspension, but on the same day under another author it sent a letter with the exact same allegations that was a public record and could be released. This public version of the letter was sent with a statement as

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

25

reported by the San Diego Union Tribune, DHCS told the media that Debtor "failed to meet its obligations under a settlement reached early last year."  Moreover, DHCS made it clear to the media that Debtor would be forced to "cease […] operations" after there was a "transition for all beneficiaries receiving Medi-Cal Services through Borrego."  Declaration of Rose MacIsaac in support of Motion, at ¶ 28.

DHCS' statement clearly damaged Debtor's reputation, which—pursuant to Ninth Circuit precedent—means that a liberty interest is invoked.  *See e.g. Guzman v. Shewry*, 552 F.3d 941, 955 (9th Cir. 2009).  The liberty interest is even greater than what was at issue in the *Guzman* case.  In *Guzman*, the provider was facing an unreported temporary suspension, but brought an action to challenge it.  Rather than deal with these legitimate concerns, DHCS does not address the case law at all.  The DHCS brief does not even mention the *Guzman* case, much less make any attempt to distinguish it, even though it was raised in the Complaint and the underlying motion.  The complete lack of argument is a loud concession that DHCS departed from its usual practice and did so because of its motivation to incentivize plans to take action.

### c.    The Debtor Cannot Fulfill Its Mission as an FQHC on Suspension

DHCS' assertion that Debtor does not need to participate in Medi-Cal to fulfill its mission as an FQHC is defeated by its own citation to the requirement for an FQHC to provide primary and preventive health care services to "medically underserved" populations, including Medicaid patients, without regard to a patient's ability to pay. *See*  Opp. at 35 (citing 42 USC §§ 254b(k)(3)(G)(iii)), *see also* 42 U.S.C. § 1396d(a)(2)(B); 42 CFR § 51c.102(e)). The Debtor concedes that an FQHC has an obligation to treat every patient, including Medi-Cal patients, walking through their doors. But, if under suspension, the Debtor would be unable to fulfil this obligation.

While Section 330 of the Public Health Service Act provides primary and preventive health care services to underserved populations, in addition to receiving direct grants under Section 330, FQHCs are to be <u>separately</u> reimbursed for Medicaid

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

services. *See* 42 U.S.C. § 1396a(bb). DHCS cites to the Section 330 grant as a "base funding grant," with the implication that the grant funds may permissibly cover services provided to Medicaid patients. Not so. As indicated by the Congressional Record establishing FQHCs in the Omnibus Budget Reconciliation Act, Pub. L. No. 101-239, an express legislative purposes in providing a distinct Medicaid reimbursement methodology for FQHCs was to "ensure that Federal [Public Health Service] Act grant funds are not used to subsidize health center or program services to Medicaid beneficiaries." H.R. Rep. No. 101-247, at 392-93, reprinted in 1989 U.S.C.C.A.N. 2118-19. Moreover, prohibitions against cross-subsidization prevent FQHCs from relying upon other sources of funding to pay for its Medicaid Services. Relatedly, under so-called "anti-supplementation" rules, Providers are required to accept applicable Medicare and Medicaid payments as complete payment for covered items and services. *See* 42 U.S.C. § 1320a-7b(d).

DHCS' statements are inconsistent. On one hand, it is saying that the Debtor does not need to participate in Medi-Cal. On the other hand, DHCS acknowledges that because the Debtor is an FQHC receiving grant funding, it can and must continue to treat every patient that walks through its doors, which would include Medi-Cal patients. But, the Debtor simply cannot treat Medi-Cal patients while on suspension because the Debtor cannot seek reimbursement from Medi-Cal, nor can it rely upon Section 330 grant funding for the provision of Medi-Cal services. The Debtor simply cannot survive this, let alone continue to fulfil its mission as an FQHC.

**2.**      ***The Debtor Will Suffer Irreparable Harm From The Proposed Suspension***

DHCS argues that there is no evidence of irreparable harm. Opp., at 31. This position is incomprehensible given the undisputed testimony that the Debtor will be forced to cease operations if the suspension goes into effect. This position is also appalling given the compelling, detailed and unrebutted testimony provided by the PCO. The PCO stated, among other things:

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122431583\V-1

- *"The Debtor's 100,000 patients live in these remote areas and lack the financial, social, or logistic capacity to obtain acute or preventive care from any providers elsewhere. This is a safety net program that provides for the economically disadvantaged or those remotely located […]."*

- *"The Debtor's patients lack the financial, social, or logistic capacity to obtain care without the assistance of the Debtor's FQHC's … Without the Debtor, the only alternative for these patients is the utilization of the emergency departments of local hospitals. This will overwhelm the various community hospital emergency departments and severely stress the system, placing the entire community's public health at immediate jeopardy … the loss of continuity of care will cause increased morbidity and mortality as established by multiple studies published by The Institute of Medicine."*

- *"DHCS' total disregard for the patients and the providers is shocking. I cannot discern why DHCS, no matter what kind of financial facts it believes exist, has taken actions that are causing health plans to move patients from an organization that is providing healthcare consistent with the standard of care and with no reasonable alternatives for the patients […] The consequences of a shut down or material drawback of services is devastating".*

*See e.g.*, Docket No. 4 at ¶¶ 10, 19, 25, 28; *see also e.g.*, Docket No. 20 at ¶¶ 11-12.

DHCS appears to understand that the PCO declarations are fatal to its Opposition, and attempts to avoid them at all costs, including by (1) completely ignoring that evidence in their brief (the terms "PCO," "ombudsman" or "Rubin" do not even appear in DHCS' brief), and (2) asserting meritless evidentiary objections to the Rubin declarations.

DHCS rests its entire argument on the grounds that state and federal law (including various All Plan Letters or "APL"), and its contracts with MCPs, require MCPs to provide sufficient services to avoid patient harm. But DHCS fails to even

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

consider the possibility that—despite the law or contract—sufficient services to adequately replace the Debtor simply do not exist. Indeed, the PCO's unrebutted testimony proves that, despite the law and contracts, the reality is that there is patient harm actually occurring. Simply citing to the law and contracts does not prove that no patient harm is occurring, <u>especially given the undisputed evidence to the contrary</u>.

