TENTATIVE RULING

ISSUED BY JUDGE LAURA S. TAYLOR

Adversary Case Name:   Borrego Community Health Foundation v. California Department of Health Care Services

Adversary Number:         22-90056-LT

Case Number:              22-02384-LT11

Hearing:                  2:00PM Thursday, October 6, 2022

Motion:       MOTION: (I) TO ENFORCE THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. 362; OR, ALTERNATIVELY (II) FOR TEMPORARY RESTRAINING ORDER FILED ON BEHALF OF BORREGO COMMUNITY HEALTH FOUNDATION (ON SHORTENED TIME)

Hear.

Debtor-Plaintiff Borrego Community Health Foundation moves to enforce the stay or for a temporary restraining order to prevent the California Department of Health Care Services (the "Department") from effecting a suspension of Debtor's Medi-Cal payments or taking other acts that would cause contracted health plans to transfer patients from Debtor.

**Background**

Debtor is a nonprofit Federally Qualified Health Care Center that operates 18 clinics, two pharmacies, and six mobile units in underserved areas of San Diego and Riverside Counties. Its operations serve low income and rural patients. Medi-Cal payments account for approximately 44% of Debtor's revenue. There are eight Managed Care Plans ("MCP", or "health plans") with Medi-Cal patients who use Debtor for medical care.

On August 26, 2022, the Department informed Debtor that its Medi-Cal payments would be suspended beginning September 29, 2022. This threatened suspension follows a prior suspension that began on November 18, 2020, as a result of fraud discovered in Debtor's contract dental services (as opposed to directly provided, or "in-house" dental services). Shortly thereafter, the Department limited the suspension to dental claims only; this suspension remains in effect. Debtor has ceased providing dental services through contracted providers and now only provides dental services directly. It should be emphasized that Debtor provides these services despite the dental-payment suspension. Debtor asserts that is holds approximately $6.7 million in unpaid, non-contract dental services that accrued after the imposition of the dental

1

suspension (in addition to the over $15 million in outstanding contract dental bills).

Following the identification of the fraud (Debtor argues that it self-identified the problem), major changes in Debtor's management and operations occurred. An apparently complete or near complete change in involved senior management occurred. Criminal prosecution and a civil action related to the fraud commenced. And Debtor entered into a settlement agreement with the Department. As part of that agreement, Debtor was required to retain an independent monitor selected by Department, Berkely Research Group ("BRG"). BRG implemented two "Corrective Action Plans." According to Debtor, the standards set by Department and BRG were unreasonable and exceeded the Medi-Cal requirements; yet Debtor attempted to perform in good faith.

In May of 2022, Debtor requested that the Department further limit the suspension to contract dental services and lift the requirement that Debtor employ an independent monitor. Debtor provided requested documentation and offered to do an audit of the contract dental services to identify any overpayment. But according to the Debtor, the Department did not respond with approval of or any feedback regarding its request.

Again, it is undisputed that Debtor has ceased providing contract dental services, cooperated with civil and criminal investigations, replaced much of its leadership, and brought a lawsuit against former staff and contractors involved in the fraud.

According to the Department (as set forth in its opposition to the request at issue here), based on information from BRG, in addition to being under current investigation for (past) fraud and abuse, Debtor has continuing deficiencies in the level of care provided. These include excessive wait times for appointments, excessive time between referrals and the resulting services, patient difficulty in communicating with clinics, an excessive number of grievances, some extreme and urgent grievances, and lack of adequate resolution and reporting of grievances. It also states that Debtor has continued to improperly submit Medi-Cal billings, even after being aware of improper telehealth billing. Additionally, it asserts that Debtor has breached its Settlement and CAP agreements with it, including by the failure to conduct required audits.

Debtor filed its chapter 11 bankruptcy petition on September 12, 2022. Despite the bankruptcy, the Department stated an intent to proceed with the suspension. Consequently, Debtor brought this motion. The Department agreed to maintain the status quo through October 6, 2022, to provide it more time to respond to the motion. In the meantime, at least one of the eight affected health plans begun to unilaterally transfer patients out of Debtor because of the impending suspension.

According to Debtor, the suspension would require it to shut down entirely. As a result, what the Court understands to be approximately 6,000 creditors have a grim prospect for any repayment, and approximately 700 employees will be out of work. (The loss of employment may be particularly problematic for those living in remote areas where jobs are scarce). And, if the clinics shut down, many of its 94,000 patients would face long travel times, far distances, and limited public transit to receive care. Additionally, health care centers in the surrounding areas likely lack sufficient capacity to take on such a large influx of patients.