DHCS' proposed solution that, if the MCPs fail to meet the standards set forth in the law and contracts, it will impose a corrective action plan ("CAP") is not helpful. Opp., at 34. DHCS then admits that those MCPs will have "up to six months to correct all deficiencies…" and may be subject to "sanctions, including civil monetary sanctions." Opp., at 35. The Debtor doubts that the Debtor's beneficiaries that go without adequate services for "up to six months" will take comfort in the fact that DHCS may later recover "civil monetary sanctions."

Despite DHCS' insistence to the contrary, there is simply not an adequate network of providers to provide services to the Debtor's 94,000 beneficiaries. DHCS' brief states, correctly, "<u>Each year</u>, each MCP is required to certify to DHCS that it has the network capacity to serve the <u>anticipated</u> membership in the service area and must provide documentation in support of that certification." Opp., at 31 (emphasis added). DHCS goes on to describe, in general, how this process works. Opp., at 31. DHCS ignores, however, the fact that the "anticipated membership" for each MCP at the point in time when the MCP submitted its certification, which may have been months ago, did not include the 94,000 beneficiaries currently assigned to Debtor.

Despite DHCS' reliance on the rote recitation of the regulations and guidance with respect to Medi-Cal providers, the simple fact is that even if there is compliance with the technical standards, patients will still suffer harm. In fact, are already suffering harm. And there is an important distinction to be made between within the technical standards and "no harm". For instance, the different networks might not have the same primary care doctors, nurses or specialists, forcing patients to transition to different medical professionals that they do not know or trust, often during the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122431583\V-1

middle of a course of treatment.  DHCS argues that it is "presumptuous" for the Debtor to assume that alternative providers will not have the expertise the Debtor has in serving its particular patient population or to be familiar with the unique needs of Debtor's patients.  Opp., at 39.  Yet, DHCS offers no evidence or argument that its proposed alternative providers have that expertise and experience.

Further, even if alternative providers are available within the time and distance standards upon which DHCS relies, while this may be technically compliant with the law and regulation, patient harm may still result.  For instance, for rural counties, the time and distance standard for specialty care is 60 miles or 90 minutes from a members residence.  *See* Cisneros Declaration, Exhibit B.  Therefore, instead of seeing a specialist near a beneficiary's work or home through the Debtor's network, the same beneficiary could be required to travel an hour and a half, each way, and still be within the "time and distance standard" required by DHCS' transition plans.  Notably, if within this 90-minute radius, the MCPs are not obligated to provide transportation, a problem which is exacerbated by the lack of transportation options in these rural areas and limited resources to devote to travel of these beneficiaries (especially with 2022 gasoline prices).

DHCS spends five pages of its brief describing the transition plans that it requested, and that the MCPs dutifully provided, to evaluate those MCPs' ability to provide continued access to services.  Tellingly, DHCS does not introduce those plans into evidence, so the Debtor cannot evaluate whether there were any caveats, qualifications or other questions in those transition plans.  But, even based on DHCS' terse summaries of those transition plans, DHCS' conclusion that no patient harm will result strains credulity.  A discussion regarding the MCPs follows:

IEHP (33,900 beneficiaries):  Even DHCS' opposition does not assert that no beneficiary harm will result:  "IEHP indicated that it was in discussions with Riverside University Health System (RUHS) and SAC Health (SACH) to potentially absorb any impacted members."  Opp., at 35:9-11 (emphasis added.)  Apparently, IEHP intends

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

to use mobile clinics "as it looks for space to lease in the area." Opp., at 35:15-21. Of course, mobile clinics are not the same as brick-and-mortar facilities, in terms of quality, quantity and scope of services. Finally, IEHP apparently identified a list of specialists that can see Debtor's patients, but DHCS provides no information whatsoever about those specialists' location, capacity, availability, etc.

Molina Healthcare (8,381 beneficiaries):  Here, Molina is apparently relying on "contingency providers" (whatever that means) which "could be leveraged" to absorb the Debtor's members. Opp., at 36:7-10. Even DHCS is forced to admit that there will be a "disruption to services," though they attempt to minimize that disruption. Opp., at 36:18-20.

Aetna Healthcare (458 beneficiaries):  DHCS states that the bulk of these lives "could be" assigned to a new primary care provider (suspiciously, specialists are not mentioned by DHCS) within time and distance standards. First, as discussed above, within the technical minimum standard does not mean there is no harm to the beneficiaries. Second, DHCS admits that 17 beneficiaries cannot be assigned to providers within the required time and distance standards. According to DHCS, Aetna confirmed that it would coordinate transportation for these beneficiaries. However, DHCS provides absolutely no detail about how such arrangement would be made (or even if they could be made). In addition, DHCS does not acknowledge that the additional effort and time involved in accessing services outside of time and distance standards is patient harm.

Blue Shield of California Promise (1,522 beneficiaries):  Again, DHCS asserts that the bulk of patients would be transferred to providers within time and distance standards, but 44 would require individual transportation arrangements.

Community Health Group (11,496 beneficiaries):  For CHG, DHCS again states that bulk of the beneficiaries would be able to access care within time and distance standards. For the remainder, CHG is attempting to get DHCS to approve "alternative access standard requests." Debtor is not familiar with this term, but it

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

31

1    appears that those patients will be harmed by the transition and that CHG is attempting

2    to get DHCS to "pre-approve" that harm.

3        <u>Health Net Community Solutions (777 beneficiaries)</u>:  According to DHCS, the

4    bulk of the beneficiaries "could be" reassigned to a new primary care provider within

5    time or distance standards (again, specialists are notably absent).   For a few

6    individuals, however, no provider is available, so Blue Shield would—according to

7    DHCS—"contact each member to discuss the transition and PCP options."  Opp., at

8    38:19-21.

9        <u>United Healthcare (823 beneficiaries)</u>:  Again, the bulk of beneficiaries would

10   be transferred to providers within time and distance standards, but at least one would

11   require individual transportation arrangements.