According to the Department, the Managed Care Plans are required to and have submitted transition plans under which the patients transitioned would receive continuity of care through providers with capacity. But this "evidence" is questionable. The Department provided only a summary of what it received. The actual plans were not made available; the entirety of the submission in this regard may be hearsay unless the Department can point to an applicable exception.

On reply, the Debtor does a good job of countering the Department's allegations of ongoing problematic behavior. For example, while it acknowledges that patient complaints in numbers as outlined by the Department may exist, it also notes that this equates to only 2.7% of patient interactions during the relevant time period. The Debtor claims that this is well within the norm for entities of its type.

## Standards

### Automatic Stay

Debtor argues that the Department's actions have violated or will violate § 362(a)(1), (3), and (6). Section 362(a) states that a bankruptcy petition operates as a stay applying to all entities of:

> (1) the commencement or continuation… of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title…;
>
> …
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
>
> …
>
> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

Section 362(b)(4) provides an exception to existence of the automatic stay for actions by a government unit taken to enforce its police or regulatory power. The police or regulatory power within the meaning of the statute, involves "the

3

enforcement of laws affecting health, welfare, morals and safety, but not regulatory laws that directly conflict with the control of the res or property by the bankruptcy court." *In re Universal Life Church, Inc.*, 128 F.3d 1294, 1297 (9th Cir. 1997). To determine whether government actions fall under the § 362(b)(4) exception, courts use two tests. *Id.* (Finding "an IRS letter revoking the tax exempt status of a religious corporation… meets both" tests.). Both tests involve "factual determinations to be made based on the presentation of evidence." *In re Yun*, 476 B.R. 243, 253 (B.A.P. 9th Cir. 2012). "A suit comes within the exception of § 362(b)(4) if it satisfies either test." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1107 (9th Cir. 2005) (citing *Universal Life Church*, 128 F.3d at 1297).

Under the pecuniary interest test, "[i]f the government action is pursued solely to advance a pecuniary interest of the governmental unit, the stay will be imposed." *In re Universal Life Church, Inc.*, 128 F.3d at 1297. This exception applies to fraud detection activities, even if the government also has a pecuniary interest. *Id.* at 1298. The exception also applies to the government's attempt to prevent future occurrences of fraud. *In re Poule*, 91 B.R. 83, 87 (B.A.P. 9th Cir. 1988). The government, however, may not, use "their police or regulatory powers" to "subvert the relief afforded by the federal bankruptcy laws." *Id.* at 86, citing *In re Thomassen*, 15 B.R. 907 (9th Cir. BAP 1981).

The public policy test "distinguishes between government actions that effectuate public policy and those that adjudicate private rights." *In re Universal Life Church, Inc.*, 128 F.3d at 1297.

However, the First Circuit has noted that "[n]owhere is it mentioned that section 362(b)(4) permits government agencies to enforce *contractual* rights against debtors without first seeking relief from the automatic stay… even if [such actions are] related to the agency's general regulatory power." *In re Coporacion de Servicios Medicos Hospitalarios de Fajardo*, 805 F.2d 440, 445 (1st Cir. 1986) (emphasis in original).

And the § 362(b)(4) exception applies only to the governmental unit, regardless of whether a private party purports to act as an agent of the government in the interest of public health and safety.[1]

**Temporary Restraining Order**

The purpose of a temporary restraining order ("TRO") is to preserve the status quo and prevent irreparable harm until the court can more fully develop the record at a preliminary injunction hearing. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439

---

[1] *See Porter v. Nabors Drilling USA, L.P.*, 854 F.3d 1057, 1062 (9th Cir. 2017) ("We are not persuaded that the government's creation of a private right of action to enforce laws aimed to protect the health and safety of the public is sufficient governmental involvement to invoke the exception to the bankruptcy stay.").

4

(1974). To further this purpose, the applicant has the burden to "demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (equating constitutional standing to challenge an administrative regulation to the required irreparable harm showing); *see also Occupy Sacramento v. City of Sacramento*, No. 2:11-cv-02873-MCE, 2011 WL 5374748, 4 (E.D.Cal. Nov. 4, 2011) (denying TRO application for twenty-five day delay).