12       Ultimately, the question of patient harm must not be evaluated based on well-

13   intentioned, but perhaps impossible plans written on paper, but in the actual,

14   demonstrable, factual patient harm that had already resulted from DHCS' actions.

15   This is evidenced by the testimony of the independent, neutral PCO, and this evidence

16   is far more compelling than bureaucratic plans and regulations.

17       3.    ***Balance of Equities and Public Interest***

18       In light of the foregoing, and for the additional reasons set forth in the Motion,

19   the balance of equities clearly weighs against suspension. On one hand, DHCS has an

20   interest in thwarting fraud and ensuring patient access to care.  Here, any fraud that

21   occurred was discovered and stopped years ago, and the Debtor's payments are

22   already suspended for even in-house dental services.  It is beyond dispute that patient

23   care will be harmed by the Debtor's suspension, as tens of thousands of patients will

24   have their access to healthcare reduced, if not eliminated altogether.  This is not

25   hypothetical.  As the undisputed evidence presented by the PCO shows, even during

26   the brief period when DHCS and its MCPs took action following the notice of

27   suspension, patient care was threatened or denied. Meanwhile DHCS' only "harm" is

28   that it will have to continue to pay the Debtor for valid medical services provided to

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122431583\V-1

1 | Medi-Cal beneficiaries.    Therefore, DHCS' and the public's interests are
2 | maintained—even advanced—if the suspension is stayed.  The balance of equities
3 | could not be more clear.

4 | ### IV.    <u>CONCLUSION</u>

5 | WHEREFORE, for all the foregoing reasons and such additional reasons as
6 | may be advanced at or prior to the hearing on this Motion, the Debtor respectfully
7 | requests that this Court enter an order: (i) enforcing the automatic stay to prevent
8 | DHCS, acting by and through its director Michelle Baas, from suspending all Medi-
9 | Cal payments and taking other related acts; or, alternatively; (ii) for the entry of order
10 | restraining and enjoining DHCS from causing immediate and irreparable harm to the
11 | Debtor, its estate, and thousands of patients by suspending all Medi-Cal payments and
12 | taking other related acts; and (iii) granting such other and further relief as is just and
13 | proper under the circumstances.

14 |

15 | Dated: October 4, 2022                     DENTONS US LLP
16 |                                            SAMUEL R. MAIZEL
                                               TANIA M. MOYRON
17 |

18 |                                            */s/ Tania M. Moyron*
19 |                                            Proposed Attorneys for the Chapter 11
                                               Debtor and Debtor In Possession

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122431583\V-1

## DECLARATION OF KENNETH M. SODA

I, Kenneth M. Soda, hereby state and declare as follows:

1. I am an physician licensed to practice medicine in the State of California. I received my medical degree from Jefferson Medical College and completed my residency at University of Iowa.

2. I have been a practicing physician since 2001, and am Board Certified in Family Medicine. I have been engaged in physician executive roles since 2015, and have continued seeing patients while in physician executive roles up to and including this year.

3. I currently am the Chief Medical Officer of Borrego Community Health Foundation ("Borrego"). I have been in this position at Borrego since June 27, 2022. My job responsibilities at Borrego include supervision of varied positions within my department, including: clinical quality, patient safety and risk management, clinical nursing, and medical staff office management and services.

4. I am providing this declaration to apprise the Court of certain facts and opinions relevant to clinical quality of care at Borrego, and Borrego's proposed suspension from the Medi-Cal program by the Department of Health Care Services ("DHCS").

5. As a practicing physician, I am closely involved in managing clinical quality of care teams and ensuring quality of patient care. Part of my role in managing quality of care concerns is reviewing patient grievances as reported within monitor reports. I have reviewed the most recent monitor report, which shows 584 patient grievances out of a total of 213,000 patient encounters, representing only .27% of all visits.

6. Another factor of quality of care management I am closely involved in is in reviewing timely care and access metrics. Borrego's metrics regarding next available and second next available are impressive. In the vast majority of cases a next available appointment at Borrego would be the same day. A second available

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

122431583\V-1

1    would typically be days later.  The urgent care network is so robust that patients have

2    great flexibility to take advantage of what works for their schedule.

3        7.    Another factor of quality of care that I closely oversee is wait time for

4    patient referrals.  In overseeing patient referrals, I am aware that the number that

5    DHCS is focused on – referrals that are over 90 days old – represents referrals that

6    have already been processed by Borrego Health Borrego Health is waiting for a

7    response from the external specialist and/or the health plans to accept the referral to

8    send to a specialist.  The closing of the referral by the external specialist or the health

9    plan is out of the control of Borrego and is the responsibility of the external specialist.

10        8.    Another factor of quality of care I closely oversee is provider retention.

11    While at Borrego 58 providers have been lost, 23 of those 58 providers are no longer

12    with Borrego because they have either transferred to another organization as part of

13    Borrego transferring certain clinics to other FQHC's (15 in total), or (in 8 cases) are

14    full-time providers changing to per diem status, contract term of short-term locum

15    providers, unable to accommodate leave of absences, termed or per diems who are no

16    longer active.

17        9.    Another factor of quality of care I oversee is grievance resolution. At

18    Borrego, grievance resolution is occurring within the goal of 30 days, with most

19    resolved within one week. Borrego is also moving toward using grievances and

20    complaints to drive quality improvement.

21        10.    I also oversee various aspects of operations and management at Borrego.

22    One aspect of operations and management I oversee at Borrego is call abandonment

23    rates.  While abandonment rates are not indicative of a clinical quality issue, Borrego

24    Health has instituted an action plan regarding these metrics, which has had the impact

25    of trending the call abandonment rate downwards.

26        11.    Prior to DHCS proposing Borrego be suspended from the Medi-Cal

27    program, DHCS and Borrego engaged in a meet and confer process regarding

28    Borrego's ongoing compliance efforts.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

12.    I was closely involved with Borrego meetings and correspondence with DHCS monitors during the meet and confer process.  I have talked to senior leadership, including Rose MacIsaac, Interim Chief Executive Officer of Borrego, and Dana Erwin, Chief Compliance Officer, to discuss these issues in detail. They have informed me regarding the below facts related to the meet and confer process.