To obtain a TRO, the applicant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Small v. Avanti Health Systems, LLC*, 661 F.3d 1180, 1187 (9th Cir. 2011). Alternatively, "[a] preliminary injunction is appropriate when a[n] [applicant] demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the [applicant's] favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)). Under either test, preliminary relief requires a "clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. The analysis required to issue a TRO is "substantially identical" to that of a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

And the § 362(b)(4) exception applies only to the governmental unit, regardless of whether a private party purports to act as an agent of the government in the interest of public health and safety.[2]

**Medi-Cal Regulations**

There are several statutes relevant to the Department's attempts to suspend payments to Debtor. 42 Code of Federal Regulations § 455.23(a) requires a state Medicaid agency to suspend payments to a provider if there is a credible allegation of fraud unless there is good cause not to suspend in whole or in part. Section 455.23(c) states that the suspension is temporary in that it will continue until the agency or prosecutor determines there is insufficient evidence of fraud or legal proceedings regarding the fraud is complete. California Welfare and Institutions Code § 14107.11(a) likewise requires a temporary suspension of a provider for credible allegations of fraud. Section 14123(a)(1) also provides

---

[2] *See Porter v. Nabors Drilling USA, L.P.*, 854 F.3d 1057, 1062 (9th Cir. 2017) ("We are not persuaded that the government's creation of a private right of action to enforce laws aimed to protect the health and safety of the public is sufficient governmental involvement to invoke the exception to the bankruptcy stay.").

broad authority for suspension of a Medi-Cal service provider for a violation of other provisions of the chapter.

**Analysis**

Debtor argues that the enforcement of the threatened suspension violates § 362(a)(1), (3), and (6) (ECF No. 3). Debtor argues that the Department's failure to pay Debtor for pre- and post-petition in-house dental services likewise violates 362(a)(1), (3), and (6), including by the Department's exercise of control or dominion over Debtor's property. Debtor also argues that the Department's "direction" that the health plans transfer patients to other providers violates § 362(a)(3). On the other hand, the Department argues that its proposed actions would not violate the stay under § 362(b)(4)'s police power exception (ECF No. 30).

As a threshold matter, the Court considers the adequacy of the presented evidence. The Department objects to and moves to strike the declarations of the Patient Care Ombudsman Dr. Jacob Rubin (ECF Nos. 34 & 35). It primarily argues that his testimony is premised on hearsay, lacks foundation, lacks personal knowledge, and is speculative. *Id.* The Court will hear argument but preliminarily concludes that these objections are without merit. While performing his duties under § 333(b), Dr. Rubin personally visited Debtor's facilities and conducted an investigation (ECF No. 20). To the extent he does not have information from the Department, it does not appear that this is for lack of trying to obtain input. Moreover, the Department forgets the great leeway experts (such as Dr. Rubin) have in what they can base testimony on – including otherwise inadmissible hearsay. *See* Fed. R. Evid. 703, 705. The department's arguments go to weight – if anything. The Court will credit his declarations as it deems appropriate and currently intends to deny both motions to strike.[3]

Next, the Court must determine whether the proposed suspension will violate the automatic stay or qualify for the § 362(b)(4) police power exception. To qualify, the Department's actions must satisfy either the pecuniary purpose test or the public purpose test. *See Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1107 (9th Cir. 2005) (citing *Universal Life Church*, 128 F.3d at 1297). The Court considers each in turn.

Under the "pecuniary purpose" test, "the court determines whether the action relates primarily to the protection of the government's pecuniary interest in the debtors' property or to matters of public safety and health." *NLRB v. Cont'l Hagen Corp.*, 932 F.2d 828, 833 (9th Cir. 1991). "If the suit seeks to protect the government's pecuniary interest, the § 362(b)(4) exception does not apply. On the other hand, if the suit seeks to protect public safety and welfare, the exception does apply." *Lockyer*, 398 F.3d at 1108-09. "The purpose of the

---

[3] Indeed, the Department's consternation about Dr. Rubin's declarations ring hollow given the apparent hearsay widespread in their declarations (*see* ECF Nos. 31, 32, & 33).

6

'pecuniary purpose' test is to prevent suits that would allow a governmental unit to obtain an advantage over creditors or potential creditors in the bankruptcy proceeding." *Id.*

The Court will hear argument but preliminarily concludes that the Department fails the pecuniary purpose test. It seeks to suspend *all* post-petition payments due Debtor for services rendered (ECF No. 3). The suspended payments (essentially accounts receivable) are estate property. *In re THG Holdings, LLC*, 604 B.R. 154, 160–61 (Bankr. D. Del. 2019) (citing 11 U.S.C. § 541). Suspending millions of dollars in potential payments, regardless of whether any alleged fraud exists, clearly protects the Department's pecuniary interest in the funds. Those dollars are meant to pay Debtor for services rendered and will contribute to any Chapter 11 plan to repay creditors. Withholding them unduly allows the Department "to obtain an advantage over other creditors." *Lockyer*, 398 F.3d at 1108–09. And, it should be emphasized, that the Department requires that payments (reimbursements) cease even while noting that nothing in its payment suspension directly requires that Debtor cease to provide services. Refusing to pay for properly performed post-petition work appears to be a classic example of an attempt to control money to the detriment of all creditors and stake-holders other than the Department.