13.    Shortly after the monitor's appointment, Borrego began questioning the appropriateness of the monitor's oversight, especially given the great cost of the monitor, which was paid solely by Borrego.  The cost of the monitor appointed to Borrego is now more than $2.6 million.  In May 2022, Borrego requested that DHCS consider removing the monitor, and thereby the extreme financial burden that comes with the monitor.  The parties met and conferred in July 2022, and Borrego followed up several times to find out DHCS's response.  DHCS sent Borrego a notice of suspension on August 19, 2022.

14.    During the meet and confer process, Borrego exchanged materials with DHCS and also produced documents regarding compliance efforts undertaken.  As part of that process, Rose MacIsaac responded to DHCS questions on quality and compliance efforts taken at Borrego on July 22, 2022. A copy of that letter is attached as Attachment A (attachments intentionally omitted).  Additionally, as part of that process, Dana Erwin and Borrego counsel Jordan Kearney received communications from Wipfli auditors providing additional details regarding the scope and purpose of the March 2022 Wipfli audit.  A copy of these communications is attached as Attachment B (redacted).

15.    As follow-up to the documents exchanged between Borrego and DHCS regarding compliance efforts undertaken, and specifically claim coding and billing concerns identified within the March 2022 Wipfli audit, Borrego presented the results of a subsequent 30-claim audit to DHCS on September 16, 2022.  This audit found zero errors in either claim coding or billing within the 30 claims sampled.

16.    DHCS has also required Borrego complete action items within

1 | Corrective Action Plans.

2 |     17.    I was also closely involved with Borrego meetings and correspondence

3 | with DHCS monitors regarding action items contained within Borrego Corrective

4 | Action Plans.  I have talked to senior leadership, including Rose MacIsaac, Interim

5 | Chief Executive Officer of Borrego, and Dana Erwin, Chief Compliance Officer, to

6 | discuss these issues in detail. They have informed me regarding the below facts

7 | related to Corrective Action Plans.

8 |     18.    With respect to the action item of supervisors signing off on payroll

9 | records, Borrego has substantially complied with this requirement as compliance is at

10 | 94% for supervisors signing time sheets as of September 2022.

11 |     Executed on this 4th day of October, 2022, at Palm Desert, California.

12

13 |                       /s/ *Kenneth Soda*

14 |                       Kenneth Soda, M.D.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

**EXHIBIT A**



P.O. Box 2369
BORREGO SPRINGS, CA 92004
760-767-6433 | BORREGO SPRINGS
619-398-2405 | SAN DIEGO
BORREGOHEALTH.ORG

**Bruce Lim**
**Deputy Director**
California Department of Health Care Services – Audits and Investigations
bruce.lim@dhcs.ca.gov

July 22, 2022

Dear Mr. Lim,

Thank you for meeting with us on July 7. 2022 to discuss re-initiating the funding for Borrego Health's in-house dental program and for your follow-up requesting additional information.  I appreciate your candor and openness in your communications with us, as well as the opportunity to provide additional information for your consideration.  This letter summarizes our responses to the questions you raised in your July 13, 2022 follow-up letter.

Borrego continues to make significant strides forward to revitalize the organization.  We want to prove to you that we have made the progress we need to make to turn the page on the past.  We are here to serve our communities and our patients, and securing funding for in-house dental is critical for us to be able to do that.  Thank you for your consideration of this issue.

I.    **In-House Dental – Program Integrity**

Borrego's in-house dental program is providing high-quality services to Borrego's patients.  Though we presented on its program integrity efforts, please also find attached as Attachment 1 a summary of the quality assurance and compliance efforts for in-house dental. We believe these efforts should give you confidence in releasing the payment hold for in-house dental.

II.   **Substantive and Satisfactory Progress on the CAPs that Implement the Requirements of the Stipulated Agreement.**

Borrego Health has completed the vast majority of the CAP requirements. We believe the progress we've made on the CAPs demonstrates a wholesale turn-around from the prior management.  We are proud of the new organization that we've built.

A.    <u>Completed CAP Items</u>

The Monitors have signed off that all of the following tasks from CAP-1 have been completed.

- Developed and implemented a comprehensive plan to realign the organizational structure.

- Included assignment of accountability and responsibility based upon the realigned hierarchy and the specific business processes in comprehensive plan.

- Effectuated a tracking and reporting system regarding the progress of assignments.

- Recruited and filled designated executive positions with experience delineated by the Monitors.

- Developed, obtained Board of Trustees approval, and implemented an anti-nepotism policy which requires informing the Monitor and DHCS of any and all actions taken in respect to nepotism identified since the implementation of the Agreement with DHCS.

- Developed a monthly financial reporting process for all revenue and cost centers, including monthly CFO reports to executive management and the Board of Trustees.

- Developed a corporate administration overhead allocation methodology.

- Created an Independent Compliance Committee (ICC) comprised of the CCO and other senior executives of relevant departments, such as billing, clinical, human resources, finance, and operations. Granted the Compliance Committee unfettered access to the Board of Trustees for reporting.

- Revised the QMP to reflect HRSA requirements.

- Established a consistent process for documenting, attaching and referencing the actual quality monitor findings and reports in the QMC minutes.

- Reassessed the effectiveness of the QMC and added actively-practicing Borrego Health providers from each discipline as QMC members. Ensured QMC considers: The monitoring of appropriate utilization of services (i.e., over-and-under utilization); access and availability; monitoring patient outcomes; and the effectiveness of care and organizational determinations (utilization management referral process).

- Reviewed the legality of existing leases and took appropriate actions to remediate above FMV leases.

The Monitors have also signed off that all of the following tasks from CAP-2 have been completed:

- Outsourced the billing department pursuant to the agreement with Greenway Health.

- Developed an implementation project plan, which was approved by the Monitor, with a timeline leading up to the "go-live."

- Revised the Compliance Program Description (CPD) to reflect all of the required components and activities specified in the HRSA Compliance Manual, as well as the compliance requirements for an organization participating in CMS funded programs, including but not limited to Medicare and Medi-Cal.

- Compliance department provides written reports to the board of trustees and meets with the full board and compliance committee, in executive session.