Accordingly, it appears that the Department is not entitled to the § 362(b)(4) exception under this test. This is consistent with the few courts that have encountered the issue. *See, e.g.*, *In re Medicar Ambulance Co., Inc.*, 166 B.R. 918, 927 (Bankr. N.D. Cal. 1994) (suspension of Medicare payments by the Department of Health and Human Services "directly and impermissibly conflicts with the court's control of property of the estate" and is "the equivalent of the seizure of property or the enforcement of a judgment."); *THG Holdings*, 604 B.R. 154, 161 (withholding post-petition Medicare payments for prepetition wrongs is "the exact conduct that the pecuniary interest test was designed to prohibit.").

Likewise, the Department appears to fail the public purpose test. Under that test, "the court determines whether the government seeks to effectuate public policy or to adjudicate private rights." *Lockyer*, 398 F.3d at 1109 (quoting *NLRB v. Cont'l Hagen Corp.*, 932 F.2d 828, 833 (9th Cir. 1991)). The exception applies if the government seeks the former. *Id.* If it pursues the latter – or to advantage discrete entities rather than the public – the exception does not apply. *Id.* Debtor and the Department resolved their prepetition (2020) fraud issue with a settlement agreement (ECF Nos. 3 & 30). The Department wishes to suspend all payments because of alleged breaches of this agreement (ECF No. 30). While the Department may have some contractual claim, pursuing its breach of contract remedies does not appear to serve a public purpose. *See In re Coporacion de Servicios Medicos Hospitalarios de Fajardo*, 805 F.2d 440, 445–46 (1st Cir. 1986) (Section 364(b)(4) does not permit government agencies "to enforce contractual rights, even if related to the agency's general regulatory power.").

7

The Department is not pursuing a regulatory remedy to benefit the public, such as revoking Debtor's ability to operate as a healthcare provider. Despite its questionable allegations of problems as set out in its opposition to the emergency motion, it emphasizes that its actions do not require third parties to discontinue to work with the Debtor. It is only trying to prevent funds from reaching Debtor. As in *THG Holdings*, "nothing in the record supports a finding that the Defendant['s] actions are an effort to enforce public policy." 604 B.R. at 161. All the alleged fraud occurred prepetition – plus the stay would not stop the Department from disallowing specific payments because of supposed fraud. Any argument that the Department is supporting a public interest rather than its own financial interests appears illusory. And this is particularly true given the well-documented risks to the public if the Department's grab for the purse leaves patients without care. The statements of public support for Debtor's continued operation are voluminous and compelling. The documentation of possible, indeed, probable harm to patients – people – is strong. The Court will hear argument but cannot fathom how cessation of payments achieves any public benefit.

The Department argues that, once it asserts a public purpose, the Court cannot question its intentions or legitimacy (ECF No. 30). It misconstrues the law. True, when the government exercises a police power a bankruptcy court cannot review the legitimacy of that exercise. *Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin.*, 502 U.S. 32, 40 (1991). But that is different than determining whether a government action qualifies as a police power for § 362(b)(4)'s purposes. The Department also contends that Plaintiff must exhaust all its administrative remedies with it before seeking relief from the court (ECF No. 30). This too appears to be an argument lacking merit. The Ninth Circuit has held that exhaustion of state remedies is not required in bankruptcy. *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1141 n. 11 (9th Cir. 2010).

In short, the Court does not see that the Department satisfies either pecuniary interest or public purpose tests. Thus, it is inclined to hold that § 362(b)(4) does not apply and that the stay enjoins the Department's proposed payment suspension.[4] Because the stay still applies, the court need not reach the merits of Debtor's TRO argument. At the hearing, the parties should come prepared to discuss these points.

But having said the above, the Court also notes that the Department continues to have regulatory power. It just doesn't appear to extend to this area of attempted fiscal control.

---

[4] Here the Department creates a catch-22 of epic proportions. It apparently intends to control the dollars while saying the Debtor must continue to provide services until terminated by a health plan, and it leaves the health plans in the lurch as they cannot terminate their contracts without relief from stay. One wonders how the Department thinks anyone in these underserved areas will receive health care.

8