- Implemented a testing protocol for all claims submitted to payers and DHCS.

- Developed and implemented a policy for documenting all patient complaints.

- Developed and implemented grievance review tools including a scoring tool for grievances.

- Trend filed grievances to identify systemic issues and processes, and/or individual physician or treating provider issues.

- Created, implemented, and distributed key metric and KPI reports to all management levels of the organization including clinic management.

- Distribute key metrics and KPI reports monthly.

- Created a process for reviewing metrics and KPIs that utilizes the information to make and implement decisions specific to the efficiency, and effectiveness of operations, as well as financial profitability.

- Established a policy that would require bidding or a request for proposal for all outside services or contracts over an established threshold amount.

- Implemented internal controls and segregated duties to prevent nepotism as well as minimize exposure of collusion and internal fraud schemes that can be perpetrated as a result of nepotistic relationships.

- Established a process that is inclusive of operations, finance and legal for the oversight of lease negotiations. This process must include, but is not limited to, the review of leases, contracts, and substantial business ventures.

- Produced a turnaround plan that addresses the overall profitability and sustainability of operations.

  o The turnaround plan must consider individual clinic performance and the reduction of corporate overhead.

  o The turnaround plan must also consider new clinics that are under construction and the production of a five-year forecast for those clinics. The five-year forecast must use realistic assumptions and indicate that the clinic is profitable within six months of commencing operations. If the forecast indicates that the clinic will lose money, then consideration must be given to the abandonment of the construction project and the costs related to such abandonment.

- Implemented an effective compliance testing program for the complete revenue cycle.

- Implemented the proper approvals and controls for all JEs prior to posting to the GL.

- Established a process in which all contingent liabilities are reviewed immediately by the Board of Trustees and the Executive Management Team when making the required representations during the annual independent audit.

- Completed a FMV analysis appraisal and provide the results to the Board of Trustees and the ICM. (Specific to Coachella / Tower Lease)

- Evaluated the legality of the leases and determined the legal options for restructuring the lease to FMV with a termination clause or outright termination. (Specific to Coachella / Tower Lease)

- Took appropriate actions to renegotiate leases and to seek other legal remedies. (Specific to Coachella / Tower Lease)

- Completed an FMV analysis appraisal as to each property in the lease agreements and provide the results to the Board of Trustees and the Monitor. (Specific to Riverside Community Health Foundation)

- Established policies and procedures that require the contract and grant department to consult with individual clinic grant recipients and

assess the ability to comply with the terms, and requirements of the grant.

- Created a standardized process for payer contracting that included an annual, or other predetermined period, review of contract terms by all departments within the organization.

- Established a program that specifically addresses staff, executive management, and Board of Trustee education and training in the area of FQHC operations, including state, federal, and local laws that pertain to an FQHC, The CA State Plan as it pertains to FQHCs, governance, financial reporting, internal controls, and ethical conduct.

- The Board established a Compliance Committee that meets monthly with Compliance Department staff. The purpose of the monthly meeting is to develop an understanding of compliance issues, discuss proposed solutions, and establish expectations for the timing of resolution of compliance program staffing, testing, and overall compliance issues.

- The Board of Trustees established a mechanism by which it is informed by management on a timely basis of human resource, compliance, finance, and operating issues.

- The Board of Trustees ensured that the executive management team implemented compliance program testing for the billing of payers.

- Reorganized the IT functions, including hiring of missing skill sets identified by the Monitors.

- Assigned to the IT Department the maintenance and configuration of all Intergy System modules and any other systems utilized by Borrego for patient care, in-house clinic, and contract medical provider billing.

- Established a process and timeline for the updating of the CPT Codes, fee schedules and payer contracts by the IT department.

- The Board of Trustees established written policies and procedures concerning the preparation, review, and submission of the Form 990. These policies address the selection of a qualified preparer, the due date of the return, the sources of information used to prepare the return, procedures used to verify the accuracy of the return, and the review and approval process by the Board of Trustees prior to the submission to the IRS, as well as the transmission of the return to the IRS, CA Franchise Tax Board, and CA Department of Justice.

B.      Efforts to Complete CAPs

While we take very seriously the outstanding items on the CAP, we also believe nearly all items are nearing completion, as demonstrated in the tracking chart produced below.  The chart summarizes each open item, as well as the Monitors' feedback as of June 29, 2022 when they last scored the CAP and a current update as to Borrego's progress.

**We realize that some of our status updates should go through the Monitor, and we intend to go through that process.  However, we wanted to be as responsive as possible to your request and are therefore providing you with the update directly.**

As always, my team and I are happy to answer any follow-up questions you may have on this topic.

| Open CAP Item | Feedback from Monitor on June 29, 2022 | Status Update from Borrego | Status |
|---|---|---|---|
| CAP-2, 3.3:  Borrego must fully effectuate all aspects of the revised Compliance Program Description. Borrego must have the Monitors review and approval prior to implementation.<br><br>CAP-2, 4.3:  Borrego must revise its Compliance Program Description to include all the information in Attachment A. Borrego must have the Monitors' review and approval prior to implementation. | "The CPD has been implemented in part, however the CPD has not been fully drafted and/or approved by the Monitors." | A draft implementing all of the Monitors' proposed changes was submitted to the Monitors for review on July 14, 2022. | Presumed complete |
| CAP-2, 4.4: Borrego must recruit and hire a compliance department team. Borrego must have the Monitors' review and approval prior to implementation.<br><br>CAP-2, 8.4:  The Board of Trustees must ensure that the compliance department and overall program is adequately staffed, and funded. | "The Board has approved the expansion of the compliance department.  The compliance department has not filled all approved positions." | The Compliance department has grown to include a Chief Compliance Officer, Director of Compliance and HIPAA Privacy Officer, 2 compliance auditors and a Director of Program Integrity. The final position for the department is a compliance analyst. An offer was made to a qualified applicant who has accepted the position with a tentative start date of August 1, 2022. | Presumed Complete |
| CAP-2, 3.4:  Borrego must implement the proper approvals, disclosures, controls and testing around the sliding fee scale. | "The Monitors would like to understand the testing methodology, the testing data for a particular month and be provided with an update as to who will be overseeing the testing process once the current individual leaves Borrego." | Operations team met with monitor Jessica Huebner on July 18, 2022 to review the process of the Sliding Fee Scale on the audit format and frequency. From the meeting, Jessica gave feedback that she felt that what was presented would satisfy the requirements of this CAP item. | Presumed Complete |
| CAP-2, 15:  Borrego must provide the Monitors access to the unredacted transcripts, audio tapes, and minutes | Item is 85% complete. | Borrego emailed the Monitors on July 20, 2022 to ask what is outstanding to satisfy this requirement. Further, a | Presumed Complete |

| Open CAP Item | Feedback from Monitor on June 29, 2022 | Status Update from Borrego | Status |
|---|---|---|---|
| of its board and board committee meetings through a secure protocol. | | formal complaint has now been filed against past board members to rectify past board practices. Borrego requests that this legal action be accepted as satisfaction of this item. | |
| CAP-1, 4.3: Develop a monthly cash flow projection by revenue and cost center, as well as the overall operations. Ensure that these reports are disseminated to Executive Management Team and the Board of Trustees timely, and that the CFO briefs both parties on the results. Submit to BRG for review and approval prior to implementation. | "BRG is unaware of any discussions that have occurred with the management team and the board at the cost center level. Borrego has only discussed the cash flow projections at the organizational level as a whole. Going forward, Borrego has informed the Monitors that they will provide a summary of capital expenditures in excess of $5,000." | On June 20, Monitors agreed with CFO Rose MacIsaac that on a monthly financial reporting basis, whatever capital expenditures there were  in excess of $5000 for that month, we would have it attributed at the level of the individual cost center that the capital expenditure was placed at. From the date of that meeting to now, there have been no capital expenditures that would warrant placement on the monthly reporting for any of the cost centers. The management team is aware of the rationale for this being that accounting for capital expenditures at the cost center level will allow for the management team and Borrego Board of Directors to decipher if there are cost centers adversely affecting cash flows not obvious by a Profits and Losses statement alone. It is the management teams opinion that they have satisfied this CAP item at 100%. | Presumed complete |
| CAP-2, 8.2:  Borrego and its operational, and payroll departments must ensure all time sheets are approved by supervisors. Borrego and its payroll department must ensure that | "While the number of manager authorizations of employees' timesheets have improved since the beginning of the year, | Borrego is at 96-97% of timesheet completion on a monthly basis.  A report will go to management each pay period so that management can implement performance | Presumed complete |

| Open CAP Item | Feedback from Monitor on June 29, 2022 | Status Update from Borrego | Status |
|---|---|---|---|
| all pay rate approvals are documented in the employee's personnel file. | Borrego is still not 100% compliant in this area." | improvement plans on noncompliant supervisors. | |
| CAP-1, 7.5:  Remediate any cost report filings that contain above FMV costs for the four leases in question by filing amended cost reports. Ensure that the appropriate related party disclosures are made in the amended filings. | "The Monitors need clarification as to whether the Julian Barn expense was included on the home office report." | The Julian Barn was not made part of any home office cost reports.  It was included in the rate setting for Julian in 2011. The license was surrendered in 2017 and operated as an intermittent clinic until 2021.  The Monitors reported this to DHCS, and DHCS A&I rate-setting auditors have been in contact with Borrego about pulling the barn expenses out of the rate setting.  This issue will be resolved through that process. | Presumed complete. Borrego will work with Monitor to ensure the Monitor is satisfied with this outcome. |
| CAP-1, 4.4: Develop a short-term and long-term forecast and business plan for Borrego. The short-term and long-term forecasts, and plans must consider three scenarios: a worse-case scenario, a mid-point scenario, as well as a best-case scenario. Submit the forecasts and plans to BRG for review and approval prior to implementation. | "Borrego has acknowledged that the budget previously prepared was inaccurate. The turnaround plan will be replacing the budget going forward but the turnaround plan has yet to be approved by the board. A draft operating budget was presented to the board the week of 6/27." | The FY budget was completed with data from the phases of the turnaround plan that have thus far been executed, including an additional reduction in force set to take place July 22 and the transfer of RCHF clinics. A short-term (12 week) liquidity forecast was presented to the finance committee of on June 27, 2022. Monitors attended this meeting and expressed satisfaction with the presentation. Sustainability was shown through the short-term liquidity forecast as well as longer-term through the budget year. Continued work with the Ankura team on completion of the turnaround plan will also  focus on revenue enhancements for consideration into the continued | Turnaround plan to be presented for Board approval on July 28, 2022 |

| Open CAP Item | Feedback from Monitor on June 29, 2022 | Status Update from Borrego | Status |
|---|---|---|---|
| | | sustainability of Borrego Health. It is anticipated that delivery of the turnaround plan will satisfy the criteria for this item. | |
| CAP-2, 12.2:  Define the process and responsibilities for documenting, and retaining patient complaints in detail, as well as the investigative findings. Borrego must submit to the Monitors for review and approval prior to implementation.

CAP-2, 4.4:  Where a quality issue is identified, the grievance process must report the quality issue to the PQI committee who must act and document the action taken. Borrego must submit to the Monitors for review and approval prior to implementation. | "Borrego is currently filtering grievances and complaints and is only forwarding to plans what they perceive as a grievance or complaint rather than forwarding 100% to the plan. Borrego continues to fail to identify complaints that are PQI and do not report it to the quality improvement team for investigation." | Addressed in detail in Section III.  In short, the new Chief Medical Officer will oversee the grievance process.  A clinical risk manager will be assigned the daily assessments of grievance and assess for any PQIs. That list will be reviewed weekly by the CMO and then sent to health plans. Trends will be tracked and cases involving PQIs will be examined bimonthly by the PQI committee.  Generated reports will be discussed with the compliance committee for report out to the executive management team and ultimately the Board of Trustees. Further, data is mapped to create monthly reports to each clinic. PQI is also a standing agenda item for the Risk Management Committee. | Will seek Monitor feedback |
| CAP-2, 12.5:  Upon the employment and staffing of a permanent senior executive team, the Board must employ a management consulting firm to evaluate each individual's management style including decision making abilities. The management consultant will work with the executive team to improve communication and the success of decision making. | "All permanent executive team positions will had been filled on or by 4/5/2022, however the VP of HR was terminated effective 6/24. Borrego is currently interviewing to fill the position." | Borrego has an accepted offer for a replacement VP of HR, who is scheduled to start 8/1/22. While Borrego supports this initiative and seeks to do it in the future, completion is not connected to compliance and is not necessary to protect DHCS from potential fraud.  We ask that dental payments not be held for this reason. | Pending filling open positions. |

III.     Improper billings for Medi-Cal Services

A.     Telehealth (and Behavioral Health) Compliance Efforts, Including Revenue Cycle Improvements

Borrego acknowledge that there have been issues with billing for telehealth services[1] since Borrego began to rely heavily on telehealth at the beginning of the COVID-19 pandemic.  We have identified certain issues that create overpayment risk, which are addressed in the next section below.

I want to assure you, though, that Borrego Health has put measures in place to ensure that it is not submitting improper claims to Medi-Cal.  We recognize that our obligation is not just to refrain from submitting claims that could constitute overpayments, but that we should also strive to submit claims that are coded as accurately as possible.  In light of this, we are in the process of a wholesale reassessment and reorganization of revenue cycle, a summary of which is below:

- As of June 28, 2022, Borrego has had a 100% claims review for telehealth and behavioral health claims.  This ensures that no improper claims are submitted.

- Compliance created a Revenue Cycle Support Plan, which formalizes the process for pre-submission claim scrubbing for telehealth (and behavioral health) claims.  This plan is attached as Attachment 2.

- Engaged Wipfli to complete training for issues identified through its audits.

   o  The following trainings have been completed:
      ▪ March 30 & 31, 2022 - FQHC Telehealth under a PHE 2022
      ▪ April 20 & 21, 2022 - E&M Leveling by Medical Decision Making
      ▪ May 4 & 5, 2022 - E&M Leveling by Total Time
      ▪ July 14 & 15 - Registration Training
      ▪ July 20, 2022- Re-visit Telehealth in the FQHC

   o  The following trainings are upcoming:
      ▪ July 27, 2022 - Documenting in the Medical Record
      ▪ August 3, 2022 - Behavioral Health

---

[1] During the COVID-19 pandemic, Borrego provided behavioral health services via telehealth.  Many of the telehealth issues are for behavioral health claims.  Addressing the telehealth issues also addresses the behavioral health issues.

- Engaged Wipfli to complete monthly audits of 10% of claims. Audit results will be reviewed for identification of potential overpayments, which will be returned in accordance with the 60 Day Rule. Preliminary findings for May 2022 indicate improvement in provider coding of telehealth consistent with provider participation in Wipfli's trainings.

- Engaged Ankura to provide an analysis of the revenue cycle team and of Greenway. The goal of Ankura's assessment is to do a complete evaluation and implement a reorganization of revenue cycle. Ankura's workplan is attached as Attachment 3.

I am confident that these measures will not only ensure that current claims submitted will be proper but will also lead to more accurate coding, more timely claim submission, and more efficient revenue cycle.

B.    Quantification of Overpayments

Borrego has engaged Hooper, Lundy, and Bookman, P.C. to analyze potential overpayments. Please find HLB's summary of outstanding overpayment analyses attached as Attachment 4.

IV.    Quality Efforts

Your letter raised two issues having to do with quality of care: Management of complaints and grievances and coordination of referrals. Obviously, quality is the highest concern for all of us at Borrego Health. I want to assure you that I hear the concerns you have raised and that we are taking immediate steps to rectify them.

Borrego Health has hired a new Chief Medical Officer to lead this charge. Dr. Kenneth Soda has extensive experience in physician executive leadership. He is a board certified family medicine physician and went on to obtain his executive masters in healthcare administration from Brown University. He has experience in clinical quality and oversight and was selected for his vision for quality that entailed whole person care. Having served as the transformation medical director for Whole Person Care Medi-Cal Waiver for Santa Clara County Health and Hospital Systems, he brings with him the knowledge of building the foundational aspects of integrating a coordinated model of care that will improve the quality and outcomes of our patient population.

Dr. Soda began his position this month. He will be leading the quality of care initiatives. I am optimistic that his addition to the team will lead to improved quality of care for Borrego's patients.

A.     Quality Improvement / Management – Managing Grievances.

Borrego Health has revamped its grievance and complaint scoring and reporting processes.  Reporting is now weekly to the plans.  Borrego Health is also recruiting additional talent with appropriate clinical quality experience.  In the interim, the Chief Medical Officer will evaluate complaints and grievances for appropriateness of PQI classification, and Borrego Health will evaluate whether internal providers may have (or need to receive) additional training to assist in the process.  The Monitor identified 40 complaints/grievances from the first two quarters that it asserts should be subject to PQI.  The Chief Medical Officer will review them.  Borrego Health will also start performing a trending analysis on complaints to identify potential areas of performance improvement.  The revised processes and workflows should sufficiently address any prior concerns with grievance/complaint reporting and scoring, and are more fully described in Attachment 5.

B.     Monitoring of Patient Care and Outcomes – Referrals and Access to Care.

A summary of Borrego's efforts to address issues with patient referrals and access to care is below.

(i)     Patient Referrals

First, the Monitors have asked Borrego to ensure that there is a reporting process to ensure that referral requests that require health plan approval are sent to the health plan within 24 hours.  This is currently in place.

Borrego has an aging process for referrals.  Urgent referrals be sent to the health plan for approval within 24 hours, and all other referrals must be sent for approval within 48 hours.  This meets or exceeds Borrego's contractual obligations with the plans.  To ensure compliance with this, an aging report is sent to the referrals manager and to individual clinic managers weekly.  The referrals managers and clinic managers must then follow-up with care coordinators for any outstanding referrals. The most recent report shows for the past week 97% (457/473)of regular referrals were submitted within 48 hours of appointment and 100% of urgent referrals (19/19) were submitted within 24 hours.

Next, it is true that there was a historical backlog of referrals that was exacerbated by the shutdown of specialist appointments during the height of the COVID-19 pandemic.  To be clear, this backlog was for all four categories of pending referrals, which includes referrals pending submission (see above for

current process), pending health plan authorization, pending appointment, and pending report.[2]

A concerted work project was launched, which significantly reduced this backlog. The workflow that was used to address this was for all referrals that did not have an upcoming appointment with a provider, the ordering provider was sent a message in the EHR to review the referral and close the referral or re-order if still indicated. Patients were then contacted via phone or letter explaining that the referral was expired and to alert the clinic if they intended to be compliant with the order. We can provide examples of patient correspondence showing the justification of closure, if needed.

(ii)    <u>Access to Care</u>

There are three important issues that Borrego is working on with respect to access to care: (1) timely access for urgent issues, (2) creation of a data system that allows for improved tracking, and (3) provider recruitment.

First, in January 2022, Borrego made changes to the provider templates (schedules) to ensure that sots are reserved for ER and hospitalization follow-ups and same-day visits. Now, all templates have automatic holds for ER and hospitalization follow-ups that will only be filled if no appointment has been scheduled in the slot 24-hours before the appointment. The automatic holds for same-day appointments can only be reserved if the triage nurse determines that specific parameters are met to establish that the patient needs a same day appointment.[3]

Second, the management team recognizes that Borrego needs to improve in how it tracks Key Performance Indicators (KPIs). The Borrego Data team has published several dashboards that are actively used to monitor clinical KPIs such as encounter volume, biller productivity, consent and registration, open encounters, and more. We have also engaged in a data program assessment with Himformatics to evaluate our data program and establish a roadmap to build a data warehouse to allow for improved access to timely data. The data team is actively working to complete all critical KPI related dashboards as a top priority. When complete, the clinic-level dashboard will facilitate real-time tracking and be reported up to the executive

---

[2] Though health plans have broader obligations to ensure beneficiary access (and Borrego is an active partner in helping to meet those goals), Borrego's contractual obligation is to timely submit the referrals, which it is doing.

[3] Note that these issues are not visible in Borrego's Third Next Available Appointment outcomes. The data the Monitor pulls for that considers only wait times for basic and complex slots. It does not account for these two template holds.

management team and board of trustees.  Access to the clinic-level data allows Borrego to initiate targeted improvement efforts.

Third, the management team recognizes the issue of provider shortage, which is not unique to Borrego Health, especially with the rural regions that we serve. We have bolstered our provider recruitment efforts to fill voids. Since the beginning of this year, Borrego Health has successfully on boarded 10 providers (2 psychiatrists, 1 pediatrician, and 7 family medicine providers).  In addition, while permanent providers are being sought, Borrego Health has been utilizing the services of 2 reputable locums agencies (CompHealth and AB staffing) that have assisted in providing interim coverage.

Of course, access to care in the desert area is a problem bigger than Borrego.  This is an incredibly underserved area.  Borrego is doing its best to try to fill this gap, and the fact that patients are not able to secure specialist appointments at Borrego or otherwise only underlines the need for Borrego to continue doing its best to offer care to this population.  Securing funding for contract dental is critical to facilitating this mission.

V.      <u>Governance and Board Oversight of Management - Disconnect and lack of communications between management and the Board of Trustees</u>

Since starting at Borrego in March, I have been dedicated to making changes to increase communication with the Board of Trustees.  I have asked our Board Chair, Sandy Hansberger, to provide perspective on this issue.  Her letter is attached as Attachment 6.

*        *        *

I appreciate your obligation to protect the integrity of the Medi-Cal program.  I am horrified by how prior management misused Borrego for their own gains.  But those days are over.  **Though we recognize that there are certain open issues for improvement, we ask that you take special consideration to note that none of them put the program at risk of being defrauded by Borrego.**  I hope that we have demonstrated to you that a payment suspension is not needed at this time.

Again, we have appreciated your candor.  In addition to evaluating the request to re-initiate payments for in-house dental, we request that you also provide feedback on what metrics Borrego must meet to terminate the monitoring process.

I am at Borrego because I truly believe in its mission.  Our communities need the services we provide, and the ongoing payment suspension puts those services in jeopardy.

I am eager to answer any of your questions or concerns.  You can reach me by email at rmacisaac@borregohealth.org or by phone at 619-306-2284.

Sincerely,


Rose MacIsaac
Interim CEO

**EXHIBIT B**

## Jordan Kearney

**From:** McPherson, Misty <misty.mcpherson@wipfli.com>
**Sent:** Tuesday, July 19, 2022 10:55 AM
**To:** Jordan Kearney; Dana Erwin
**Cc:** Petersen, Valerie
**Subject:** Wipfli / Borrego Clarification Statement

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Good day,

I wanted to clarify our final report finding for our CY 2021 review.

The 2022 audit report of findings on the Borrego Health coding and claim review of CY 2021 encounters, within specific chart types, was intended for the purpose of reviewing compliance as it relates to the claims and chart encounters reviewed and not intended to discuss financial impact on reimbursement. It is our opinion that the errors in billing/coding were due to a lack of processes in place as well as educational needs rather than intentional incorrect coding and billing. It is imperative to understand that under the scope of the audit, there will be differences between billing and coding review findings. Also noted, what is in the final report as a claim/coding error or concern, may not equate to a reimbursement concern or impact. The report submitted under contract should not be misconstrued or applied as anything other than reporting our findings in accordance to the scope outlined below and was not an audit to calculate nor report on reimbursement over or underpayments.





*Thank you*
*Take care and stay well*



**Misty McPherson, CBCS, CMAA**
***Director - Revenue Cycle***

2

*Wipfli LLP, Healthcare Practice*

651 766 2868 Office
210 332 3110 Mobile
Wipfli LLP / 150 South 5th Street, Suite 2000, Minneapolis, MN 55402
wipfli.com

Member of Allinial Global, an association of legally independent firms



The content of this email and any attached files are confidential, and may be subject to certain privilege. This email is intended for the designated recipient(s) only. If you have received this email in error, please immediately contact the sender.

Wipfli LLP
CPAs and Consultants